UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SHIMON ROSENBERG, et al., KIA SCHERR,   :
et al., EMUNAH CHROMAN, et al., LINDA   :
RAGSDALE, et al., AUTUMN GILLES, et al.,   :
                                                          :                    **R E P O R T     AND**
                       Plaintiffs,   :                    **RECOMMENDATION**
                                                          :                    10-CV-5381 (DLI) (CLP)
             -against-   :                    10-CV-5382 (DLI) (CLP)
                                                          :                    10-CV-5448 (DLI) (CLP)
LASHKAR-E-TAIBA et al.,   :                    11-CV-3893 (DLI) (CLP)
                                                          :                    12-CV-5816 (DLI) (CLP)
                       Defendants.   :
                                                          :
------------------------------------------------------------- x

POLLAK, United States Magistrate Judge:

        Plaintiffs in the above-captioned cases (collectively, "plaintiffs") are American and Israeli

citizens who were injured or whose relatives were killed during the 2008 terrorist attacks in

Mumbai, India.  (Compl.[1] ¶¶ 1-5).  Plaintiffs assert damages arising under the Alien Tort Statute

("ATS"), 28 U.S.C. § 1350, and the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, against the

terrorist organization Lashkar-e-Taiba ("LeT"), and several of its alleged leaders, Mohamaed

Hafiz Sayeed ("Sayeed"),[2] Zaki ur Rehman Lakhvi ("Lakhvi"), Azam Cheema ("Cheema"), and

---

        [1]Citations to "Compl." refer to plaintiffs' Complaint, filed on November 19, 2010 in the
Eastern District of New York, Docket Number 10 CV 5381 (the "Rosenberg Complaint"). There
are four additional actions that are related to and allege substantially the same claims as this lead
case:  (1) 10 CV 5382 (the "Scherr Complaint"), (2) 10 CV 5448 (the "Chroman Complaint"),
(3) 11 CV 3893 (the "Ragsdale Complaint"), and (4) 12 CV 5816 (the "Gilles Complaint").
Since the five actions are being litigated as related actions, with the Rosenberg action designated
as the lead case (see Notice of Related Case, Dkt. Entry No. 34), unless it is necessary to
distinguish among the cases, the Court will refer to the allegations in the Rosenberg Complaint
throughout this Report and Recommendation.

        [2]At various points throughout plaintiffs' submissions, Sayeed is spelled "Saeed."  For the
purpose of clarity and consistency, the Court will refer to this defendant exclusively as "Sayeed."

1

Sajid Majid ("Majid"), as well as the Inter-Services Intelligence Directorate of the Islamic Republic of Pakistan ("ISI"), two former ISI Director Generals, Ahmed Shuja Pasha ("Pasha") and Nadeem Taj ("Taj"), as well as Major Iqbal ("Iqbal")[3] and Major Samir Ali ("Ali"), also both associated with ISI (collectively, "defendants"). (See Compl. ¶¶ 6-15). On September 30, 2013, the Honorable Dora L. Irizarry, United States District Judge, dismissed the claims in all five actions against ISI, Pasha, and Taj for lack of subject matter jurisdiction.[4] (Order 09/30/13[5] at 2).

As of the date of this Report and Recommendation, defendants LeT, Sayeed, Lakhvi, Cheema, Majid, Iqbal, and Ali have not filed an answer or otherwise responded to the Complaint. On October 22, 2013, plaintiff requested a Certificate of Default in each of the five related cases, and on November 4, 2013, the Clerk of Court entered a notation of default in each case. Thereafter, on November 12, 2013, plaintiffs filed a motion for default judgment in each case. On January 9, 2014, Judge Irizarry referred plaintiffs' motion to the undersigned to conduct an inquest and to issue a Report and Recommendation.[6] On March 6, 2014, the undersigned held a status conference in connection with the inquest. Defendants failed to appear. At the March 6, 2014 conference, the Court indicated that additional questions regarding damages would be directed to plaintiffs by written order.

---

[3]The Complaint does not specify a first name for defendant Iqbal. The Court notes that a large number of individuals of Pakistani origin have this last name.

[4]The district court entered a final judgment of dismissal of all claims against ISI, Pasha, and Taj on November 6, 2013.

[5]Citations to "Order 09/30/13" refer to Judge Irizarry's Opinion and Order, filed on September 30, 2013 (granting defendants' Motion to Dismiss).

[6]While the referral Order is only docketed on the lead case (10 CV 5381), it applies to each of the five related and above-captioned cases.

Accordingly, having reviewed the Complaint and plaintiffs' Motion for Damages, along with all of the supporting documentation, the Court respectfully recommends that plaintiffs' Motions for Default Judgment and Damages be denied at this time, without prejudice to re-file the motions with the supplementation described herein.

<u>FACTUAL BACKGROUND</u>

A.      <u>The Mumbai Terrorist Attacks</u>

Plaintiffs allege that defendant Lashkar-e-Taiba ("LeT") is a Foreign Terrorist Organization as defined in Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 302, 110 Stat. 1214 (1996), whose members were responsible for the November 26, 2008 terrorist attacks in Mumbai, India that left 166 people dead and at least 304 people wounded over the course of four days (the "Mumbai terrorist attacks"). (Compl. ¶¶ 6, 19). Plaintiffs allege that ten LeT terrorists, all of Pakistani nationality, mounted terrorist attacks targeting the Chabad House, the Oberoi Trident Hotel,[7] the Taj Mahal Hotel, the Leopold Café, the Cama and Allbless Hospital, the Metro Cinema, and the CST Railway Station. (<u>Id.</u> ¶¶ 19, 20). According to the Complaint, nine of the ten terrorists were killed during the siege. (<u>Id.</u> ¶ 20).

There are five plaintiffs in the <u>Rosenberg</u> action: Shimon Rosenberg, Nachman Holtzberg, Moses Shvarzblat, Maribeth Jeswani, and Andreina Varagona. (<u>Id.</u> ¶¶ 1-5). Plaintiff

_____

[7]At various points throughout plaintiffs' submissions, the Oberoi Trident Hotel is referred to as the "Oberoi Hotel" as well as the "Oberoi-Trident Hotel." For the sake of consistency, the Court will refer to this location as the "Oberoi Trident Hotel" throughout this Report and Recommendation.

Rosenberg, a citizen and resident of Israel, brings this action individually, and as the Legal

Guardian of M.H., who is a minor child and citizen of the United States.  (Id. ¶ 1).  He also sues

as the Personal Representative of the Estate of Gavriel Noach Holtzberg, a United States citizen

and resident of Brooklyn and Mumbai,[8] and as the Personal Representative of the Estate of Rivka

Holtzberg, a resident of Israel and Mumbai, and her remaining survivors.[9]  (Id.)  Plaintiff

Holtzberg is a United States citizen and resident of Brooklyn.  (Id. ¶ 2).  He is the father of

Gavriel Noach Holtzberg and sues on behalf of himself and other remaining survivors of Gavriel

Holtzberg.  (Id.)  Plaintiff Shvarzblat, a United States citizen and resident of New Jersey, brings

claims individually and on behalf of his deceased sister, Norma Shvarzblat-Rabinovich, a citizen

and resident of Israel and Mexico, and her survivors.  (Id. ¶ 3).  Plaintiff Jeswani is a United

States citizen and resident of Illinois, who sues on behalf of herself, the Estate of Sandeep

Jeswani, her deceased husband and a naturalized American citizen, and his survivors.  (Id. ¶ 4;

Aff. ¶ 114).  Plaintiff Varagona is a United States citizen and resident of Tennessee, who sues for

damages to compensate her for the injuries that occurred when she was shot in the right femur

and right triceps during the attack at the Oberoi Trident Hotel.  (Id. ¶ 5; Aff. ¶¶ 147-154).

The plaintiff in the Scherr action, Kia Scherr, is a United States citizen, who sues for

damages stemming from the loss of her husband, Alan Scherr, and her minor daughter N.S., both

of whom were United States citizens killed in the attack on the Oberoi Trident Hotel.  (Scherr

---

[8]According to plaintiffs' papers, Gavriel Noach Holtzberg was born in Israel and moved
to the United States when he was nine years old.  (Affirmation of James P. Kreindler in Support
of Plaintiffs' Damages Inquest ("Aff."), filed February 14, 2014 ¶ 84).

[9]Rivka Holtzberg's citizenship is not specified in plaintiffs' papers.  It appears that she is
an Israeli citizen, based on the statement that she was born and raised in Israel.  (Aff. ¶ 87).

Compl. ¶¶ 1, 42; Aff. ¶ 99).  The plaintiff in the <u>Chroman</u> action, Emunah Chroman, lost her

husband Ben Chroman,[10] a United States citizen, in the Mumbai terrorist attack on the Chabad

House.  (<u>Chroman</u> Compl. ¶¶ 1, 43).  Ms. Chroman is a citizen of Israel, who brings this action

individually, and as the Personal Representative of her husband's estate and on behalf of her

three children, who were in the process of becoming United States citizens at the time that the

<u>Chroman</u> Complaint was filed.  (<u>Id.</u> ¶ 1; Aff. ¶ 108).  Plaintiff Linda Ragsdale, a citizen of the

United States and resident of Tennessee, was shot in the back at the Oberoi Trident Hotel; she

filed the <u>Ragsdale</u> action to recover for economic losses and pain and suffering that she incurred

during the attack.  (<u>Ragsdale</u> Compl. ¶¶ 1, 44; Aff. ¶¶ 138-145).  Plaintiff Autumn Gilles,  a

citizen of the United States, was also a victim of the Mumbai terrorist attacks; she seeks damages

for post traumatic stress disorder which she suffered as a result of hiding and evading the

terrorists during the attack on the Taj Mahal Hotel.  (<u>Gilles</u> Compl. ¶¶ 1, 45; Aff. 122, 125-35).

     The plaintiffs allege that LeT is an organization based primarily in Pakistan that is

dedicated to committing acts of terrorism, particularly aimed at citizens and residents of the

United States.  (<u>Rosenberg</u> Compl. ¶ 6).  The United States government has designated LeT as a

Foreign Terrorist Organization, pursuant to 8 U.S.C. § 1189, as amended, and the Department of

the Treasury has designated LeT as a "specially designated global terrorist" entity, pursuant to 31

C.F.R. §§ 595, 596.  (<u>Id.</u> (internal citations omitted)).

     Plaintiffs allege that defendant Sayeed, a Pakistani cleric, was a leader, officer, and

director of LeT, who was listed as a "specially designated global terrorist" under the C.F.R. at all

---

[10]The Court notes that Ben Chroman is referred to as both "Bentzion Chroman" and "Ben
Zion Chroman" at various points throughout plaintiffs' submissions.  For the sake of consistency
the Court will refer to him as "Ben Chroman" throughout this Report and Recommendation.

times relevant to this action.  (Id. ¶¶ 7, 23).  Defendant Lakhvi is alleged to be a mujahedeen experienced in battles against the Soviets in Afghanistan.  (Id. ¶ 23).  He, along with defendants Cheema and Majid, are alleged to be leaders, officers, and/or directors of LeT; both Lakhvi and Cheema have been specially designated as "global terrorists."  (Id. ¶¶ 8, 9, 10).  The remaining defendants – Major Iqbal and Major Samir Ali – are alleged to be officers, employees, and/or agents of ISI, a Pakistani organization engaged in intelligence gathering and operations on behalf of the military of the Islamic Republic of Pakistani.  (Id. ¶¶ 11, 14, 15).

Plaintiffs allege that LeT openly advocates violence against the United States, India, and Israel, and had previously undertaken numerous terrorist attacks against various locations in New Delhi, Bangalore, and Mumbai.  (Id. ¶¶ 24, 28).  Plaintiffs allege that following the September 11, 2001 attacks on the United States, the government of Pakistan banned LeT from operating inside Pakistan's borders.  (Id. ¶ 25).  However, according to plaintiffs, LeT continued to operate training camps located in the Pakistani cities of Muridke, Manshera, and Muzaffarabad.  (Id. ¶ 26).  Plaintiffs allege that the ten LeT members who carried out the Mumbai terrorist attacks underwent extensive training in the use of firearms, explosives, and counter-interrogation, as well as indoctrination as to the need and justification for suicide attacks.  (Id. ¶ 29).  According to a Press Release issued by the United States Department of the Treasury, defendant Cheema, who has been described as LeT's intelligence chief, was involved in LeT's training activities, and the cell that carried out the Mumbai terrorist attacks "'received some of their training from Cheema.'"  (Id. ¶ 30 (quoting Treasury Press Release TG-944, November 4, 2010)).  The Complaint further alleges that defendant Sayeed "chose operational destinations for graduates of the LeT camps."  (Id. ¶ 27).

Plaintiffs allege that beginning in or around 2002, a Chicago resident of Pakistani descent, Daoud Gilani, also known as David Headley ("Headley"), began to build a network of connections at the direction of LeT and ISI, in preparation for the Mumbai terrorist attacks. (Id. ¶ 31). Among other things, Headley allegedly engaged in fund raising and planning efforts in New York City, and he traveled to Mumbai to perform reconnaissance of the various sites of the attacks, including the Chabad House, the Oberoi Trident Hotel, the Taj Mahal Hotel, the CST Railway station, and Leopold Café.[11] (Id. ¶¶ 31-33).

Plaintiffs allege that in September 2008, ten LeT terrorists were installed in an ISI/LeT safe house in Karachi, Pakistan, where they were "closely monitored by defendant Lakhvi" and trained to handle small boats, explosives, satellite and cellular phones, and GPS equipment. (Id. ¶ 35). According to the Complaint, "[o]n at least two occasions, defendant Lakhvi was present during the training." (Id.) Plaintiffs allege that while there, the ten terrorists received

---

[11]In the Affirmation of James P. Kreindler, Esq., plaintiffs' counsel sets forth additional facts, which appear to be derived from information provided to government authorities by Headley, following his arrest. For example, the Affirmation indicates that Headley's initial encounter with LeT took place in 2000 at a meeting in Pakistan where defendant Sayeed spoke about the importance of jihad. (Aff. ¶ 37). Thereafter, Headley allegedly completed four LeT training courses between February 2002 and August 2003, and allegedly worked directly with defendants Lakhvi, Majid, Iqbal, and Ali over the course of the next five years to prepare and plan for the Mumbai attack. (Id. ¶¶ 39-60). During that time, Headley changed his name from Daoud Gilani to David Headley to hide evidence of his Pakistani origin. (Id. ¶ 41). According to counsel's Affirmation, Headley also relocated to Mumbai and opened an immigration office at the direction of and with financial support from Majid and Iqbal, underwent additional training from Iqbal and his associates, including recognition of Indian military insignia and movements, dead drops, pick up points, and clandestine photography, and performed surveillance of public areas such as the Taj Mahal Hotel and areas related to the Indian military as requested by Iqbal, Lakhvi, and Majid. (Id. ¶¶ 43-52, 57, 58). The Affirmation also claims that Headley provided memory cards to Iqbal, Lakhvi, and Majid containing surveillance footage, assisted Iqbal, Lakhvi, and Majid in identifying target locations for the attacks, and discussed landing sites and ground transportation for those carrying out the Mumbai terrorist attacks who were to arrive by sea. (Id. ¶¶ 52-60). None of this information, however, is included in the Complaints.

instructions on their Mumbai targets.  (Id.)  Plaintiffs allege that the training took place in at least

one boat bought with ISI funds and that defendants Taj and Pasha "exerted full command and

control over the ISI" during the period of the training and throughout the attack.  (Id. ¶ 37).

According to the Complaint, the ten terrorists left Karachi on the morning of November

22, 2008 by boat, hijacked an Indian fishing vessel, and forced the captain to navigate the vessel

to Mumbai, where the captain was killed.[12]  (Id. ¶ 38).  After landing in Mumbai on the evening

of November 23, 2008, the ten terrorists paired off into five teams and proceeded to attack the

Chabad House, the Oberoi Trident Hotel, the CST Railway station, the Leopold Café and the Taj

Mahal Hotel, receiving instructions and encouragement from LeT officers, including defendant

Majid, who was located in a mission control room in Pakistan.[13]  (Id. ¶¶ 40, 49).

Gavriel Noah Holtzberg and his wife, Rivka Holtzberg, and her unborn child were killed

by LeT attackers in the Chabad House (id. ¶ 41); M.H., the couple's two year old son, witnessed

the murder of his parents.  (Id. ¶ 42).  M.H. was rescued by his caregiver and survived.  (Id.)

Norma Shvarzblat-Rabinovich, Ben Chroman, and Leibish Teitlebaum[14] were also killed during

the attack on the Chabad House.  (Id. ¶¶ 43, 47, 48).  Sandeep Jeswani was killed by LeT

attackers at the Oberoi Trident Hotel, as were Alan Scherr and his daughter N.S.  (Id. ¶¶ 44, 46).

Andreina Varagona and Linda Ragsdale were shot by the attackers at the Oberoi Trident Hotel.

---

[12]According to counsel's Affirmation, "[a]t least two of the crew [members] . . . may have
been killed by Majid, who then returned to Karachi and oversaw the rest of the Mumbai attack by
telephone from an operational center."  (Aff. ¶ 62).

[13]According to counsel's Affirmation, LeT took responsibility for initiating the attack on
November 26, 2008.  (Aff. ¶ 76).

[14]While referred to throughout plaintiffs' submissions, it does not appear that Leibish
Teitlebaum is a party to or represented by a party to these cases.

(Id. ¶ 45; Ragsdale Compl. ¶ 44).  Plaintiff Gilles was in the Taj Mahal Hotel when the LeT

attackers took over the hotel with firearms, bombs, and explosive devices.  (Gilles Compl. ¶ 45).

According to counsel's Affirmation, defendants Sayeed and Lakhvi were identified as

associates of LeT and al Qaeda by the United Nations in December 2008 and on October 27,

2009, Interpol issued Red-Corner Notices for their arrest on charges of international crime and

terrorism.  (Aff. ¶¶ 77, 79).  On October 7, 2010, Interpol issued additional arrest notices for

Iqbal, Ali, and Majid.  (Id. ¶ 79).  In April 2012, the U.S. State Department offered a reward of

$10 million for information leading to the arrest of defendant Sayeed, for his participation in the

attack.  (Aff. ¶ 81).  Finally, after the attacks, Iqbal allegedly "instructed Headly to remove any

incriminating materials from his home" and to "lay low" given the ensuing investigation.  (Id. ¶

78).

### B.    The Complaints

Plaintiffs[15] bring wrongful death claims against LeT, Sayeed, Lakhvi, Cheema, and

Majid, alleging that they were directly engaged in and provided material support or resources to

further acts of international terrorism, as defined in 18 U.S.C. § 2331, including the use of

torture, extrajudicial killing, sabotage, and hostage taking, intended to hurt and kill United States

citizens, in violation of United States criminal laws including, but not limited to, 18 U.S.C. §

2339 (Count One).  (Rosenberg Compl. ¶¶ 58, 59, 62).  It is further alleged that as a "direct and

proximate result" of these acts of terrorism, plaintiffs suffered severe and permanent injuries.

(Id. ¶ 63).

---

[15]Counts One through Six in the Rosenberg Complaint described above, are brought on behalf of all of the plaintiffs in the five actions, with the exception of plaintiffs Ragsdale and Gilles.

Count Two of the Complaint brings wrongful death claims against defendants Iqbal and

Ali, alleging that they "(as well as other officials, agents and employees of ISI), were

purposefully engaged in the direct provision of material support or resources" to further

international acts of terrorism, targeted at United States citizens, and as a "direct and proximate

result" of the defendants' actions, plaintiffs were caused to suffer severe and permanent injuries.

(Id. ¶¶ 68, 71).  Count Three alleges that defendants Iqbal and Ali acted to advance the goals of

LeT and the other named defendants "by aiding and abetting the planning and execution of the

Mumbai terrorist attacks."  (Id. ¶¶ 76, 78).

Counts Four and Five bring survival claims against defendants LeT, Sayeed, Lakhvi,

Cheema, and Majid (Count Four) and against defendants Iqbal and Ali (Count Five), alleging that

because the decedents suffered conscious pain and suffering and fear of impending death as a

direct consequence of defendants' conduct, plaintiffs' estates and/or surviving family members

are entitled to compensatory and punitive damages.  (Id. ¶¶ 83-85, 88-90).  Count Six asserts a

claim of aiding and abetting against defendants Iqbal and Ali and seeks survival damages on

behalf of the representatives and family members.  (Id. ¶¶ 93-97).

Counts Seven and Eight,[16] brought on behalf of the infant M.H. and plaintiffs Varagona,

Ragsdale, and Gilles, allege personal injury claims against LeT, Sayeed, Lakhvi, Cheema, and

Majid (Count Seven) and defendants Iqbal and Ali (Count Eight).  (Id. ¶¶ 100-06, 109-15;

Ragsdale Compl. ¶¶ 55-61, 64-70; Gilles Compl. ¶¶ 56-62, 65-71).  Finally, Count Nine[17] asserts

---

[16]These claims appear as Counts One and Two respectively, in the Ragsdale and Gilles
Complaints.

[17]This claim appears as Count Three in the Ragsdale and Gilles Complaints.

a claim of aiding and abetting against defendants Iqbal and Ali for the personal injuries suffered by M.H. and plaintiffs Varagona, Ragsdale, and Gilles.  (Rosenberg Compl. ¶¶ 118-22; Ragsdale Compl. ¶¶ 73-77; Gilles Compl. ¶¶ 74-78).

C.     The Court's Order of September 30, 2013

On July 29, 2011, following the filing of the Complaints in each action, defendants ISI, Pasha, and Taj, through counsel, moved to dismiss the claims against them for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).  Defendant ISI, an agency of the government of Pakistan, asserted that it was immune from jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603 et seq., and the individual defendants, Pasha and Taj, asserted that as foreign officials, they were entitled to immunity because their actions were alleged to have been undertaken in their official capacity.  (Order 09/30/13 at 3).

On April 23, 2012, the district court stayed the action and requested that the United States Department of State provide the Court with a statement of interest on the question of whether ISI, Pasha, and Taj were immune from suit.  (Id.)  The Department of State issued its Statement of Interest and Suggestion of Immunity, dated December 17, 2012 ("Stmnt"), taking the position that "the ISI, a fundamental part of the government of Pakistan, qualifies for foreign state immunity under the FSIA and no exception to immunity applies."  (Id. (citing Stmnt at 2-6)).  As for defendants Pasha and Taj, the Statement of Interest stated that they were "entitled to immunity from civil suit under federal common law because they are foreign officials who were sued in their official capacities."  (Id. at 3-4 (citing Stmnt at 7-11)).  Based on the position taken by the Department of State, the district court granted the motion to dismiss the claims against ISI with prejudice and the claims against Pasha and Taj without prejudice.  (Id. at 12).

The remaining defendants have not appeared in this action and based on their failure to answer or otherwise respond to the Complaint, plaintiffs moved for entry of default, which was entered on November 4, 2013.  Plaintiffs' motions for default judgment were referred to the undersigned on January 9, 2014 to conduct an inquest and issue a Report and Recommendation as to an appropriate award of damages.

## DISCUSSION

I.   Default Judgment

    A.   Legal Standard

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. 55(a).  Rule 55 sets forth a two-step process for an entry of default judgment. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993).  First, pursuant to Rule 55(a), the court clerk enters a default by noting the defaulting party's failure to respond or appear. See id. Second, if the defaulting party then fails to successfully vacate the default pursuant to Rule 55(c), the court may enter a default judgment. See Fed. R. Civ. P. 55(b).  Where the amount of damages owed requires a judicial finding, a default judgment may be entered once the court has conducted a hearing or made a referral to determine the question of damages. See Fed. R. Civ. P. 55(b).

Providing guidance as to when a default judgment is appropriate, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it "must remain a weapon of last,

rather than first, resort." Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second

Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules,

are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district

court must balance that interest with its responsibility to "[afford] litigants a reasonable chance to

be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96. Thus, in light of the "oft-stated

preference for resolving disputes on the merits," default judgments are "generally disfavored,"

and doubts should be resolved in favor of the defaulting party. Id. Accordingly, plaintiff is not

entitled to a default judgment as a matter of right simply because a party is in default. See Erwin

DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts

must "supervise default judgments with extreme care to avoid miscarriages of justice").

      The Court possesses significant discretion to consider a number of factors in deciding

whether to grant a default judgment, including whether the grounds for default are clearly

established and the amount of money potentially involved. See Hirsch v. Innovation Int'l, Inc.,

No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992). The greater the amount of

money involved, the less justification there may be for entering the default judgment. See id.

Additionally, the Court may consider whether material issues of fact remain, see Pacific M. Int'l

Corp. v. Raman Int'l Gems, Ltd., 888 F. Supp. 2d 385, 393 (S.D.N.Y. 2012), whether the facts

alleged in the complaint state a valid cause of action, see Au Bon Pain Corp. v. Artect, Inc., 653

F.2d 61, 65 (2d Cir. 1981), whether plaintiff has been substantially prejudiced by the delay

involved, see Arthur F. Williams, Inc. v. Helbig, 208 F.R.D. 41, 44-45 (E.D.N.Y. 2002), and

whether the default judgment might have a harsh effect on the defendant, see Au Bon Pain Corp.

v. Artect, Inc., 653 F.2d at 62.

When a default judgment is entered, the defendant is deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability.  Greyhound ExhibitGroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d. Cir. 1992) (citations omitted), cert. denied, 506 U.S. 1080 (1993). For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages.  See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65.

B.     Service of Process

Before determining whether a default judgment should enter in this case, the Court must first determine whether service of process was properly effected upon each defendant.  In support of their claim that service was properly effected, plaintiffs' counsel has submitted an affidavit in each case describing how process was served on each defendant.  In these five cases, because all of the defendants were residing in a foreign country, service was effected pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hague Convention").

1)     Service Upon Individuals in a Foreign Country

Rule 4 of the Federal Rules of Civil Procedure prescribes the manner in which service of process must be effected in order to subject a defendant to the court's jurisdiction.  See Fed. R. Civ. P. 4.  If a defendant does not receive service in compliance with Rule 4 and does not waive formal service, the court lacks personal jurisdiction over the defendant.  See Martin v. N.Y. State Dep't of Mental Hygiene, 588 F.2d 371, 373 (2d Cir. 1978); see also Michaelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (stating that proper service on a defendant of a summons and complaint is a prerequisite to personal

jurisdiction).  "Neither actual notice . . . nor simply naming the person in the caption of the

complaint . . . will subject defendant[] to personal jurisdiction if service was not made in

substantial compliance with Rule 4."  <u>Jackson v. Hayakawa</u>, 682 F.2d 1344, 1347 (9th Cir.

1982).

      Pursuant to Rule 4(f)(1) and (2), service upon an individual in a foreign country may be

effected in any of the following ways:

> (1) by any internationally agreed means of service that is
> reasonably calculated to give notice, such as those authorized by
> the Hague Convention on the Service Abroad of Judicial and
> Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international
> agreement allows but does not specify other means, by a method
> that is reasonably calculated to give notice:
>
> > (A) as prescribed by the foreign country's law for
> > service in that country in an action in its courts of
> > general jurisdiction;
> >
> > (B) as the foreign authority directs in response to a
> > letter rogatory or letter of request; or
> >
> > (C) unless prohibited by the foreign country's law, by:
> >
> > > (i) delivering a copy of the summons and
> > > of the complaint to the individual
> > > personally; or
> > >
> > > (ii) using any form of mail that the clerk
> > > addresses and sends to the individual and
> > > that requires a signed receipt; . . .

Fed. R. Civ. P. 4(f)(1), (2).  Rule 4(f)(3) of the Federal Rules of Civil Procedure authorizes

service "by other means not prohibited by international agreement, as the court orders."  Fed. R.

Civ. P. 4(f)(3).

2)      The Hague Convention

Turning first to subsection (f)(1) of Rule 4, service may be effected on an individual or entity in a foreign country through the Hague Convention.  The Hague Convention was designed to simplify and expedite the procedures for the extraterritorial service of documents and to ensure that defendants served abroad receive actual and timely notice of suit.  See Trump Taj Mahal Assocs. v. Hotel Servs., Inc., 183 F.R.D. 173, 176 (D.N.J. 1998).  The Convention applies to all civil cases where a judicial or extrajudicial document is transmitted for service in a foreign country, see id., and "[a]s a ratified treaty, the Convention is of course the 'supreme law of the land.'"  Ackermann v. Levine, 788 F.2d 830, 838 (2d Cir. 1986) (quoting U.S. Const. Art. VI, cl. 2).  Indeed, the Supreme Court has noted in dicta that compliance with the Convention is mandatory in all cases in which it applies.  See Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699-700 (1988).

In this case, Pakistan is a signatory to the Hague Convention (as a non-member state), HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, www.hcch.net/index_en.php?act=conventions.statusprint&cid=17, and therefore service on defendants in Pakistan under the provisions of the Convention is required.  See Michnovez v. Blair, LLC, No. 10 CV 110, 2011 WL 5239239, at *2 (D.N.H. Oct. 31, 2011); BP Products N. America, Inc. v. Dagra, 236 F.R.D. 270, 271 (E.D. Va. 2006); Felice Feder Oriental Art, Inc. v. Scanlon, No. 81 CV 5168, 1983 WL 13709, at *2 (S.D.N.Y. Dec. 8, 1983).  Thus, where, as here, service is sought to be made upon an individual believed to be residing in Pakistan, the Hague Convention governs since both the United States and Pakistan are signatories to the

16

Convention.

The Convention provides for several basic procedures for service.  Service may be effected through: (1) a member state's Central Authority pursuant to Article 5 of the Convention; (2) consular channels designated by the member state pursuant to Article 9; or (3) service by mail pursuant to Article 10(a).  See generally Trump Taj Mahal Assocs. v. Hotel Servs., Inc., 183 F.R.D. at 176-77.  Under Article 2 of the Convention, each signatory state identifies a Central Authority that is designated to receive requests for service from other countries.  In this case, Pakistan has specifically designated the Solicitor of the Ministry of Law & Justice, located at R. Bock, Pak. Sectt. in Islamabad as its Central Authority.  HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, Pakistan – Central Authority & Practical Information, http://www.hcch.net/index_en.php?act=authorities.details&aid=288.

Under Article 5 of the Convention, the Central Authority, upon receiving a request, is to either serve the document itself or arrange for service by an appropriate agency.  Hague Convention, Article 5.  Service by the Central Authority may be made by a method prescribed by the law of the country in which the Central Authority is located or "by a particular method requested by the applicant, unless such a method is incompatible with the law of [that country]."  Hague Convention, Article 5(a), (b).  If the Central Authority receives a request that it believes does not conform to the model request annexed to the Convention or does not otherwise comply with the Convention, the Central Authority shall notify the applicant of the basis for its objections.  See Hague Convention, Articles 3 and 4.

In lieu of service through the Central Authority, the Convention permits each signatory state to allow the use of consular or diplomatic channels to forward documents for service.

17

See Hague Convention, Articles 8 & 9.  Finally, the Hague Convention states that, subject to the

objection of a signatory state, the Convention is not intended to prevent a party from sending

judicial documents by mail to a foreign party, nor does it inhibit the freedom of judicial officers

or officials, or persons interested in a judicial proceeding to effect service directly through a

judicial officer, official, or other competent person in the foreign jurisdiction.  See Hague

Convention, Article 10(a), (b), (c).  Although Pakistan objected "to service of judicial documents

upon persons, other than nationals of the requesting States, residing in Pakistan, directly through

the Diplomatic and Consular agents of the requesting States" (Article 8), it did not object to

service by postal channels (Article 10(a)) or service "directly through the judicial officers of

Pakistan." (Article 10(b)).  HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW,

Declarations, http://www.hcch.net/index_en.php?act=status.comment&csid=436&disp=resdn;

see EOI Corp. v. Medical Marketing Ltd., 172 F.R.D. 133, 136-37 (D.N.J. 1997) (finding that

"Provided the State of destination does not object, the present Convention shall not interfere with

– (a) the freedom to send judicial documents, by postal channels, directly to persons abroad").

Article 10(a) of the Hague Convention has been the subject of controversy among courts

and commentators who are divided over the meaning of the phrase "freedom to send judicial

documents," which some courts have held authorizes service of process by mail.  See, e.g.,

Ackermann v. Levine, 788 F.2d at 838-39.  Other courts, however, have held that this subsection

does not sanction service of process by mail but is merely intended to provide a method for

sending subsequent documents after service has been achieved through other means.  See

Bankston v. Toyota Motor Corp., 889 F.2d 172, 174 (8th Cir. 1989) (concluding that "sending a

copy of a summons and complaint by registered mail to a defendant in a foreign country is not a

18

method of service of process permitted by the Hague Convention").

Although the Supreme Court has not considered this issue, the Second Circuit has held that this clause permits foreign service by mail where the signatory countries have not registered an objection to subsection 10(a). Ackermann v. Levine, 788 F.2d at 838-39 (noting that "[t]he reference to the freedom to send judicial documents by postal channels . . . would be superfluous unless it was related to the sending of such documents for the purpose of service") (internal citations and quotations omitted); see also EOI Corp. v. Medical Marketing Ltd., 172 F.R.D. at 137 (determining that "service by mail is consistent with the overriding purpose of the Convention to develop a comprehensive system to effectuate proper service of process in other countries") (citing R. Griggs Group Ltd. v. Filanto Spa, 920 F. Supp. 1100, 1104 (D. Nev. 1996)).

In this case, it appears that to the extent that any of the defendants maintain a presence in Pakistan, and are not located within or otherwise available for service in the United States, the Hague Convention governs, and service on such defendants should be attempted in accordance with the Convention's prescribed procedures, which in this case would authorize service by registered mail on a defendant's residence in Pakistan, pursuant to Article 10(a) of the Hague Convention. See Ackermann v. Levine, 788 F.2d at 838-39.

Plaintiffs' counsel's Affidavits of Service[18] indicate that the United States Postal Service's international mailing service, known as Global Express Guaranteed ("GXG"), was used

---

[18]The separate Affidavits of Service filed on May 4, 2011 in 10 CV 5381, 10 CV 5382, and 10 CV 5448 contain identical information and therefore will be referred to collectively as "Aff. of Service 1." A single Affidavit of Service was filed on October 21, 2013 in 11 CV 3893 and 12 CV 5861 and will be referred to as "Aff. of Service 2."

to mail packages containing copies of all of the summons and complaints to each defendant.[19]

(Aff. of Service 1 ¶¶ 9-11; Aff. of Service 2 ¶¶ 9-11).  Packages sent to Pakistan via GXG are

assigned a tracking number by the United States Postal Service ("USPS") and delivered by

Federal Express ("FedEx"), which also assigns its own tracking number.  (Aff. of Service 1 ¶ 11;

Aff. of Service 2 ¶ 11).  Plaintiffs' attorney attests that between December 11, 2010 and

December 13, 2010, packages containing summons and complaints for 10 CV 5381, 10 CV

5382, and 10 CV 5448 were delivered by GXG to Jamat ud Dawa,[20] Majid, Cheema, Iqbal, and

Ali and signed for upon delivery.  (Aff. of Service 1 ¶ 11).  However, delivery to Sayeed and

Lakhvi was initially refused.  (Id. ¶¶ 12, 14).

On December 11, 2010, counsel for plaintiffs learned that the package addressed to

Sayeed, at the address provided on the United States Department of Treasury list of Specially

Designated Global Terrorists, could not be delivered because the address used was incorrect.  (Id.

¶ 12).  Plaintiffs' attorney instructed the delivery agent to deliver the package to Sayeed at the

address of Jamat ud Dawa, which Sayeed is alleged to have founded.  (Id.)  Counsel alleges that

the package was successfully delivered on December 20, 2010.  (Id.)  Similarly, on December 13,

---

[19]Service of the summons and complaints in 11 CV 3893 and 12 CV 5861 was not attempted on ISI, Pasha, and Taj, who have been dismissed from the case.  Service on these dismissed defendants therefore will not be addressed in this Report and Recommendation.

[20]Although plaintiffs named LeT as a defendant in this action, plaintiffs allege that LeT is also known as, inter alia, Jamat ud Dawa.  (Compl. ¶ 6).  However, Jamat ud Dawa represents that it has "nothing to do with [LeT]."  (Written response dated June 1, 2011, sent by Sayeed and Jamat ud Dawa to plaintiffs' counsel regarding:  10 CV 5381, 10 CV 5382, and 10 CV 5448, and filed on May 4, 2011 as Exhibit 12 to plaintiffs' Affidavit of Service 1 (Aff. of Service 1, Ex 12) ¶ 6).  According to Jamat ud Dawa, it is "a peaceful and charitable organization . . . [that] is not involved in any terrorist activities."  (Id.)  The Court notes that while this written response by Sayeed and Jamat ud Dawa refers to itself as an "answer," it was provided only to plaintiffs' counsel and was never filed with the Court in compliance with the Federal Rules.

2010, plaintiffs' counsel was informed that delivery to Lakhvi at the Rawalpindi Central Jail, where he had been incarcerated, was refused.  (Id. ¶ 14).  Again, the delivery agent was instructed to use the address of Jamat ud Dawa, with which Lakhvi was allegedly affiliated, where the package was also allegedly successfully delivered on December 20, 2014.  (Id.)

On December 22, 2010, the packages initially delivered to Ali and Iqbal were returned to plaintiffs' counsel by ISI.  (Id. ¶ 16).  The package addressed to Iqbal had allegedly been opened, while the package for Ali appeared to be sealed.  (Id.)

In addition to attempting service by mail, in compliance with Article 10(a) of the Hague Convention, plaintiffs' counsel explains that on January 4, 2011, service was initiated on each defendant in 10 CV 5381, 10 CV 5382, and 10 CV 5448, via the Pakistan Central Authority, pursuant to Article 2 of the Hague Convention.  (Id. ¶ 19).  Packages containing a copies of the summons and complaints addressed to each defendant were delivered to the Pakistani Central Authority by GXG on January 17, 2011.  (Id.)  However, plaintiffs' counsel says that "[t]o date the Pakistan Central Authority has not informed [plaintiffs' counsel] whether it has served the documents on defendants."[21]  (Id.)

On January 11, 2011, plaintiffs' counsel received a response from Sayeed and Jamat ud Dawa, in which they argue, inter alia, that the Eastern District of New York does not have proper subject matter jurisdiction in this case, given that the events at issue occurred outside of the

---

[21]The Hague Convention requires that the Central Authority complete a certificate (which is annexed to the Convention), indicating that service was completed and describing the method, place, and date of such service, or in the alternative, if service is not effected, the certificate must set forth the reasons why not.  (Hague Convention, Article 6).  It is not clear that individual defendants should be held liable where a nation's Central Authority fails to comply with the Hague Convention.

territory of the United States.  (Id. ¶ 15, Ex. 12 ¶¶ 1, 2).  The response also suggests that suit may

not be brought under the ATS against non-United States citizens, that principles of International

Law have not been violated, that any American court would have great bias against Sayeed and

Jamat ud Dawa, and that Sayeed and Jamat ud Dawa have no relationship with LeT and are not

global terrorists.  (Id., Ex 12 ¶¶ 3-7).

On March 1, 2011, the packages sent to Majid and Lakhvi at the address of Jamat ud

Dawa were returned to plaintiffs' counsel, with the package to Majid having been opened and the

package to Lakhvi still sealed.  (Id. ¶¶ 17, 18).

Accordingly, based on the information presented in counsel's Affidavits of Service for 10

CV 5381, 10 CV 5382, and 10 CV 5448, it does not appear that service by mail was effectively

executed upon defendants Ali, Iqbal, Majid, Lakhvi, and LeT given that the packages sent to Ali,

Iqbal, Majid, and Lakhvi were ultimately returned and given that Jamat ud Dawa claims to have

no affiliation with defendant LeT.

On October 19, 2013, packages containing copies of the summons and complaints in 11

CV 3893 and 12 CV 5861 were delivered by GXG to each of the defendants and signed for upon

delivery.  (Aff. of Service 2 ¶ 11).  The Affidavit of Service does not indicate whether any of the

packages were later returned; however, the same addresses were used for Ali, Iqbal, Majid, and

Lakhvi that had resulted in the earlier packages being returned.  (See id. ¶ 10).  Additionally,

Jamat ud Dawa, which asserts that it has no affiliation with LeT, was again sent the summons

and complaints for LeT.  (Id.)

Article 1 of the Hague Convention clearly states that "[t]he Convention shall not apply

where the address of the person to be served with the document is not known."  It is not clear to

this Court that the addresses in Pakistan of defendants Ali, Iqbal, Majid, and Lakhvi will suffice as a "known address" in the country for purposes of service under the Hague Convention, given the returned packages.  If these defendants no longer have a valid address in Pakistan, then the Hague Convention does not apply, and service must be attempted under Federal Rule of Civil Procedure 4(f)(2) or (3).[22]

Given that it is not clear that service on defendants Ali, Iqbal,[23] Majid, Lakhvi, and LeT pertaining to 10 CV 5381, 10 CV 5382, 10 CV 5448, 11 CV 3893, and 12 CV 5816 was properly effected, the undersigned respectfully recommends that plaintiffs' motion for default judgment against these defendants with respect to each of these cases be denied without prejudice.  On the other hand, based on the information provided in counsel's affirmations, it appears that service on Cheema may have been effected under Article 10(a) of the Hague Convention, given that there is no indication that the packages sent to Cheema were ever returned.  Furthermore, given that Sayeed sent a response to plaintiffs' counsel concerning 10 CV 5381, 10 CV 5382, and 10

---

[22]Moreover, it is not at all clear that service on Majid and Lakhvi at the address of Jamat ud Dawa, an organization with which these defendants are allegedly affiliated, was proper.  (See Aff. of Service 1 ¶¶ 12, 14 (indicating that when the original packages addressed to Sayeed and Lakhvi were returned, plaintiffs' counsel instructed the delivery agent to instead use the address of Jamat ud Dawa); Aff. of Service 2 ¶ 10).  The Convention does not specify where and upon whom proper service by mail under Article 10(a) must be effected.  The Ackermann court held that if "the Convention is silent, federal law should govern where possible." Id. at 840.  Under the Federal Rules of Civil Procedure, as well as the New York Civil Practice Law and Rules, an individual cannot be served through service on an organization with which he or she is affiliated.  Plaintiffs have not provided sufficient information to justify service on these defendants through the organization Jamat ud Dawa.

[23]The Court also notes that the question of whether proper service was effected as to defendant Iqbal is complicated by the fact that neither the Complaint nor any supporting documents submitted by plaintiffs give a first name for this defendant, whose surname is fairly common in Pakistan.

CV 5448, it appears that those summons and complaints were effectively delivered to him and he is clearly on notice of these lawsuits.  Moreover, since there is no indication that the Summons and Complaints for 11 CV 3893 and 12 CV 5816, which were sent to Sayeed at the same address, were not delivered as well, the Court finds service was properly effected on Sayeed in those cases as well.

In summary, the undersigned respectfully recommends that the court find that there has been proper service and thus personal jurisdiction exists as to defendants Cheema and Sayeed. However, if plaintiffs wish to pursue their claims against Ali, Iqbal, Majid, Lakhvi, and LeT, they must demonstrate that these defendants have been served in compliance with the Hague Convention and Rule 4.  Plaintiffs may choose to re-serve defendants by registered mail in Pakistan, sent by the Clerk of this Court, in a manner that is consistent with the requirements of Federal Rule 4(f)(2)(C)(ii).

II.   <u>Legal Authority for Claims Brought Under the ATS and ATA</u>

Apart from issues relating to service, which must be resolved before the Court can exercise personal jurisdiction over a defendant, the Court must also determine, based on a review of the Complaints, whether it has subject matter jurisdiction to consider plaintiffs' claims, whether plaintiffs have standing to bring these claims and, accepting plaintiffs' claims as true for purposes of this default motion, whether plaintiffs have stated a valid claim against each defendant.  At the end of each count in their Complaints, plaintiffs assert that the Court "has the authority and jurisdiction to hear plaintiffs['] claims and award plaintiffs damages pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity jurisdiction), 1350 (alien tort claims act) and

2333 (civil remedies)."  (Rosenberg Compl. ¶¶ 66, 74, 86, 91, 98, 107, 116, 123).  Since

plaintiffs have not distinguished the statutory basis as to which claims are brought on behalf of

which plaintiffs, the Court considers the claims under each statute separately.

A.    Alien Tort Statute

Turning to plaintiffs' claims brought pursuant to the Alien Tort Statute ("ATS"), 28

U.S.C. § 1350, the statute provides that "district courts shall have original jurisdiction in any

civil action *by an alien* for a tort only, committed in violation of the law of nations or a treaty of

the United States."  28 U.S.C. § 1350 (emphasis supplied).  This is a jurisdictional statute that

does not expressly provide a cause of action, but instead allows federal courts to hear certain

common law claims.  Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1663 (2013); see

Sosa v. Alvarez Machain, 542 U.S. 692, 714 (2004) (holding that the grant of jurisdiction allows

federal courts to "recognize private claims" based on "the understanding that the common law

would provide a cause of action for [a] modest number of international law violations").

1)    Subject Matter Jurisdiction After Kiobel

In Kiobel v. Royal Dutch Petroleum Co., the Supreme Court held that "the presumption

against extraterritoriality applies to claims under the ATS," and that given the historical context

in which the statute was enacted, there is no suggestion that Congress "intended federal common

law under the ATS to provide a cause of action for conduct occurring in the territory of another

sovereign."  133 S. Ct. at 1660, 1668-69; see also Balintulo v. Daimler AG, 727 F.3d 174, 182

(2d Cir. 2013) (finding that the decision in Kiobel "plainly bars common-law suits . . . alleging

violations of customary international law based solely on conduct occurring abroad"); Sikhs For

Justice v. Gandhi, No. 13 CV 4920, 2014 WL 2573487, at *2 (E.D.N.Y. 2014) (finding that since

25

all of the events at issue took place in India, claims brought under the ATS should be dismissed

for lack of subject matter jurisdiction given that Kiobel expressly barred claims under the ATS

for conduct occurring within the territory of a country other than the United States). The Court in

Kiobel further opined that "even where the claims touch and concern the territory of the United

States, they must do so with sufficient force to displace the presumption against extraterritorial

application." 133 S. Ct. at 1669.

While the majority opinion in Kiobel did not further elaborate on what would be

sufficient, Justice Kennedy in his concurring opinion noted that the "'presumption against

extraterritorial application would be a craven watchdog indeed if it retreated to its kennel

whenever *some* domestic activity is involved in the case.'" Id. at 1670 (quoting Morrison v.

Nat'l Australia Bank Ltd., 561 U.S. 247, 266, 130 S. Ct. 2869, 2884 (2010)) (emphasis in

original). Citing the decision in Sosa, Justice Kennedy explained that when the ATS was

enacted, the focus was on "'three principal offenses against the law of nations . . . : violation of

safe conducts, infringement of the rights of ambassadors, and piracy.'" Id. (quoting Sosa v.

Alvarez-Machain, 542 U.S. at 723-24). In Justice Kennedy's view then, a cause of action under

the ATS would be barred unless the domestic conduct involved was sufficient to violate an

international law norm that was consistent with Sosa's "requirements of definiteness and

acceptance among civilized nations." Id. Justice Breyer, in his concurring opinion joined by

Justices Ginsburg, Sotomayor, and Kagan, expressed the view that the statute would provide

jurisdiction where "(1) the alleged tort occurs on American soil, (2) the defendant is an American

national, or (3) the defendant's conduct substantially and adversely affects an important

American national interest, and that includes a distinct interest in preventing the United States

from becoming a safe harbor . . . for a torturer or other common enemy of mankind." Id. at 1674.

Therefore, while "a plaintiff may plead a theory of aiding and abetting liability' under the ATS," Balintulo v. Daimler AG, 727 F.3d at 183 (quoting Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 260 (2d Cir. 2007) (internal quotations omitted), it is not clear that the plaintiffs in the instant case have set forth sufficient facts to demonstrate that the alleged misconduct "touch[es] and concern[s] the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." See Balintulo v. Daimler AG, 727 F.3d at 190 (citing Kiobel v. Royal Dutch Petroleum, 133 S. Ct. at 1669) (internal quotations omitted)). Specifically, in the Balintulo case, the action was brought against various corporate defendants whose South African subsidiaries, agents, or alter egos allegedly aided and abetted violations of international law by engaging in practices that supported the South African apartheid regime, including employment discrimination, suppression of political speech and union organizing, arrests, detention, torture, exile, manufacturing and supplying vehicles and equipment to apartheid security forces, and providing technology to assist in tracking and restricting the movement of black South Africans. Id. at 182-83. In that case, the Second Circuit found that the Supreme Court's decision in Kiobel barred plaintiffs' claims because plaintiffs "failed to allege that any relevant conduct occurred in the United States." Id. at 189.

In one of the few decisions to address this issue following Kiobel, a magistrate judge in the District of Columbia found that a terrorist attack on the United States Embassy in Nairobi was "tied much more closely to our national interests than a case whose only tie to our nation is a corporate presence here." Mwani v. Bin Laden, 947 F. Supp. 2d 1, 5 (D.D.C. 2013). The court concluded that such a terrorist attack plotted in part in the United States and "directed at a United

States Embassy and its employees," fell within the "narrow category of cases for which the presumption against extraterritorial application of the ATS is displaced." Id.

In the instant case, it is undisputed that the actual terrorist attacks occurred on foreign soil and not in the United States. However, the Complaints allege that "[t]he support, planning, organization[,] and funding of the Mumbai terrorist attack came from, among other places, United States sources." (Compl. ¶ 61). Specifically, plaintiffs assert that Headley, an individual of Pakistani descent, assisted in coordinating the attack by building a "network of connections" between Chicago, New York City, and Pakistan. (Id. ¶ 31). Plaintiffs allege that Headley not only raised funds to support the attacks, but traveled to India where he engaged in surveillance, and performed reconnaissance of the planned sites of the Mumbai attack, at the direction of and with the material support from both the LeT and ISI. (Id. ¶¶ 31, 32, 34). Headley allegedly provided reports of his surveillance to the LeT and ISI and took additional instructions from those groups. (Id. ¶ 33).

The Complaints further allege that LeT is an organization dedicated to committing acts of terrorism against citizens and residents of "among other places," the United States. (Id. ¶ 6). However, unlike the Mwani case, the targets here do not appear to have been exclusively American institutions. Indeed, the Complaints are largely silent with respect to any allegations as to why the specific targets were chosen, although counsel's affidavit asserts that the Leopold Café and Taj Mahal Hotel were "Mumbai icons" (Aff. ¶¶ 66, 67), and the Chabad House was "owned and operated by a Jewish organization as a welcome drop in center for travelers to India." (Id. ¶ 73). In counsel's affidavit, he notes that in 2003, the ISI launched the "Karachi Project," which targeted urban centers in India (id. ¶ 27), and that the Chabad House was chosen

28

in part because it was "a front office for the Mossad." (Id. ¶ 57). Given that the Complaints allege that LeT had previously carried out an attack on the Indian Parliament, and attacks in New Delhi, Bangalore, and Mumbai (Compl. ¶ 24), it is not clear that the targets here were in fact United States citizens or American institutions. See, e.g., Kaplan v. Central Bank of the Islamic Republic of Iran, 961 F. Supp. 2d 185, 205 (D.D.C. 2013) (distinguishing the case from Mwani based on the finding that "[t]rue some of the individuals affected by the attacks are American, but there is no indication that the attack was specifically targeted at Americans, rather than Israelis").

In summary, although it appears then that the claims may "touch and concern the territory of the United States," it is unclear whether this conduct, as alleged in the Complaints, does so "with sufficient force to displace the presumption against extraterritorial application." See Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. at 1669.

Given that the Complaints in these actions were filed in 2010, 2011, and 2012, prior to the Supreme Court's recent decision in Kiobel, it is unclear whether plaintiffs are precluded from proceeding with their claims under the ATS. At this stage, based on the facts alleged and existing case law, the Court is unable to recommend that default judgment enter in favor of the plaintiffs under the ATS. It is recommended, however, that plaintiffs be given an opportunity to address the question of subject matter jurisdiction under the ATS in light of Kiobel.

2)    Standing

Apart from the jurisdictional issue that may prevent plaintiffs from succeeding on their ATS claims, there is a second fundamental question as to whether the various plaintiffs in these combined actions possess the requisite standing to bring claims under the ATS. As the Second Circuit noted in Rothstein v. UBS AG, "[n]o principle is more fundamental to the judiciary's

29

proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. . . . The concept of standing is part of this limitation." 708 F.3d 82, 90 (2d Cir. 2013).

Here, the plain language of the ATS appears to provide a right to relief for only "aliens" or non-United States citizens: "The district courts shall have original jurisdiction of any civil action by an *alien*. . . ." 28 U.S.C. § 1350 (emphasis added); see Kaplan v. Central Bank of Islamic Republic of Iran, 961 F. Supp. 2d at 205 (noting that the "non-American plaintiffs have asserted ATS claims . . ."); Miner v. Begum, 8 F. Supp. 2d 643, 644 (S.D. Tex. 1998) (finding that "where the plaintiff is not an alien, there can be no federal jurisdiction under the [ATS]").

However, the statute is silent regarding a plaintiff's standing to bring suit based on injury to another. See Beanal v. Freeport-McMoRan, Inc., 969 F. Supp. 362, 368 (E.D. La. 1997) (citing Xuncax v. Gramajo, 886 F. Supp. 162, 189 (D. Mass. 1995)). It is also unclear from the language of the ATS whether it is the plaintiff's representative or the decedent who must be an "alien" in order to maintain a right to relief under the statute. Consequently, a federal court interpreting the statute must look to state law to determine who has proper standing to bring a civil action under the ATS on behalf of a decedent. See Beanal v. Freeport-McMoRan, Inc., 969 F. Supp. at 368 (citing LA. CIV. CODE ART. 2315.2) (looking to Louisiana law to determine who was entitled to bring suit under the ATS and finding that because in Louisiana a wrongful death action may not be brought by a non-relative of the victim, the plaintiff, who was not identified as a relative, did not have standing to sue under the ATS on any victim's behalf); see also Fed. R. Civ. P. 17(b) (setting forth the rule that capacity to sue as a representative of an estate is to be determined by the law of the state in which the district court sits); Graham v. Henderson, 224

30

F.R.D. 59, 62 (N.D.N.Y. 2004).

In New York, under the Estates, Powers and Trusts Law (the "EPTL"),"[n]o cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed." EST. POWERS & TRUSTS § 11-3.2(2)(b). Thus, if a person who had a cause of action for injury to her person or property dies, a personal representative of the decedent may commence or continue an action against the tortfeasor. See EST. POWERS & TRUSTS §§ 5-4, 11-3.2(2)(b). However, the converse is thus also true; where the decedent did not have a cause of action while she was alive, the personal representative may not bring an action on her behalf after her death. See Tuosto v. Philip Morris USA Inc, 672 F. Supp. 2d 350, 367 (S.D.N.Y. 2009) (explaining that in order "to proceed in this action, [plaintiff] must first properly plead that the decedent could have brought an action against [defendant] for injuries caused by a 'wrongful act, neglect or default.'") (citing Prink v. Rockefeller Center, Inc., 48 N.Y.2d 309, 315-16, 422 N.Y.S.2d 911, 915, 398 N.E.2d 517, 521 (1979)).

Accordingly, it appears that no cause of action exists under the ATS for the vast majority of plaintiffs' claims which are brought in these actions on behalf of United States citizens or the estates of United States citizens. Indeed, with the possible exception of claims brought on behalf of the Estate of Rivka Holtzberg, who may be an Israeli citizen,[24] and the Estate of Norma Shvarzblat-Rabinovich, who is an Israeli and Mexican citizen (Compl. ¶ 3), it appears that the claims in each of the above captioned actions are brought by or on behalf of United States citizens, and therefore are not proper under the ATS. Moreover, with the exception of Shimon

---

[24]The citizenship of Rivka Holtzberg is not specified; however, she apparently "was born and grew up in Israel" (see Aff. ¶ 87), and was a resident of both Israel and India. (Compl ¶ 1).

Rosenberg and Emunah Chroman, who are Israeli citizens (Compl. ¶ 1; Chroman Compl. ¶ 1), the personal representatives of the victims in these actions also appear to be American citizens and thus cannot sue for damages on their own behalf. Similarly, plaintiffs indicate that Ben Chroman's three children, on behalf of whom damages are also claimed, are either United States citizens or in the process of being naturalized. (Aff. ¶ 108). With respect to the claims of the other surviving family members of most of the victims, it is unknown whether these family members are citizens or non-citizens; thus, standing to bring civil actions under the ATS on these individuals' behalf cannot be determined at this time.

Finally, the Court notes that under the New York EPTL, "[a] personal representative is a person who has received letters to administer the estate of a decedent." EST. POWERS & TRUSTS § 1-2.13. Thus, in order to represent an estate one must obtain specific letters testamentary and provide them to the court. Estate of Vaiselberg ex rel v. Snow, No. 02 CV 6235, 2003 WL 1878248, at *1 (S.D.N.Y. April 14, 2003) (finding that since Howard Vaiselberg, attempting to sue on behalf of the estate of his mother, was not a "personal representative" with letters to administer his mother's estate, he therefore lacked capacity to bring the suit); Graham v. Henderson, 224 F.R.D. at 64 (finding that "[t]he law of the forum state determines the capacity of the parties to sue and be sued" and determining that "under the applicable New York law, a representative is a person who has received letters to administer the estate of a decedent") (citing Collins v. Am. Automobile Ins. Co., 230 F.2d 416, 422 (2d Cir. 1956); EST. POWERS & TRUSTS § 1–2.13).

In the instant cases, plaintiffs have not provided letters testamentary to the Court showing that this requirement has been satisfied. Indeed, plaintiffs' submissions indicate that certain

plaintiffs, including Emunah Chroman, Maribeth Jeswani, and Moses Shvarzblat, "ha[ve] been or will be appointed" as personal representatives.   (See e.g., Compl. ¶¶ 3, 4, 94, 108; Chroman Compl. ¶ 1).  However, at this time, the Court does not know whether such appointments have in fact been finalized, and, in the absence of supporting documentation to establish the representative status of these and other plaintiffs, the Court is unable to determine whether or not they may pursue their claims.[25]

Accordingly, the Court respectfully recommends that plaintiffs' motion for default judgment based on claims brought under the ATS be denied without prejudice.  The Court also recommends that if plaintiffs wish to pursue these claims, they must provide the Court with legal authority explaining why federal jurisdiction exists pursuant to the ATS.  Plaintiffs are asked to specifically address whether, after Kiobel, jurisdiction exists to consider the claims in the Complaints and in addition to provide sufficiently detailed information for the Court to decide whether the plaintiffs have standing to bring suit both in their individual and representative capacities under the ATS, including how legal relief could be available under the statute for plaintiffs who are United States citizens or representing United States citizens in these actions.

B.    The Antiterrorism Act

Plaintiffs also bring their claims under the Antiterrorism Act, 18 U.S.C. § 2333.  The ATA provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in an appropriate district court of the United States and shall recover

---

[25]The Court notes that this applies to both claims brought under the ATA as well as under the ATS.

threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). The statute defines "international terrorism" as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or any State; (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnaping.

18 U.S.C. § 2331(1)(A), (B). The statute further provides that the acts must "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." 18 U.S.C. § 2331(1)(C).

1)      Aiding and Abetting Claims Against Iqbal and Ali

In Rothstein v. UBS AG, 708 F.3d 82 (2d Cir. 2013), the Second Circuit considered claims that UBS AG facilitated certain terrorist attacks in Israel by furnishing United States currency to Iran, which the State Department had designated a state sponsor of terrorism. Noting that the first count of the Complaint asserted a claim based on UBS AG's liability as an aider and abettor of international terrorism, the court held that "[w]e are not persuaded that Congress intended to permit recovery under Section 2333 on a showing of less than proximate cause," and that because the ATA was "silent as to the permissibility of aiding and abetting liability," the claims against UBS AG were properly dismissed. Id. at 95, 97-98 (deciding that "[w]e doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence") (internal citation omitted).

34

In this case, Counts Three, Six, and Nine of the <u>Rosenberg</u> Complaint and Count Three of the <u>Ragsdale</u> and <u>Gilles</u> Complaints assert claims against defendants Iqbal and Ali based on a theory of aiding and abetting liability, relying on Section 2333.  Thus, it appears that these claims are subject to dismissal for failure to state a claim upon which relief can be granted.  Accordingly, the Court respectfully recommends that plaintiffs' motion for default judgment against defendants Ali and Iqbal for aiding and abetting violations of Section 2333 under Counts Three, Six, and Nine of the <u>Rosenberg</u> Complaint and Count Three of the <u>Ragsdale</u> and <u>Gilles</u> Complaints be denied without prejudice.  Again, if plaintiffs can provide legal authority for proceeding on these Counts, the Court would recommend that the motion be reconsidered.

     2)    <u>Immunity for Iqbal and Ali</u>

Although Counts Two and Eight of the <u>Rosenberg</u> Complaint and Count Two of the <u>Ragsdale</u> and <u>Gilles</u> Complaints allege wrongful death and personal injury claims directly against defendants Iqbal and Ali based on their conduct in directing the conduct of others and engaging in the provision of material support or resources to the LeT terrorists, plaintiffs have failed to explain why Iqbal and Ali, both alleged to be officers of ISI, stand in a different position from Taj and Pasha, defendants who were dismissed as foreign officials immune from suit under the FSIA.  (Order 09/30/13 at 13).  Although neither Iqbal or Ali have appeared in this matter to raise the defense of immunity, the Supreme Court in <u>Samantar v. Yousef</u>, 560 U.S. 305, 311, 103 S. Ct. 2278, 2284 (2010), held that if the United States does not take a position as to a foreign official's immunity, "a district court 'ha[s] authority to decide for itself whether all the requisites for such immunity exist[].'"  The Court further held that in making this determination, the district court should apply "the established policy of the [Department of State]."  <u>Id.</u> (internal quotations

35

and citations omitted).

In this case, although the Department of State did not explicitly consider the issue of immunity as to Iqbal and Ali, the Department's Statement of Interest notes that "[t]he [C]omplaint contains largely unspecific and conclusory allegations against [Pasha and Taj], and relies centrally on plaintiffs' view that the ISI is not part of the Government of Pakistan." (Stmnt at 10). The Statement of Interest further notes that the Complaint does not refer "to any private conduct by defendants" but only to the actions of Pasha and Taj as Directors General of the ISI, exercising "full command and control over the ISI." (Id. at 10-11). Reasoning that acts of foreign officials sued for the exercise of the powers of their office are "treated as acts taken in an official capacity," the State Department took the position that defendants Pasha and Taj were immune from suit because they acted in their official capacity as directors of an entity that is part of the government of Pakistan. (Id. at 10-11).

The allegations against defendants Iqbal and Ali are similarly conclusory; indeed, apart from alleging that Iqbal and Ali were at all times "officer[s], employee[s] and/or agent of ISI," rather than the Director General of ISI, the allegations as to the acts taken by Iqbal and Ali in connection with the Mumbai terrorist attack are the same as those alleged against Pasha and Taj. (See Compl. ¶¶ 14, 15). Nothing in the Complaints allege that Iqbal or Ali were acting in their personal capacity; rather, these defendants, like Pasha and Taj, are alleged to have been acting as officers of an entity of the Government of Pakistan. Under the principles announced by the Department of State with respect to Pasha and Taj, this Court finds that on their face, the claims

against Iqbal and Ali also appear to subject them to immunity as foreign officials.[26]

However, because this issue implicates questions of subject matter jurisdiction and because plaintiffs have not addressed this issue in their papers in support of damages, the Court respectfully recommends that plaintiffs' request for damages against defendants Iqbal and Ali be denied without prejudice and that plaintiffs be given an opportunity to address: 1) whether Iqbal and Ali, as officers of ISI, are subject to immunity from suit for the same reasons that Pasha and Taj were held immune; 2) even if not immune from suit, may Iqbal and Ali be held liable under a theory of aiding and abetting; and 3) if not, do the allegations in Counts Two and Eight of the Complaints sufficiently state a claim against these defendants under Section 2333 of the ATA.

 3) <u>ATA Liability for Sayeed, Lakhvi, Majid, and Cheema</u>

With respect to the claims brought against defendants Sayeed, Lakhvi, Majid, and Cheema, the plaintiffs' Complaints must allege facts sufficient to establish: 1) that plaintiffs are "nationals" of the United States; 2) who suffered an injury; 3) by reason of an act of international terrorism. 18 U.S.C. § 2333(a). In addition to pleading a predicate act of international terrorism, plaintiffs must also plead the requisite mental state and causation. <u>Gill v. Arab Bank, PLC</u>, 893 F. Supp. 2d 474, 502 (E.D.N.Y. 2012); <u>see also</u> <u>Ahmad v. Christian Friends of Israeli Communities</u>, No. 13 CV 3376, 2014 WL 1796322, *2 (S.D.N.Y. May 5, 2014). With respect to the element of scienter, the case law requires an allegation that "the defendant must have known or intended that the support would be used in preparation for, or in carrying out, violations of

---

[26]Even in counsel's Affirmation, it is alleged that Major Iqbal "was the contact or handler" for Headley "on behalf of the ISI," further supporting the proposition that Iqbal should be subject to immunity because he was acting in his official capacity, as an officer of ISI. (Aff. ¶ 36).

certain federal criminal statutes." Ahmad v. Christian Friends of Israeli Communities, 2014 WL 1796322, at *3.  As for causation, plaintiffs must plead that defendants' actions were "'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" Id. (quoting Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 426 (E.D.N.Y. 2013)).

In their Complaints, plaintiffs allege that defendant Sayeed was "a leader, officer and/or director of LeT," who has been listed "as a 'specially designated global terrorist.'"  (Rosenberg Compl. ¶¶ 7, 23).  Defendant Sayeed is further alleged to have chosen "operational destinations for graduates of the LeT [training] camps."  (Id. ¶ 27).

Defendant Cheema, who has also been designated as a global terrorist, is alleged to be "a leader, officer and/or director," as well as "intelligence chief" of LeT.  (Id. ¶¶ 9, 30).  According to the Complaint, defendant Cheema was involved in LeT's training activities and the cell that was engaged in the Mumbai terrorist attacks "received some of their training from Cheema."  (Id. ¶ 30 (internal quotations omitted)).

Defendant Lakhvi is alleged to be a mujahedeen, experienced in battle, who is also a leader of LeT and who has also been designated as a global terrorist.  (Id. ¶¶ 8, 23).  It is alleged in the Complaint that on two occasions, Lakhvi was present during the training of the Mumbai terrorists and that they were monitored and trained by Lakhvi while installed in a safe house in Karachi.  (Id. ¶ 35).

Defendant Majid is also alleged to be "a leader, officer and/or director of LeT," who was present in the control room in Pakistan and gave instructions and encouragement to the Mumbai terrorists during the attacks.  (Id. ¶¶ 10, 49).

38

The Complaint alleges that all of the defendants were engaged directly in providing

> material support or resources (including but not limited to
> provision of property; services; currency; monetary instruments or
> financial securities; financial services; lodging; training; expert
> advice or assistance; safehouses, false documentation or
> identification; communications equipment; facilities; weapons;
> lethal substances; explosives; personnel and/or transportation) to
> further and aid the international acts of torture, extrajudicial
> killing, sabotage and hostage taking, which acts were intended to
> and did target, hurt and kill United States citizens, among others.

(Compl. ¶¶ 59, 68).  The Complaint further alleges that the actions of defendants LeT, Sayeed,

Lakhvi, Cheema, and Majid constituted direct acts of international terrorism as defined in 18

U.S.C. § 2231, and constitute violations of the criminal laws of the United States, including

violations of 18 U.S.C. § 2339,[27] that were designed to intimidate or coerce a civilian population

or influence government policy through coercion or intimidation.  (Id. ¶ 62).  The Complaint

further alleges that "[a]s a direct and proximate result of the direct acts of terrorism committed"

by the named defendants, plaintiffs and their decedents suffered severe and permanent injuries.

(Id. ¶¶ 63, 71, 78, 83, 88, 95, 102, 111, 120).

Although on a motion for default judgment, the Court considers the facts as alleged in the

complaint to be true, the factual allegations of the complaint must still "be enough to raise a right

to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007),

and there must be sufficient factual content to allow the court "to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678

---

[27]Section 2339 of the ATA provides:  "Whoever harbors or conceals any person who he knows, or has reasonable grounds to believe, has committed, or is about to commit, an offense under . . . section 2332b (relating to acts of terrorism transcending national boundaries) . . . shall be fined . . . or imprisoned . . . ."  18 U.S.C. § 2339(a).  Apart from a citation in the Complaints to this section, plaintiffs do not allege any specific facts to support a claim under this section.

(2009).  As the Second Circuit in <u>Rothstein</u> noted in reviewing a complaint under the ATA, "[i]n addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations."  <u>Rothstein v. UBS AG</u>, 708 F.3d at 94.

Here, the allegations against each of these four defendants are extremely sparse and conclusory.  With respect to defendant Majid, he is alleged to have provided support and encouragement from the control room in Pakistan while the terrorist attack was occurring, so factually that suggests knowledge and involvement on his part.  Similarly, defendant Lakhvi is alleged to have provided a safe house and training directly to the Mumbai terrorists, again supporting an inference of knowledge and personal involvement.  However, with respect to defendants Sayeed and Cheema, apart from alleging that they are officers and leaders of LeT, the allegations in the Complaint indicate only that they were involved in either training LeT terrorists and selecting sites for LeT operations, but there is nothing that specifically ties them factually to the Mumbai terrorist attacks.

In counsel's affirmation, he adds certain additional facts that provide further support for the allegations in the Complaint.[28]  Among other things, counsel's affirmation represents that in 2001, Majid became a senior member of LeT as well as Lakhvi's personal assistant.  (Aff. ¶ 21).  In 2006, Majid became head of LeT's external operations; as such, he supervised the training of the Mumbai attackers and supervised the 2008 Mumbai attack from Pakistan.  (<u>Id.</u> ¶¶ 7, 21).

Counsel also indicates that upon his arrest, Headley cooperated with authorities and provided additional information concerning defendants' activity and conduct.  (<u>Id.</u> ¶ 36).

---

[28]<u>See also</u> <u>supra</u> note 11, at 7.

40

According to counsel's affirmation, Headley met with defendant Sayeed in Pakistan in 2000, where Headley was inspired by Sayeed's statement that "One second spent conducting jihad was superior to 100 years of worship." (Id. ¶ 37). Headley also trained at LeT camps in 2002 and 2003; when he expressed the desire to fight in Kashimir at the conclusion of his training, Lakhvi told Headley that the LeT "had something better in mind for him." (Id. ¶¶ 38, 39). Counsel's affirmation states that "[t]hroughout the training[,] Lakhvi, Majid[,] and Cheema supervised and closely monitored the group of ten" individuals selected to carry out the attack in Mumbai. (Id. ¶¶ 34, 35).

By the summer of 2005, Headley was assigned to Majid's "group" and Majid became his handler. (Id. ¶ 41). According to Headley, he met with Lakhvi and Majid, who told him to film the Taj Mahal Hotel. (Id. ¶ 46). Upon his return to Pakistan in November 2007, Headley met with Majid and Iqbal several times and Iqbal gave him $20,000 in Indian currency for expenses. (Id. ¶ 52). In December 2007, Headley discussed with Majid an attack on the Taj Mahal Hotel, and later met with Majid and Lakhvi where they discussed possible landing sites in Mumbai. (Id. ¶¶ 53, 54). In April 2008, Headley returned to Mumbai and before leaving for Pakistan, reported to Majid and Lakhvi regarding the surveillance he had performed. (Id. ¶ 55). He met again with Lakhvi and Majid in Pakistan in June 2008 where he was told that the Chabad House had been selected as a target because it was a front for the Mossad. (Id. ¶ 57). Headley allegedly received an email from Majid, using the name Wasi (the name Majid allegedly used during the attacks), and met again with Majid in July 2008 to report on his surveillance activity. (Id. ¶¶ 56, 59). Majid informed Headley that Majid was training the LeT attack team in Muzaffarabad. (Id. ¶ 60). Counsel's affirmation also alleges that Majid instructed LeT members to murder individual

foreigners under their control during the 2008 attack and that he may have personally killed two members of an Indian fishing boat crew when it was overtaken by the attackers.  (Id. ¶¶ 61-63).

Based on the allegations set forth in counsel's affirmation, it appears to the Court that plaintiffs have sufficient information to allege plausible claims against defendants Sayeed, Majid, and Lakhvi for violations of the ATA.  However, the Court is constrained to review the allegations in the Complaint(s) as filed and while there may be sufficient information in the existing Complaints to find that plaintiffs have satisfied the pleading requirements of plausibility as to defendants Majid and Lakhvi, the Court respectfully recommends that plaintiffs' request for default judgment based on the claims against Sayeed and Cheema be denied because there is insufficient factual information currently alleged in the Complaint(s) to tie them directly to the Mumbai terrorist attacks.  Although the Court is permitted to draw reasonable inferences from the facts taken as true, with respect to these two defendants, the inferences to be drawn are too speculative based on the existing factual allegations.

In light of the additional facts set forth in counsel's affirmation, it is respectfully recommended that plaintiffs be given the opportunity to amend the Complaints to add any additional factual allegations regarding the roles played by the defendants in the attacks.

II.   Damages

Even if the Court were to find that the allegations in the current Complaints are sufficient as to defendants Lakhvi and Majid,[29] given the problems set forth below with respect to

---

[29]In addition, the Court reiterates that it is unclear whether there has been proper service on these two defendants.  (See supra at 14-24).

plaintiffs' requests for damages, the Court would nonetheless recommend that plaintiffs' motion for default judgment be denied at this time, without prejudice.

A.    Legal Standard for Damages in Default Judgment

Unlike allegations pertaining to liability, allegations in connection with damages are not deemed admitted in the context of a default judgment. The burden is on the plaintiff to establish its entitlement to recovery "in an evidentiary proceeding in which the defendant has the opportunity to contest the amount." See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158. When a court enters a default judgment and the amount of damages sought does not consist of a sum certain, Rule 55(b) of the Federal Rules of Civil Procedure provides that: "The Court may conduct hearings or make referrals – preserving any federal statutory right to a jury trial – when, to enter or effectuate judgment, it needs to . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2). It is within the Court's discretion "to determine whether plaintiffs' burden has been met, and whether or not to hold an evidentiary hearing." Gesauldi v. Dan Yant Inc., No. 13 CV 1872, 2014 WL 1057307, at *3 (E.D.N.Y. Mar. 19, 2014) (citing Fustok v. Conticommodity Servs., Inc., 873 F.2d 38, 40 (2d. Cir. 1989), aff'g, 122 F.R.D. 151, 156 (S.D.N.Y. 1988)). Here, plaintiffs' counsel has submitted an affirmation detailing the damages requested. Defendants, however, failed to appear. Thus, the Court considers plaintiffs' evidence as to damages.

B.    Plaintiffs' Request for Damages

In seeking damages on behalf of the plaintiffs in each case, counsel's affirmation seeks to recover economic and non-economic damages for the pain and suffering that the 11 plaintiff-victims of the attacks and their families have suffered, as well as solatium and punitive damages.

43

1) <u>Shimon Rosenberg</u> - Plaintiff Shimon Rosenberg seeks to recover damages on behalf of his daughter Rivka Holtzberg, his son-in-law Gavriel Noach Holtzberg, their son and Shimon Rosenberg's grandson M.H., and all other remaining survivors of Rivka Holtzberg. (Compl. ¶ 1). Born in Israel, Gavriel Holtzberg was Chief Rabbi for the Indian Cities of Mumbai, Goa, Bangalore, and Manali, as well as Chairman of the Chabad Lubavitch of India, a non-profit organization. (Aff. ¶ 84). According to counsel's affirmation, Gavriel Holtzberg received an annual salary of $40,000 for his work at the Chabad Lubavitch Organization. (<u>Id.</u> ¶ 88). Rivka Holtzberg, also born in Israel, married Gavriel in 2002. (<u>Id.</u> ¶ 87). She became director of the Chabad House upon moving to India, and worked for the Chabad Lubavitch Organization in an unpaid capacity. (<u>Id.</u> ¶¶ 87, 88). At the time of the Mumbai terrorist attacks, Rivka Holtzberg was 5 or 6 months pregnant. (<u>Id.</u> at 87). The Holtzbergs rented out rooms at the Chabad House, receiving $120,000 annually in rentals. (<u>Id.</u> ¶ 88).

In addition to seeking lost earnings for Gavriel and Rivka Holtzberg, Gavriel Holtzberg's siblings seek to recover the $25,000 spent annually on travel and other expenses to support the Holtzbergs' remaining son, M.H., and Gavriel Holtzberg's parents have also spent an additional $15,000 to support M.H. (<u>Id.</u> ¶ 89). In total, plaintiffs seek $1.5 million in economic damages based on Gavriel Holtzberg's expected earnings over the course of his life, and the cost of caring for M.H. (<u>Id.</u>)

Plaintiffs also seek $2 million in pain and suffering for Gavriel Holtzberg, $2 million for Rivka Holtzberg, and $5 million for M.H. (<u>Id.</u> ¶ 90). According to counsel's affirmation, Rivka Holtzberg was shot by the terrorists but did not die immediately; her son's nanny, who was hiding in another room, heard her cries for help. (<u>Id.</u>) When Rivka Holtzberg's body was found,

44

it was wrapped in a prayer shawl, which led investigators to conclude that her husband wrapped her in the shawl before he was killed.  (Id.)

Two year old M.H. was found sitting alone with the bodies of his parents and was rescued by his nanny, who fled the house with him.  (Id.)  Plaintiffs ask for solatium in the amount of $17 million for M.H. for the loss and future support of both his parents, and $8.5 million for Shimon Rosenberg for the loss of his daughter.  (Id. ¶ 91).

2) Nachman Holtzberg - Plaintiff Nachman Holtzberg, the father of Gavriel Holtzberg, also seeks solatium on behalf of himself, his wife Freida Holtzberg, and Gavriel Holtzberg's siblings, Shoshana Levinson, Devora Meriam Speilman, Avraham Holtzberg, Meyer Holtzberg, Nechama Popack, and Rikal Kaler, in the amount of $8.5 million each for Nachman Holtzberg and his wife, Freida, and $4.25 million for each of Gavriel's six siblings.  (Id. ¶¶ 92, 93).

3) Moses Shvarzblat - Plaintiff Moses Sharzblat's sister, Norma Shvarzblat-Rabinovich, was killed in the Mumbai terrorist attack on the Chabad House.  (Id. ¶¶ 94, 95).  According to counsel's affirmation, "Moses will be appointed the Personal Representative of Norma's Estate by the Surrogate's Court for Ocean County, New Jersey."  (Id. ¶ 94 (emphasis supplied)).  However, it is unclear at this time whether that appointment has occurred.  Since Norma Shvarzblat-Rabinovich was not employed, plaintiffs do not seek any economic damages for her.  (Id. ¶ 96).  However, she was captured and held captive by the LeT terrorists, and plaintiffs seek $2 million for her pain and suffering.  (Id. ¶ 97).  According to counsel's affirmation, Norma Shvarzblat-Rabinovich was ordered to call Israeli diplomats to propose a prisoner exchange and several hours after reporting their response, defendant Majid gave the order to have her killed.  (Id.)  Norma's family members, including her brother Moses Schvarzblat and three children seek

an award of solatium in the amount $4.25 million for her brother and $8.5 million each for the children.  (Id. ¶ 98).

    4) Kia Scherr - Plaintiff Kia Scherr lost both her husband Alan Scherr and her daughter N.S. during the attack on the Oberoi Trident Hotel.  (Id. ¶¶ 99, 106).  Alan Scherr was born in 1950, had a B.A. degree in Social Science from the University of Maryland, and a Masters degree in Fine Arts Photography from George Washington Univerity.  (Id. ¶ 100).  According to counsel's affirmation, Alan Scherr was an art professor at the University of Maryland and a part-time photography instructor at Loyola College until 1996, when he quit both jobs and with moved his wife and daughter to the Synchronicity Foundation (the "Foundation") in Virginia. (Id.)  There Alan Scherr, who had been teaching and practicing transcendental meditation, became the Vice President of the Foundation and served in that capacity for ten years prior to his death.  (Id. ¶¶ 100, 105).  As compensation for his work, Alan Scherr received food, lodging, and other material needs for himself, his wife, and his daughter, valued at $5,000 per month.  (Id. ¶ 105).  Alan Scherr also received a monthly stipend of $300 and approximately $1,500 annually for consulting fees.  (Id.)  According to counsel's calculations, Alan Scherr had an annual income of $65,000, with a work life expectancy of seven more years to age 65.  (Id.)  In addition, Kia Scherr underwent grief counseling for a year at a cost of $2,200 and funeral expenses for Alan and N.S. amounted to $7,302, for a total economic loss of $464,502.  (Id.)

    Kia Scherr's daughter, N.S., was 13 years old at the time of her death.  (Id. ¶ 104).  She had traveled with her father on a Foundation sponsored pilgrimage to India, and was with her father having dinner in the restaurant when the terrorists attacked the Oberoi Trident Hotel.  (Id. ¶ 106).  According to counsel's affirmation, Alan Scherr was shot first and then N.S. was

murdered.  (Id.)  For their pain and suffering, plaintiffs seek $2 million each for Alan Scherr and

N.S.  (Id.)  Kia Scherr, who lost her husband and only child, seeks an award of solatium in the

amount of $12.5 million for the loss of her husband and $8.5 million for the loss of N.S.  (Id. ¶

107).  Plaintiffs also seek an award of $8.5 million in solatium for Carolyn Scherr, Alan Scherr's

mother, and $4.25 million each for Alan Scherr's brother Marc and sister Susan Scherr.  (Id.)

  5) <u>Emunah Chroman</u> - Emunah Chroman lost her husband, Ben Zion Chroman, during

the attack on the Chabad House.  (Id. ¶¶ 108, 109).  At the time, they had three children, all under

the age of five.  (Id.)  Emunah Chroman sues as guardian of their three children and as the

representative of her husband's Estate.  (Id. ¶ 108).  However, according to counsel's affirmation,

"Emunah Chroman *will be appointed* the Personal Representative of the Estate of Ben Chroman

. . . " (id. (emphasis supplied));  thus, it is unclear whether that appointment has occurred at this

time.

  As for economic damages, counsel's affirmation states only that:  "Although economic

data for Ben is difficult to calculate, it is estimated to be in the range [of] between $750,000 and

$1,000,000."  (Id. ¶ 110).  The affirmation provides no further information as to how this figure

was reached; there is no information regarding Ben Chroman's education, job experience, or

income from which the Court could determine the basis for these figures.

  Plaintiffs also seek $2 million in pain and suffering for Ben Chroman.  (Id. ¶ 111).

According to counsel's affirmation, the LeT terrorists were in the Chabad House for nearly 48

hours and it is not known when during that time, Ben Chroman was shot point blank in the head.

(Id.)  Plaintiffs also seek $12.5 million in solatium for Emunah Chroman and $8.5 million each

for their three children.  (Id. ¶ 112).

6) <u>Maribeth Jeswani</u> - Plaintiff Maribeth Jeswani is the widow of Sandeep Jeswani, who was also killed in the restaurant of the Oberoi Trident Hotel. (<u>Id.</u> ¶¶ 113, 117). The <u>Rosenberg</u> Complaint indicates that Maribeth Jeswani *has or will be* appointed" as the personal representative of her husband's estate. (Compl. ¶ 4 (emphasis supplied)). Born in New Delhi, Sandeep Jeswani became a naturalized United States citizen in 1996. (<u>Id.</u> ¶ 114). He attended the University of Illinois at Chicago and the National Louis University at Evanston, where he received a B.S. in Healthcare. (<u>Id.</u>) Sandeep Jeswani was also trained in radiation therapy and dosimetry. (<u>Id.</u>) He was working as a Research Collaboration Manager for TomoTherapy, a producer of sophisticated cancer treatment equipment at the time of his death. (<u>Id.</u> ¶ 115). Plaintiffs seek economic damages of $4.3 million, comprised of Sandeep Jeswani's average income of $159,000, projected over 27 years until he reached the age of 70, plus funeral and out-of-pocket expenses of an unspecified amount. (<u>Id.</u> ¶ 116).

Plaintiffs request $2 million in pain and suffering damages for Sandeep Jeswani. (<u>Id.</u> ¶ 118). According to counsel's affirmation, one of the gunmen asked Sandeep Jeswani for identification and shot him when they learned he was an American; his wife indicated that his body was so badly damaged that she could not see his remains. (<u>Id.</u> ¶¶ 117, 118). Plaintiffs request an award of solatium in the amount of $12.5 million for Maribeth Jeswani. (<u>Id.</u> ¶ 121).

7) <u>Autumn Gilles</u> - Plaintiff Autumn Gilles was born in 1975 in Phoenix, Arizona. (<u>Id.</u> ¶ 123). She received a B.S. in International Business from Linfield College, where she specialized in science and engineering. (<u>Id.</u>) At the time of the Mumbai terrorist attacks, she was working as a securities and derivatives trader for a Dutch firm and was researching trading opportunities in India. (<u>Id.</u>) Prior to the attacks, Ms. Gilles' salary was $120,000 annually, with average bonuses

of $100,000, and benefits of $36,000, for a total annual compensation package of $256,000.  (Id.
¶ 124).

At the time of the attack, Autumn Gilles and her colleagues were dining at the Taj Mahal
Hotel when shots rang out.  (Id. ¶ 125).  She hid behind a column, where she could see the
terrorists' muzzle flashes and people fleeing through the courtyard to the street.  (Id.)  Staff
members prevented her from fleeing to the courtyard and minutes later, she heard gunshots from
the courtyard; the staff then led her to the kitchen and then into a private club on hotel grounds.
(Id.)  Although she read on her Blackberry that the hotel was under attack, no one knew how
many terrorists were involved and although she felt at ease for a bit, an hour or so later, shots
rang out and there were reports that the hotel was on fire.  (Id. ¶¶ 125, 126).  Although some
people were successfully evacuated, Ms. Gilles was not and she crawled under a couch where she
remained for the next seven hours listening to the shots and explosions as the terrorists got closer
to the club.  (Id. ¶¶ 126-130).  Then there was another wave of firing and an Indian commando
told everyone to put their hands up and led them through bloodstained corridors out of the hotel.
(Id. ¶ 133).

According to counsel's affirmation, since the attack, "Autumn has suffered from over
thirty symptoms of post traumatic stress disorder, including a fear of sudden sounds, extreme
response and flashbacks from loud sounds and flashes of light, difficulty sleeping, general
anxiety, headaches, dizziness, fatigue, depression, suicidal thoughts, a higher incidence of
infection, an inability to function socially, and a myriad of other symptoms that prevent Autumn
from leading a full life."  (Id. ¶ 134).  Although Ms. Gilles attempted to work after the attacks,
her post traumatic stress disorder has prevented her from doing so.  (Id. ¶ 124).  She seeks

$602,000 in economic damages based on, inter alia, two years of lost wages and $90,000 in un-reimbursed health care bills.  (Id.)  For pain and suffering, Autumn Gilles seeks an award of $5 million.  (Id. ¶ 135).

8) Linda Ragsdale - Plaintiff Linda Ragsdale was born in 1959, and received a B.A. in Fine Arts from Columbia College in Chicago.  (Id. ¶ 137).  Until 2004, she worked in "executive positions for manufacturing enterprises," earning a "six-figure salary," but left the field to become a writer of children's books, where she earned $30,000 a year in the two years prior to the attacks.  (Id. ¶¶ 137, 138).  At the time of the attack, she was visiting India with the Synchronicity Foundation and was having dinner with Alan Scherr, his daughter, and plaintiff Varagona, when the terrorists entered the restaurant at the Oberoi Trident Hotel.  (Id. ¶ 140).  When she heard shots fired in the lobby, Linda Ragsdale and the others hid beneath the table, at which point Alan Scherr and N.S. were shot and killed.  (Id.)  Ms. Ragsdale was also shot, with the bullet running "down her back, above her heart, along her spinal column and exited mid thigh," nicking her stomach.  (Id.)  She was extracted from the Hotel with the help of restaurant staff and was hospitalized in the Bombay Hospital for almost three weeks and then hospitalized on her return to the United States.  (Id.)

Linda Ragsdale still cannot wear jeans or underwear because it is too uncomfortable as a result of the scar down her back, and she has been unable to write any longer, or do the work necessary to put together a book.  (Id. ¶¶ 138, 139, 141).  Although she was very athletic in college, now "there is a physical adjustment to getting out of bed" and she has suffered damage to her lymphatic system that results in discomfort and swelling that are "currently unmanageable."  (Id. ¶¶ 137, 145).  According to counsel's affirmation, Linda Ragsdale's

earnings have dropped to "virtually nothing," and she has expressed the view that she "could never hold a full time job" because "'[t]here are days when I must just rest.'"  (Id. ¶¶ 138, 142).  The events have impacted her relationships with her husband, her mother, and affected her three children. (Id. ¶¶ 143, 144).

Plaintiffs seek $5 million in pain and suffering and economic losses of $510,000 for Ms. Ragsdale.  (Id. ¶¶ 139, 146).

9) Andreina Varagona - Plaintiff Andreina Varagona was born in Tennessee in 1963, attended the University of Tennessee at Knoxville and the National Institute of Health at Boulder, Colorado.  (Id. ¶ 148).  From 1998 to 2004, she worked in the film industry, earning approximately $100,000 a year.  (Id. ¶ 148).  In 2004, she began giving meditation workshops, and eventually opened a clinic providing meditation and holistic health care; at the time of the attacks, she had three other franchises pending.  (Id.)

Andreina Varagona traveled with the Synchronicity Foundation and was in the restaurant with Linda Ragsdale, Alan Scherr, and N.S. when the shooting began.  (Id. ¶¶ 150, 151).  Ms. Varagona shouted to everyone to get under the table and was near Alan Scherr at the moment a bullet hit him and she realized he had been killed.  (Id. ¶ 151).  She was also shot but, aided by others, managed to get out of the hotel.  (Id. ¶ 152).  She suffered a shattered right femur and displaced right knee cap, causing loss of sensation to her quadriceps; another bullet hit her right triceps, causing loss of control and sensation in her fingers; a third bullet grazed her neck.  (Id.)  She spent two weeks in the Bombay Hospital and then 25 months as an out-patient in Nashville, where she traveled to the hospital three to four times a week, for physical therapy, often spending up to ten hours each time.  (Id. ¶ 153).  She underwent two surgeries, had to wear a custom-made

51

prothesis, and was in a wheelchair for several months before graduating to a walker.  (Id.)  She was under treatment for over two years and still has no feeling in her right quadriceps.  (Id.)

According to counsel's affirmation, Ms. Varagona's and her husband's combined adjusted gross income for the years 2007 and 2008 averaged $70,000.  (Id. ¶ 149).  After the attack, her husband began suffering nightmares, and traumatized by living with a victim, left Ms. Varagona after ten months to fend for herself economically, saying that he "hadn't signed up for this type of stress."  (Id. ¶¶ 149, 153).

Plaintiffs seek an award of $5 million for pain and suffering and $1,485,000 in economic damages for Ms. Varagona.  (Id. ¶¶ 149, 154).

10) Attorney's Fees and Costs - In addition to the damages requested for the individual plaintiffs, counsel seeks to recover "the costs of bringing this litigation."  (Id. ¶ 155).  Counsel indicates that as of February 14, 2014, the date of counsel's affirmation, the costs expended in this litigation amounted to $82,000.  (Id.)  Counsel also indicates that their retainer agreement with plaintiffs entitles counsel to one third of the net recovery.  (Id.)  Counsel indicates that they "are also entitled to a fee equal to one third of the total of the award [sic] granted to plaintiffs." (Id. (emphasis supplied)).  As discussed below, counsel's request for costs and fees is not clear.

In total, plaintiffs seek $677,584,000 for economic and noneconomic damages, in addition to costs, fees, and prejudgment interest.  (Id. ¶ 156 (emphasis supplied)).

C.      Analysis

1)      Economic Damages

In seeking these damages, plaintiffs' counsel relies heavily on a recent case in the Southern District of New York, awarding monetary compensation to victims of the September

11, 2001 terrorist attacks and their family members.  See In re Terrorist Attacks on Sept. 11,

2001 ("Havlish"), No. 03 CV 9848, 2012 WL 3090979, at *1 (S.D.N.Y. July 30, 2012).  In that

case, as here, plaintiffs sought economic damages, damages for pain and suffering, solatium,

punitive damages, prejudgment interest, and costs.  However, to justify the economic damages

sought, the plaintiffs in Havlish submitted extensive analyses by a forensic economist who

described for each decedent "(a) the past and future lost wages and benefits . . .; (b) the estate's

loss of household services; (c) its loss of advice, counsel, guidance, instruction, and training

services; (d) its loss of accompaniment services; and (e) prejudgment interest."  Id. at *3.  The

economist explained how he calculated each decedent's lost wages, his assumptions as to work

life expectancy, and any adjustments based on growth and discount rates.  Id.  Based on the

expert's reports, the court adopted his findings, noting that they yielded economic damages

comparable to those in other cases.  Id. (citing cases and explaining that plaintiffs submitted

detailed reports concerning the calculation of lost wages and benefits for two decedents and

calculated damages for the others based on the same methodology).

　　　In this case, as noted supra, plaintiffs have only submitted the affirmation of counsel;

there are no other supporting documents to verify the wages and income earned by the decedents

and victim-plaintiffs, nor is there any indication as to where or how the information in counsel's

affirmation was obtained.  In the absence of some additional supporting documentation, whether

it is in the form of pay stubs, W-2 forms, affidavits of the plaintiffs, or of the administrators of

their Estates, the Court is not in a position to recommend an award of economic damages at this

time.  Moreover, although counsel's affirmation projects a future income stream for certain of the

decedents, he has provided no explanation for the basis of his projections of work life expectancy

or whether he has taken into account any other adjustments as was done by the economist in the

Havlish case.  Indeed, for certain decedents, counsel has projected a work life expectancy of up

to age 65 (see Aff. ¶ 105), while in another instance, the work life expectancy is projected to be

to age 70 (see id. ¶ 116); with respect to Gavriel Holtzberg, there is no work life expectancy

provided (see id. ¶ 89), and with respect to Ben Chroman, there is no basis given whatsoever for

the calculation of his economic damages.[30]  (See id. ¶ 110).

Apart from the lack of supporting information, there are other specific requests that

require additional explanation:

(a) Plaintiffs request economic damages of $510,000 for plaintiff Linda Ragsdale.  (Id. ¶

139).  Although Ms. Ragsdale allegedly earned a six-figure salary before she took up writing full

time, she earned only $30,000 annually in the two years prior to the Mumbai attacks.  (Id. ¶ 138).

While plaintiffs explain that the trauma of the Mumbai attacks has stifled Ms. Ragsdale's

creative impulse and earning potential as a writer of children's literature, they have failed to

explain how the $510,000 in economic damages was derived.

(b)  Plaintiffs request a total of $1,485,000 in economic damages for Andreina Varagona.

(Id. ¶ 149).  Plaintiffs explain that Ms. Varagona and her husband earned a combined annual

income of $70,000 in 2007 and 2008, prior to the Mumbai attack; that amount dropped to $4,000

after her husband left.  (Id.)  However, plaintiffs do not explain how the amount of economic

damages requested was derived.

---

[30]Plaintiffs indicate that as to plaintiff Ben Chroman, economic losses are "difficult to calculate," but are estimated to be in the range of $750,000 to $1,000,000.  (Aff. ¶ 110).  There is no explanation as to why economic damages are difficult to calculate or how plaintiffs arrived at the estimated range of $750,000 and $1,000,000.

(c) As previously noted, there is no supporting information as to Ben Chroman's lost wages and economic damages, nor have plaintiffs explained why more detailed information cannot be supplied.

Accordingly, the Court respectfully recommends that plaintiffs' request for economic damages be denied without prejudice to allow plaintiffs to supplement their requests with more specific information and support.  The Court encourages plaintiffs to engage the services of an economist, to the extent necessary.

2)      Pain and Suffering

Plaintiffs request an award of $2,000,000 for pain and suffering in each death case, and an award of $5,000,000 for pain and suffering in each personal injury case, arguing that the more "prolonged agony [experienced] during and after the events" by survivors of the attack, warrants such compensation.  (Pls.' Mem.[31] at 5).

As noted, counsel's affirmation provides some detail concerning the circumstances of each plaintiffs' particular experience during the Mumbai terrorist attacks.  However, it is not clear what the basis is for counsel's knowledge of the events that transpired in Mumbai or how each victim was affected.[32]  In Havlish, plaintiffs submitted an expert report prepared by a retired

---

[31]Citations to "Pls.' Mem." refer to Plaintiffs' Damages Inquest Memorandum, filed on February 14, 2014.

[32]The Court notes that plaintiffs' Exhibits to the Damages Inquest Memorandum contain various articles, press reports, book excerpts, and other materials about international terrorism, terrorists, and the Mumbai attacks, as well as a Department of Defense Memoranda (Exhibit 5), Interrogation Report of Headley (Exhibit 12), and excerpted trial transcript containing the direct examination of Headley.  However, these materials are not cited in counsel's affirmation and do not appear to provide any concrete information regarding the particular experiences of the victims in this case.

Navy Rear Admiral, providing a detailed account of the conditions that each decedent likely experienced prior to his or her death. See 2012 WL 3090979, at *4.  However, the court also recognized the inherent difficulty in understanding precisely what each unique decedent went through in the moments leading up to his or her death. See id.

Given the nature of the 2008 Mumbai terrorist attacks, which targeted multiple locations including the CST Railway Station, the Leopold Café and Bar, the Taj Mahal Hotel, the Oberoi Trident Hotel, and the Chabad House (see Aff. ¶¶ 66-73), this Court recognizes that the victims' experiences varied greatly.  Nonetheless, plaintiffs should provide additional information to aid the Court in evaluating their requested damages for pain and suffering, so that the experiences of the named plaintiffs may be evaluated in relation to other relevant case authority.  Further, in some instances, counsel quotes directly from statements made by survivors of the attacks.  There is no apparent reason why this information could not be provided by those survivors in affidavit form.  Moreover, at the very least, counsel should supplement his affirmation with citations to the sources of his information in describing what each plaintiff may have experienced.

With respect to the surviving victims, counsel's affirmation details the physical injuries they suffered, their treatment, and prognosis.  However, there are no medical records provided, nor have the plaintiffs submitted affidavits detailing their injuries and/or experiences.  Similarly, to the extent that certain of the plaintiffs suffered psychological injuries and received mental health or psychological treatment, including Ms. Gilles and several of the surviving spouses, such as Ms. Kerr, plaintiffs should provide these treatment records as well to corroborate their claims.  At the very least, plaintiffs should submit affidavits themselves; counsel's affirmation alone is not sufficient for this Court to rely upon in recommending damages for these injuries.

Accordingly, it is respectfully recommended that plaintiffs' requests for pain and suffering damages be denied without prejudice to allow them to supplement their submissions with supporting documentation, and where possible, with affirmations from survivors of the attacks, attesting to their experiences.  Further, to the extent that any additional information concerning the decedents' experiences is available, plaintiffs are directed to provide that as well.

  3) <u>Solatium</u>

Plaintiffs request solatium for the mental anguish, bereavement, and grief experienced by close family members through the loss of a loved one, for the spouses, siblings, parents, and children of those killed in the 2008 Mumbai terrorist attacks.  (<u>See</u> Pls.' Mem. at 4).  In part, plaintiffs rely on the framework set forth in <u>Havlish</u>, where the court, relying in part on the solatium damages awarded in other terrorism cases, awarded $12.5 million for spouses, $8.5 million for both parents and children, and $4.25 million for siblings of those killed in the September 11, 2011 attack.  (<u>See</u> <u>id.</u>)  Plaintiffs note that this award was an upward departure from a 2006 District of Columbia case, which the <u>Havlish</u> court found appropriate given the especially traumatic effects that the September 11, 2001 attack had on the victims' families.  (<u>See</u> <u>id.</u> (citing, <u>inter alia</u>, <u>Estate of Heiser v. Islamic Republic of Iran</u>, 466 F. Supp. 2d 299 (D.D.C. 2006))).

While the plaintiffs here rely on the framework for solatium damages set forth in <u>Havlish</u>, they have not provided comparable information to that which was provided in the <u>Havlish</u> case.  Specifically, in <u>Havlish</u>, the individual plaintiffs submitted declarations attesting to the traumatic effects they suffered as a result of the loss of their loved ones.  Again, in the absence of any supporting documentation beyond counsel's own affirmation, the Court is unable to recommend

these amounts as solatium awards and respectfully recommends that plaintiffs' request for

solatium damages also be denied without prejudice to renew with supplemental documentation.

      4)   Treble / Punitive Damages

Counsel for plaintiffs requests treble damages under the ATA.  See 18 U.S.C. § 2333; see

also Smith ex rel. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 232 (S.D.N.Y.

2003).  (Pls.' Mem. at 7).[33]  Under the ATA, "[a]ny national of the United States injured . . . by

reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue . . . in

any appropriate district court . . . and shall recover threefold the damages he or she sustains . . ."

18 U.S.C. § 2333(a).  Thus, based on the information provided by plaintiffs, a treble damage

award appears entirely appropriate in this case.  However, until plaintiffs supplement their

damages calculations and respond to the legal issues addressed herein, the Court cannot

recommend a specific award and instead respectfully recommends that plaintiffs' request for

treble or punitive damages be denied at this time without prejudice to renew upon the provision

of additional information.

      5)   Attorneys' Fees and Costs

Finally, counsel seeks recovery for "the costs of bringing this litigation."  (Aff. ¶ 155; see

also Pls.' Mem. at 8).  Specifically, counsel's Affirmation states:

> Plaintiffs are also entitled to reimbursement for the costs
> of bringing this litigation.  The cost of this action expended
> so far is $82,000.  The retainer fee agreed to in each [p]laintiffs'

---

[33]Alternatively, plaintiffs seek punitive damages, citing Havlish.  (Id.)  However, punitive damages in the Havlish case are only discussed in the context of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1605A.  That statute is not applicable in this case and it does not appear that a separate award of punitive damages, in addition to treble damages, would be warranted.

> case is one third of the net recovery.  Plaintiffs' counsel are also
> entitled to a fee equal to one third of the total of the award [*sic*]
> granted to [p]laintiffs.

(Aff. ¶ 155).

The ATA clearly provides for the recovery of costs, including attorneys' fees.  See 18

U.S.C. § 2333(a).  However, plaintiffs' submissions do not provide adequate information for the

Court to assess what exactly is sought in the way of attorneys' fees and costs.  First, counsel

seeks recovery for "the costs of bringing this litigation" and states that as of February 14, 2014,

the costs expended in this litigation amounted to $82,000.  (Aff. ¶ 155; see also Pls.' Mem. at 8).

It is not apparent from counsel's affirmation whether this amount includes both attorneys' fees as

well as litigation costs.  Further, counsel does not provide a breakdown of the specific costs

incurred, nor does he provide a breakdown of the hours spent litigating these cases.

Moreover, counsel indicates that they "are also entitled to a fee equal to one third of the

total of the award [*sic*] granted to plaintiffs."  (Aff. ¶ 155; see also Pls.' Mem. at 8).  It is unclear

whether counsel is requesting only one third of plaintiffs' net recovery pursuant to their retainer

agreements, or if they are seeking this amount in addition to the requested $82,000.  Accordingly,

counsel should clarify exactly what they are requesting in terms of both costs and attorneys' fees.

To the extent that costs and fees are sought as a separate award pursuant to 18 U.S.C. § 2333(a),

counsel must provide a breakdown of the costs and attorneys' fees requested, including the

number of hours spent on this litigation for each attorney, partner, paralegal, or other person for

whom fees are requested; the activities engaged in by each of these individuals; the number of

hours spent on each activity; and the billable rates of each attorney and paralegal.  Counsel

should also justify the billable rates requested based on each individual's background and

experience, and citations to case law identifying rates generally awarded in the Eastern District for similar work.

Accordingly, the Court respectfully recommends that counsel's request for fees and costs be denied without prejudice at this time to renew upon the provision of additional information and clarification.

CONCLUSION

For the reasons stated herein, the Court respectfully recommends that plaintiffs' Motions for Default Judgement and Damages be denied in their entirety at this time, without prejudice to re-file the motions with the supplementation described herein.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
        August 1, 2014

/s/ CHERYL POLLAK

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York