UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SHIMON ROSENBERG, et al., KIA SCHERR,
et al., EMUNAH CHROMAN, et al., LINDA
RAGSDALE, et al., AUTUMN GILLES, et al.,

                             Plaintiffs,

           -against-

LASHKAR-E-TAIBA et al.,

                   Defendants.

------------------------------------------------------------- x

**REPORT AND**
**RECOMMENDATION**
10 CV 5381 (DLI) (CLP)
10 CV 5382 (DLI) (CLP)
10 CV 5448 (DLI) (CLP)
11 CV 3893 (DLI) (CLP)
12 CV 5816 (DLI) (CLP)

**POLLAK**, United States Magistrate Judge:

      Plaintiffs Shimon Rosenberg, Nachman Holtzberg, Moses Shvarzblat, Maribeth Jeswani,

Kia Scherr, Emunah Chroman, Andreina Varagona, Linda Ragsdale, and Autumn Gilles

(collectively, "plaintiffs") are American and Israeli citizens who were injured or whose relatives

were killed during the 2008 terrorist attacks in Mumbai, India. (Am. Compl.[1] ¶¶ 1-4). Plaintiffs

assert claims arising under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the

Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, against the terrorist organization Jamat ud Dawa

("JuD"), a/k/a Lashkar-e-Taiba, a/k/a Markaz ud Dawa, a/k/a Idara Khidmat-e-Khalaq, a/k/a

---

[1]Citations to "Am. Compl." refer to plaintiffs' Amended Complaint, filed on October 30,
2014. Despite the document's presence on each of the individual dockets, the Court uses the
singular "Amended Complaint," because the same Amended Complaint was filed in each case
following the district court's adoption of this Court's Report and Recommendation, dated
August 1, 2014 (the "August 2014 Report"). This case consolidates Docket Nos. 10 CV 5381,
10 CV 5382, 10 CV 5448, 11 CV 3893, and 12 CV 5816.

Tehrik-e-Tahaffuz-e-Qibla Awal (collectively, "LeT"),[2] and several of its alleged leaders, including Mohammed Hafiz Sayeed ("Sayeed"), Zaki ur Rehman Lakhvi ("Lakhvi"), Sajid Majid ("Majid"), Azam Cheema ("Cheema"), Major Iqbal ("Iqbal"), and Major Sameer Ali ("Ali") (collectively, "defendants"). (Am. Compl. ¶¶ 10-16).[3]

On October 30, 2014, plaintiffs filed an Amended Complaint. When none of the defendants appeared to respond to the claims, plaintiffs sought an entry of default, which was entered against all defendants on February 24, 2015. Presently before this Court, on referral from the Honorable Dora L. Irizzary, is plaintiffs' third motion for default judgment and damages.

For the reasons set forth below, it is respectfully recommended that the motion be denied at this time for failure to properly serve either the Amended Complaint or the default motion papers on the defendants. However, if the district court disagrees with this Court's recommendation as to the adequacy of service, the Court respectfully recommends that plaintiffs' motion for default judgment be granted against all defendants. The Court would further recommend that plaintiff Varagona be awarded $7,976,524.80, plaintiff Ragsdale be awarded $6,281,000.00, and plaintiff Scherr be awarded $66,123,403.20, pursuant to the treble damages provisions of the ATA, and that all other requests for damages be denied for the reasons set forth below.

---

[2]In their original Complaints, plaintiffs named this defendant as Lashkar-e-Taiba, a.k.a. Idara Khidmat-e-Khalaq, Jamat ud Dawa, Markaz ud Dawa and Tehrik-e-Tahaffuz-e-Qibla Awal.

[3]On November 7, 2013, the Honorable Dora L. Irizarry dismissed claims against several additional defendants — the Inter-Services Intelligence Directorate of the Islamic Republic of Pakistan (the "ISI"), and two former ISI Director Generals, Ahmed Shuja Pasha ("Pasha") and Nadeem Taj ("Taj").

FACTUAL BACKGROUND[4]

Plaintiffs are a group of American and Israeli citizens whose relatives were killed, or who were themselves injured, in a series of terrorist attacks that occurred over the course of four days in November 2008, resulting in the deaths of 166 people and injuring at least 304 more at several different locations in Mumbai, India (the "2008 Mumbai attacks"). (Am. Compl. ¶ 20). Plaintiffs allege that the attacks occurred at locations known to cater to Americans and other foreigners, including the Oberoi Trident Hotel ("Oberoi"), the Taj Mahal Hotel ("Taj Hotel"), the Leopold Café ("Leopold"), the Cama and Abless Hospital, the Metro Cinema, the CST Railway Station, and the Chabad House. (Id. ¶ 20).

Plaintiff Shimon Rosenberg, a citizen and resident of Israel, brings this action individually, on behalf of the estate of an Israeli citizen, Rivka Holtzberg, on behalf of the estate of a United States citizen, Gavriel Noach Holtzberg, and as the Legal Guardian of the minor child M.T.H., also a citizen of the United States. (Id. ¶ 1). Plaintiff Nachman Holtzberg, a United States citizen,

---

[4]On August 1, 2014, this Court issued a Report and Recommendation in which it noted, in part, that the factual and legal insufficiency of all the individual Complaints rendered them subject to dismissal. (See generally Aug. 2014 Rep.). Citations to "Aug. 2014 Rep." refer to the Report and Recommendation issued by this Court on August 1, 2014. On September 10, 2014, Judge Irizarry adopted this Court's Report and Recommendation in its entirety, and granted plaintiffs leave to file amended complaints addressing the deficiencies identified by this Court. On October 30, 2014, plaintiffs filed one joint Amended Complaint that differs significantly from the individual Complaints initially filed. The Court describes the allegations in the Amended Complaint in some detail because the differences between the initial Complaints and the joint Amended Complaint are significant. The Court has not relied on any facts from any of the initial Complaints, as the filing of an Amended Complaint "supercedes the original complaint[,] rendering it of no legal effect." Rodriguez v. It's Just Lunch Int'l, No. 07 CV 9227, 2009 WL 399728, at*2 (S.D.N.Y. Feb. 17, 2009), report and recommendation adopted, 2009 WL 666435 (S.D.N.Y. Mar. 12, 2009). The legal significance of each change is, however, addressed in the relevant portions of this Court's analysis.

3

brings this action on behalf of himself and "other remaining survivors" of United States citizen Gavriel Noach Holtzberg. (<u>Id.</u> ¶ 2). Plaintiff Moses Shvarzblat, a United States citizen and resident of New Jersey, brings claims individually and on behalf of his deceased sister, Norma Shvarzblat-Rabinovich, a citizen and resident of Israel and Mexico, and her survivors. (<u>Id.</u> ¶ 3). Plaintiff Jeswani is a United States citizen and resident of Illinois, who sues on behalf of herself, the estate of Sandeep Jeswani, her deceased husband who was a naturalized American citizen, and his survivors. (<u>Id.</u> ¶ 4). Plaintiff Kia Scherr, a United States citizen, sues for damages stemming from the loss of her husband, Alan Scherr, and her minor daughter N.S., both of whom were United States citizens killed in the attack on the Oberoi. (<u>Id.</u> ¶¶ 5, 111). Plaintiff Emunah Chroman is a citizen of Israel, who brings this action individually, and as the Personal Representative of the estate of United States citizen Ben Zion Chroman, and on behalf of her three children, who were in the process of becoming United States citizens at the time this action was filed. (<u>Id.</u> ¶ 6). Finally, plaintiffs Andreina Varagona, Linda Ragsdale, and Autumn Gilles are all citizens of the United States who bring suit on their own behalf. (<u>Id.</u> ¶¶ 7-9).

Plaintiffs allege that defendant LeT/JuD is an international terrorist organization based primarily in Pakistan, but with cells in the United States, India, Afghanistan, Bangladesh, and Iraq. (<u>Id.</u> ¶ 10). According to the Amended Complaint, LeT has been designated by the United States government as a Foreign Terrorist Organization, pursuant to Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996; and the United States Department of the Treasury has designated LeT as a "specially designated global terrorist" entity, pursuant to 31 C.F.R. §§ 595 and 596. (<u>Id.</u>) Plaintiffs allege that the individually named defendants Sayeed, Lakhvi, Cheema, and Majid are "leader[s],

4

officer[s], and/or directors]" of the LeT/JuD, all of whom have been designated as "specially

designated global terrorists." (Id. ¶¶ 11-14). Defendants Iqbal and Ali are alleged to be residents

of Pakistan who participated in planning and funding the Mumbai attacks.[5] (Id. ¶¶ 15, 16).

According to plaintiffs, defendant Lakhvi built up a group of fighters in Afghanistan

during the anti-Soviet jihad and then joined with defendant Sayeed in 1986 to form Markaz ud

Dawa wal Irshad ("MDI"), an organization engaged in radical Islamic proselytizing. (Id. ¶¶ 23,

25). Plaintiffs allege that the military arm of MDI — LeT — was formed in 1990 with the support

of and funding from ISI. (Id. ¶ 24). Specifically, plaintiffs allege that in 1992, the U.S.

Ambassador wrote that the ISI was supporting Kashmiri and Sikh militants who carry out acts of

terrorism, by "providing weapons, training and assistance in infiltration." (Id. ¶ 26). The Foreign

Secretary of the United Kingdom allegedly told Parliament that "there is a clear link between the

[ISI] and those groups [including LeT]." (Id. ¶ 30). The Amended Complaint further alleges that

David Hicks, an Australian who was captured in Afghanistan in 2001 and debriefed in

Guantanamo Bay Detention Camp, confirmed that in 1999, he trained with LeT and infiltrated into

Kashmir through crossings controlled by the ISI. (Id. ¶ 27).

Following the December 2001 terrorist attack on India's parliament, LeT was designated a

Foreign Terrorist Organization by the United States Department of State, and as a "Specially

Designated Global Terrorist" by the Treasury Department; its assets were then frozen by the

United States. (Id. ¶¶ 31, 34). Thereafter, in January 2002, Pakistan outlawed LeT, prompting

LeT to change its name to JuD, which was the original name of Sayeed's organization prior to its

---

[5]As discussed further infra, Section II(C), the allegations with respect to Iqbal and Ali
have changed in significant respects between the filing of plaintiffs' initial Complaints and the
filing of the Amended Complaint.

merger into LeT.  (Id. ¶¶ 32-34).  Plaintiffs allege that JuD used the same offices, phone numbers, and bank accounts as LeT, and continued to operate the same website as LeT.  (Id. ¶¶ 34, 38-40). Noticing this change, the United States Department of State designated JuD a Foreign Terrorist Organization in April 2006, and in 2008, the United Nations Security Council included JuD as an entity, along with LeT, that was subject to sanctions for its support of terrorism.  (Id. ¶¶ 35, 36, 37).

Plaintiffs allege that defendant Sayeed, as the head of LeT, wrote various editorials and entries on the LeT website advancing anti-American propaganda.  (Id. ¶¶ 41-43).  Although Sayeed was arrested in 2002, plaintiffs allege that the ISI released him a few days later, and thereafter he continued to support the LeT in its terrorist training.  (Id. ¶¶ 45-53).  Plaintiffs allege that defendant Cheema was appointed head of external operational planning for the LeT in 2004 and a Red Corner Notice[6] for his arrest was issued by Interpol, also in 2004.  (Id. ¶¶ 54-55). Cheema is alleged to have overseen the bombings on the Mumbai train system in 2006.  (Id. ¶ 56). Defendant Lakhvi is alleged to have trained LeT recruits in suicide attacks and allegedly trained the attackers who participated in the 2008 Mumbai terrorist attacks.  (Id. ¶ 58).

The Amended Complaint alleges that the planning of the 2008 Mumbai attacks began some time in 2006, when United States citizen Daoud Gilani, a/k/a David Headley ("Headley"),[7] was directed by defendant Majid to relocate to Mumbai; there, Headley met with defendant Iqbal,

_____

[6]A "Red-Corner Notice" seeks the location and arrest of people wanted for extradition. (Id. ¶ 122).

[7]According to the Amended Complaint, Headley studied in Pakistan and returned to the United States where he carried out a significant portion of the planning for the Mumbai attacks. (Am. Compl. ¶¶ 60-69).  After his capture, he pleaded guilty and cooperated with the government by providing information regarding the Mumbai attacks.  (Id. ¶ 59).

who provided him with money and gave Headley instructions to conduct surveillance of various locations in Mumbai. (Id. ¶¶ 68-69). Headley had previously attended several training courses with LeT at various training camps in Pakistan; these camps were also allegedly attended by the Mumbai attackers. (Id. ¶ 61). According to the Amended Complaint, Headley not only met with Iqbal, but he also met with Lakhvi and Majid, who specifically told Headley to film the Taj Hotel. (Id. ¶ 71). It is alleged that Iqbal served as Headley's "contact or handler" in Mumbai, and helped Headley set up a sham business as a front for LeT's activities. (Id. ¶¶ 65, 69). Although Headley was arrested by Indian authorities at one point during this preparation period, defendant Ali is alleged to have facilitated Headley's release upon learning of his work on behalf of LeT. (Id. ¶ 68). After three trips to Mumbai, Headley provided Iqbal and Majid with a total of four memory cards filled with videos he had taken of various sites in Mumbai. (Id. ¶¶ 72-78).

Between December 2007 and July 2008, Headley met with Majid, Lakhvi, and Iqbal several times to identify the five sites for the attack. (Id. ¶¶ 79-85). Lakhvi also allegedly discussed potential landing sites for a team of LeT attackers who would arrive in Mumbai by sea. (Id. ¶ 80). In a meeting in June 2008, Iqbal chose the Chabad House, a Jewish center in Mumbai, as another target and Majid, who supported the choice, told Headley that this would be his last surveillance trip before the attack. (Id. ¶ 83). After his visit to Mumbai in July 2008, Headley returned to Pakistan, at which time he met with Iqbal and Majid and was told by Majid that he was training the LeT attack team. (Id. ¶ 86).

According to the Amended Complaint, during this time, a group of 32 young men underwent a series of three training sessions at three LeT sites to prepare for the attacks. (Id. ¶¶ 87, 89). Fifteen were able to complete all three sessions. (Id. ¶ 91). The Amended Complaint

7

alleges that Sayeed and Lakhvi, who acted in leadership roles at the training camp, urged the trainees on the importance of jihad, and Cheema provided training in "surveillance, bomb making and infiltration skills." (Id. ¶¶ 88, 92). In September 2008, eight of the original fifteen recruits dropped out of the plan, and were replaced with three new trainees. (Id. ¶ 93).

The Amended Complaint alleges that Lakhvi instructed the pairs of terrorists that were to attack the hotels to set them on fire and cause damage on a large scale. (Id. ¶ 96). Defendant Sayeed fixed the attack time as 7:30 p.m., when the sites would be most crowded. (Id.) Sayeed and Lakhvi allegedly showed the terrorists details of the roads inside Mumbai that led from one target to another. (Id. ¶ 97). It is alleged that "[t]hroughout the period of training and preparation, Sayeed, Lakhvi, Majid and Cheema supervised and closely monitored the group of ten" terrorists. (Id. ¶ 99).

On the morning of November 22, 2008, the ten terrorists, accompanied by Majid, left Karachi, in two boats, one of which belonged to Lakhvi. (Id. ¶ 101). Each terrorist carried a cell phone provided by Lakhvi. (Id. ¶ 100). Based on GPS tracking on the cell phones, it appears that the LeT team hijacked an Indian fishing vessel, killing all on board except for the captain, who was forced to navigate the vessel to Mumbai before he was killed. (Id. ¶¶ 102-103). Although Majid was initially on the boat with the attackers, he subsequently returned to Karachi. (Id. ¶ 102). Between November 26, 2008 and November 28, 2008, the group of ten terrorists attacked five sites throughout Mumbai. (Id. ¶¶ 105-118). Throughout the attacks, the terrorists remained in contact with Majid, Ali, Lakhvi, and Cheema through a series of virtual phone numbers[8] supplied by an American company. (Id. ¶¶ 100, 108, 117).

---

[8] Plaintiffs do not explain what "virtual numbers" are.

According to the Amended Complaint, two main targets of the attacks were the CST Railway Station and the Leopold Café and Bar, both popular with foreigners and Indians. (Id. ¶ 105). After killing 58 people at the railway station and another ten at the café, the terrorists moved to the Taj Mahal Hotel, where two of the terrorists opened fire, killing 20 people in the first few minutes. (Id. ¶ 106). The Amended Complaint alleges that the terrorists asked to see the passports of the hotel guests and expressly targeted U.S. passport holders. (Id. ¶ 107). The attack on the Taj Hotel lasted nearly 60 hours, during which the terrorists were alleged to be in contact with and taking instructions from Majid and Cheema from the control room in Karachi. (Id. ¶ 108).

At 10:00 p.m. on November 26, 2008, the terrorists entered the Oberoi Hotel, firing indiscriminately. (Id. ¶ 109). The terrorists entered the restaurant of the hotel and asked people for their passports, seeking to identify British and American nationals. (Id. ¶ 110). Decedents Alan Scherr and his 14 year-old-daughter, N.S., were dining in the Oberoi Hotel with plaintiffs Varagona and Ragsdale when the terrorists attacked. (Id. ¶ 111). Although they dove under the table, Alan Scherr and N.S. were fatally shot, and plaintiffs Ragsdale and Varagona were wounded by gunfire, but managed to escape. (Id. ¶ 111).

According to the Amended Complaint, the terrorists also attacked the Chabad House, a building operated by a Jewish organization as a welcome center for tourists to India. (Id. ¶ 114). The Amended Complaint alleges that during the attack on the Chabad House, the terrorists remained in telephone contact with Majid, who gave the order to the terrorists to kill the female hostages while he listened. (Id. ¶ 117). Another member of LeT, who was in the control room in Karachi while the attacks were ongoing, was subsequently arrested in Saudi Arabia and extradited

9

to India. (Id.) He allegedly told the Indian authorities that Ali had met with Lakhvi in the control room at the beginning of the attacks, and that Majid and Cheema were in the control room during the four days of the attacks. (Id.)

It is alleged that on December 7, 2008, Pakistani police raided the LeT facility in Muzaffarabad and arrested 12 people, including Lakhvi. (Id. ¶ 119). The control room was reportedly dismantled after Lakhvi's arrest. (Id.) Thereafter, in December 2008, Sayeed and Lakhvi were listed by the United Nations Security Council as associated with the terror group, LeT; and on October 27, 2009, Red-Corner Notices were issued for Sayeed and Lakhvi on terrorism and international criminal charges. (Id. ¶¶ 120, 122). According to the Amended Complaint, Iqbal met with Headley after the attacks and instructed Headley to remove any incriminating materials from his house and to avoid further contact with Iqbal. (Id. ¶ 121). On October 7, 2010, Interpol issued Red-Corner Notices for the arrest of Iqbal, Ali and Majid on charges of international crime and terrorism. (Id. ¶ 122).

As noted in this Court's Report and Recommendation of August 1, 2014 (the "August 2014 Report"), the initial Complaints contained allegations as to the whereabouts of each of the plaintiffs and decedents during the attacks, along with a description of what happened to each of them.[9] However, the Amended Complaint only alleges facts relating to the murders of Alan

---

[9]The original Complaint in the Rosenberg action, 10 CV 5381, alleges that Gavriel Holtzberg and his wife Rivka Holtzberg were killed in the Chabad House, and their murders were witnessed by their then two-year-old son, M.T.H. (Rosenberg Compl. ¶¶ 41, 42, 90). (Citations to "Rosenberg Compl." refer to the Complaint filed on November 19, 2010 in case number 10 CV 5381). The Rosenberg action also brings claims on behalf of Norma Shvarzblat-Rabinovich, who was killed in the attack on the Chabad House, and Sandeep Jeswani, who was killed at the Oberoi. (Id. ¶¶ 43, 44, 88, 95-96). Finally, the Rosenberg action brings the claims of Andreina Varagona, who was shot and injured at the Oberoi. (Id. ¶¶ 5, 45, 101-106, 110-113). The Complaint in the Scherr action, 10 CV 5382, alleges that Alan Scherr and his

Scherr and his daughter N.S., and to the injuries suffered by Varagona and Ragsdale. (Am. Compl. ¶ 111). Apart from identifying the others as plaintiffs or decedents and specifying their nationalities in the opening paragraphs of the Amended Complaint, the specific paragraphs delineating the location of each person during the attacks and the injuries that they suffered were deleted without explanation from the Amended Complaint filed on October 30, 2014. As discussed below, the absence of this information in the Amended Complaint is fatal to some of the plaintiffs' claims. (See discussion infra, Section II(C)(1)).


## PROCEDURAL BACKGROUND

Plaintiffs initially filed separate Complaints in each of the five above-captioned cases. Plaintiffs Rosenberg, Holtzberg, Shvarzblat, Jeswani, and Varagona filed one Complaint on November 19, 2010. (Rosenberg Compl.). Plaintiff Scherr filed a separate Complaint on the same day, November 19, 2010. (Scherr Compl.). Plaintiff Chroman brought suit on November 23, 2010 (Chroman Compl.), and plaintiff Ragsdale commenced an action on August 12, 2011.

---

daughter N.S. were shot and killed at the Oberoi. (Scherr Compl. ¶¶ 1, 42, 59-61). (Citations to "Scherr Compl." refer to the Complaint filed on November 19, 2010 in case number 10 CV 5382). The Chroman action brings claims on behalf of Ben Zion Chroman, who was killed at the Chabad House. (Chroman Compl. ¶¶ 43, 46). (Citations to "Chroman Compl." refer to the Complaint filed on November 23, 2010 in case number 10 CV 5448). The Complaint in the Ragsdale action, 11 CV 3893, brings the personal injury claims of Linda Ragsdale, who was shot in the back during the attack on the Oberoi. (Ragsdale Compl. ¶¶ 44, 57-59, 65-67, 75). (Citations to "Ragsdale Compl." refer to the Complaint filed on August 12, 2011 in case number 11 CV 3893). Finally, the Gilles action brings suit on behalf on Autumn Gilles, who was injured in the attack on the Taj Mahal Hotel. (Gilles Compl. ¶¶ 125, 126-130, 133). (Citations to "Gilles Compl." refer to the Complaint filed on November 21, 2012 in case number 12 CV 5816). Thus, taken together, the Initial Complaints alleged injuries with respect to all plaintiffs, and asserted numerous detailed causes of action. As discussed more infra, Section II(C)(1), many of these allegations and causes of action have been inexplicably removed from the Amended Complaint.

(Ragsdale Compl.)  Finally, plaintiff Gilles filed a Complaint on November 21, 2012 (Gilles

Compl.) (together with the other Complaints, the "Initial Complaints").  Together, the Initial

Complaints asserted nine causes of action against various combinations of the named defendants.

The Initial Complaints also named as defendants the ISI and two former ISI Directors General,

Pasha and Taj.  (See Init. Compl.[10] ¶¶ 6-15).  As of the date of this Report and Recommendation,

the remaining defendants are LeT/JuD, Sayeed, Lakhvi, Majid, Cheena, Iqbal, and Ali — all of

whom have failed to appear.

On July 29, 2011, defendants ISI, Pasha, and Taj, through counsel, moved to dismiss the

claims against them for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil

Procedure 12(b)(1).  Defendant ISI, an agency of the government of Pakistan, asserted that it was

immune from jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603 et seq.

(the "FSIA"), and the individual defendants, Pasha and Taj, asserted that as foreign officials, they

were entitled to immunity because their actions were alleged to have been undertaken in their

official capacity.  (See Docket No. 12).  On April 23, 2012, the district court stayed the action and

requested that the United States Department of State provide the Court with a statement of interest

on the question of whether ISI, Pasha, and Taj were immune from suit.  (See Docket No. 23).  On

December 17, 2012, the Department of State issued a statement suggesting that ISI, Pasha, and

_____

[10]Citations to "Init. Compl." refer to the Complaint filed on November 19, 2010 in case
number 10 CV 5381.  Although there are four additional Complaints in each of the other above-
captioned cases, those Complaints contain many of the same general allegations as to the facts
leading up to the attacks, and they allege substantially the same claims as this lead case.  The
various Complaints differ significantly, however, when describing the actual damages and
circumstances of the individual plaintiffs.  Thus, unless it is necessary to distinguish among the
cases, the Court will refer to the general allegations in the Complaint in 10 CV 5381 to refer to
the allegations contained in the Initial Complaints.

Taj were immune from suit under the FSIA. (See Docket No. 35). Based on the position taken by the Department of State, the district court granted the motion to dismiss the claims against ISI with prejudice and the claims against Pasha and Taj without prejudice. (See Docket No. 43).

Thereafter, on October 22, 2013, plaintiffs requested that a certificate of default be entered with respect to all other defendants, which request was granted on November 4, 2013. Following the entry of default against all defendants, plaintiffs moved on November 12, 2013 for default judgment, which motion was referred to the undersigned to prepare a Report and Recommendation.

On August 1, 2014, the Court issued a Report and Recommendation, recommending that a default judgment be denied, noting numerous areas of insufficient documentation and briefing. Specifically, the Court asked the plaintiffs to further explain: (1) the legal basis for plaintiffs' claims under the ATS following the Supreme Court's decision in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013); (2) the basis for plaintiffs' position that service could be properly effectuated on the individual defendants by mailing the pleadings and other information to the address at "4 Lake Road, Chauburji, Lahore, Pakistan;" (3) the legal authority for allowing several of the plaintiffs to pursue claims on behalf of decedents when those plaintiffs had not been appointed as administrators or executors of the decedents' estates; (4) the reasons for allowing claims against Iqbal and Ali — two Pakistani government agents — to proceed despite the district court's dismissal of several other government figures on the grounds of immunity; (5) the specific role of each individual defendant in the 2008 Mumbai attacks; and (6) the basis for plaintiffs' damages assessments, including an explanation of the expert report's methodology. The Court also directed plaintiffs to include many of the detailed factual allegations contained in their initial

13

motion papers in their amended pleadings to ensure that the Court could exercise jurisdiction over the claims. The Honorable Dora L. Irizarry adopted the August 2014 Report in its entirety over plaintiffs' objections.

Thereafter, on October 30, 2014, plaintiffs filed one joint Amended Complaint, in which they attempted to resolve the problems identified in the August 2014 Report by providing more detailed factual allegations as to the planning and commission of the 2008 Mumbai attacks. Among other things, the Initial Complaints contained only sparse allegations as to the actions of each defendant, and contained conclusory allegations of the harm suffered by each plaintiff. Noting the factual insufficiency of these pleadings, the Court recommended dismissal of all the Complaints without prejudice to re-plead with more detailed factual allegations. Plaintiffs' Amended Complaint contains a great deal more detail about the events leading up to the 2008 Mumbai attacks, and about the involvement of each defendant therein, but has omitted specific facts relating to the injuries and harms suffered by the majority of the victims, including information that was actually contained in the initial pleadings.

Among other things, plaintiffs' Initial Complaints described defendants Iqbal and Ali as "officer[s], employee[s] and/or agent[s] of ISI," a military organization associated with the government of Pakistan. (See, e.g., Init. Compl. ¶¶ 11, 14, 15). This Court, in its August 2014 Report, noted that this affiliation implicated potential immunity concerns under the FSIA, given the September 30, 2013 dismissal of the claims against the two other ISI officers named as defendants in the Initial Complaints. In its August 2014 Report, this Court recommended that plaintiffs be allowed the opportunity to explain why Iqbal and Ali were not considered to be "foreign officials" like the dismissed defendants Pasha and Taj, and should not be dismissed from

14

the action. Although plaintiffs' Amended Complaint still names Iqbal and Ali as defendants, and

has been altered to omit any reference to their affiliation with ISI, plaintiffs still have not provided

any explanation as to why their status is distinguishable from that of Pasha and Taj.

On the same day that plaintiffs filed their Amended Complaint, October 30, 2014,

plaintiffs filed a second motion for default judgment and damages. That motion was denied

without prejudice as premature.[11] Plaintiffs subsequently filed their third request for default

judgment and damages on February 24, 2015, which motion was referred to the undersigned by

Judge Irizarry on February 25, 2015. The Court held an inquest hearing on June 5, 2015, at which

defendants failed to appear. At the hearing, the Court noted numerous further deficiencies in

plaintiffs' papers, and requested supplemental briefing and documentation, which plaintiffs

provided on June 23, 2015.


## DISCUSSION

### I.  Standards for Default Judgment

As set forth in the Court's August 2014 Report, Rule 55 of the Federal Rules of Civil

Procedure sets forth a two-step process for entry of a default judgment. See Enron Oil Corp. v.

Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993). After the Clerk of Court enters a default against a

party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c),

the court may enter a default judgment. See FED. R. CIV. P. 55(b).

---

[11]Pursuant to Rule 12, a party has 21 days to respond to a complaint that is properly
served. See FED. R. CIV. P. 12(a)(1)(A)(i). Accordingly, the Court found that plaintiffs' second
motion for default judgment, filed the same day as the Amended Complaint itself, was
premature.

The burden is on the plaintiffs to establish their entitlement to recovery. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993). When a default judgment is entered, the defendants are deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability, but not as to damages. Id. It remains the plaintiffs' burden to demonstrate that the uncontroverted facts establish the defendant's liability on each cause of action asserted, Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009), but the Court draws all "reasonable inferences from the evidence offered" in plaintiffs' favor. Id. (quoting Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)). The plaintiffs must also establish their entitlement to the requested relief to a "reasonable certainty." Gunawan v. Sushi Sake Restaurant, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012). While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (collecting cases), aff'd, 873 F.2d 38 (2d Cir. 1989).

## II. Defendants' Liability

Before assessing damages, the Court first must determine whether plaintiffs have sufficiently established defendants' liability as to each cause of action. In conducting this analysis, the Court must be satisfied that the defendants have been properly served and that the jurisdictional requirements of Article III of the United States Constitution have been met. Even in the context of a default, if the court finds that it lacks personal or subject matter jurisdiction, relief may not be awarded. See FED. R. CIV. P. 12(h)(3); see also Wolf v. Town of Southampton, No. 12 CV 5166, 2013 WL 4679672 at *6 n.3 (E.D.N.Y. Aug. 30, 2013) (dismissing the complaint as to

16

several defendants against whom default was entered because of lack of subject matter jurisdiction); Hua Chen v. Honghui Shi, No. 09 CV 8920, 2013 WL 3963735, at *4 (S.D.N.Y. Aug. 1, 2013) (noting that, while lack of personal jurisdiction is not grounds for sua sponte dismissal of a complaint, default judgment cannot be entered against a nonappearing defendant who is not subject to the court's jurisdiction).  Similarly, if any of the claims asserted are nonjusticiable, a court must dismiss those claims.  See Bricklayers Ins. Welfare Fund v. Manley Const. Corp., No. 13 CV 0224, 2014 WL 4722754, at *3 (E.D.N.Y. Aug. 13, 2014), report and recommendation adopted in part, 2014 WL 4699710 (E.D.N.Y. Sept. 22, 2014) (recommending dismissal of a claim brought by plaintiffs who lacked standing, even in the context of a motion for default judgment).

The order in which the Court addresses these questions does not matter; "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431-32 (2007) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999)); accord In re Facebook, Inc., IPO Securities & Derivative Litig., 922 F. Supp. 2d 445, 454 (S.D.N.Y. 2013) (noting that such "threshold grounds" include questions of justiciability).


A.  Personal Jurisdiction

Personal jurisdiction is a necessary prerequisite to entry of a default judgment.  If a defendant does not receive service in compliance with Rule 4 of the Federal Rules of Civil Procedure and does not waive formal service, the court lacks personal jurisdiction over the defendant.  See Martin v. N.Y. State Dep't of Mental Hygiene, 588 F.2d 371, 373 (2d Cir. 1978);

see also Michaelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1282

(S.D.N.Y. 1989) (stating that proper service on a defendant of a summons and complaint is a

prerequisite to personal jurisdiction).

      Rule 4 of the Federal Rules of Civil Procedure prescribes the manner in which service of

process must be effected in order to subject a defendant to the court's jurisdiction.  See FED. R.

CIV. P. 4.  Thus, it is well established that failure to adequately prove proper service of court

documents under Rule 4 bars the entry of a default judgment.  See, e.g., Orellana v. World

Courier, Inc., No. 09 CV 576, 2010 WL 3861002, at *2 (E.D.N.Y. Aug. 24, 2010) (denying

motion for default judgment against a defendant for whom plaintiff had not adequately proved

service); Cowder v. Admin. for Children & Families, No. 09 CV 628, 2010 WL 723440, at *2

(E.D.N.Y. Mar. 1, 2010) (denying motion for default judgment where service had not been

properly effected); Llaviganay v. Cipriani 110 LLC, No. 09 CV 737, 2009 WL 1044606, at *1

(S.D.N.Y. Apr. 14, 2009) (noting that inadequate proof of service bars entry of default judgment).

      Here, defendants have not indicated any intention to waive service; accordingly, the Court

must determine whether all necessary documents have been served in compliance with the

requirements of Rule 4.

      1.  Standards for International Service

Pursuant to Rule 4(f)(1), a foreign party may be served:

> by any internationally agreed means of service that is reasonably
> calculated to give notice, such as those authorized by the Hague
> Convention on the Service Abroad of Judicial and Extrajudicial
> Documents . . . .

FED. R. CIV. P. 4(f)(1).  Thus, the preferred method of international service under Rule 4 is that

18

which comports with the requirements of the Hague Convention.  In this case, as noted in this

Court's August 2014 Report, Pakistan is a signatory to the Hague Convention (as a non-member

state).  HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, 14: Convention of 15 November

1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial

Matters, www.hcch.net/index_en.php?act=conventions.statusprint&cid=17.  Therefore, service on

defendants in Pakistan under the provisions of the Convention is required.  See Michnovez v.

Blair, LLC, No. 10 CV 110, 2011 WL 5239239, at *2 (D.N.H. Oct. 31, 2011); BP Products N.

America, Inc. v. Dagra, 236 F.R.D. 270, 271 (E.D. Va. 2006); Felice Feder Oriental Art, Inc. v.

Scanlon, No. 81 CV 5168, 1983 WL 13709, at *2 (S.D.N.Y. Dec. 8, 1983).

   The Convention provides for several basic procedures for service.  Service may be effected

through:  (1) a member state's Central Authority pursuant to Article 5 of the Convention;[12] (2)

consular channels designated by the member state pursuant to Article 9; or (3) service by mail

pursuant to Article 10(a).  See generally Trump Taj Mahal Assocs. v. Hotel Servs., Inc., 183

F.R.D. at 176-77.

   Although the Hague Convention specifies several avenues for serving judicial documents,

particularly relevant here is Article 10(a), which states that, subject to the objection of a signatory

state,[13] the Convention is not intended to prevent a party from sending judicial documents by mail

---

[12]In this case, Pakistan has specifically designated the Solicitor of the Ministry of Law &
Justice, located at R. Bock, Pak. Sectt. in Islamabad as its Central Authority.  HAGUE
CONFERENCE ON PRIVATE INTERNATIONAL LAW, Pakistan – Central Authority & Practical
Information, http://www.hcch.net/index_en.php?act=authorities.details&aid=288.  However, as
noted in the August 2014 Report, plaintiffs' efforts to serve through the Central Authority have
proven unsuccessful.

[13]Pakistan has not objected to service by postal channels (Article 10(a)) or service
"directly through the judicial officers of Pakistan."  (Article 10(b)).  HAGUE CONFERENCE ON

to a foreign party, nor does it inhibit the freedom of judicial officers or officials, or persons

interested in a judicial proceeding to effect service directly through a judicial officer, official, or

other competent person in the foreign jurisdiction. <u>See</u> Hague Convention, Article 10(a), (b), (c).

As discussed in the August 2014 Report, Article 10(a) of the Hague Convention has been

the subject of controversy among courts and commentators, who are divided over the meaning of

the phrase "freedom to send judicial documents." Some courts have held that Article 10(a)

authorizes service of process by mail. <u>See, e.g.</u>, <u>Ackermann v. Levine</u>, 788 F.2d at 838-39; <u>see</u>

<u>also</u> <u>Brockmeyer v. May</u>, 383 F.3d 798, 802-03 (9th Cir. 2004) (holding that the Hague

Convention allows for service of judicial documents by mail). Other courts, however, have held

that this subsection does not sanction service of process by mail but is merely intended to provide

a method for sending subsequent documents after service has been achieved through other means.

<u>See</u> <u>Nuovo Pignone v. Storman Asia M/V</u>, 310 F.3d 374, 384 (5th Cir. 2002) (finding service by

mail improper under the Hague Convention); <u>Bankston v. Toyota Motor Corp.</u>, 889 F.2d 172, 174

(8th Cir. 1989) (concluding that "sending a copy of a summons and complaint by registered mail

to a defendant in a foreign country is not a method of service of process permitted by the Hague

Convention").

Although the Supreme Court has not considered this issue, the Second Circuit has held that

this clause permits foreign service by mail where the signatory countries have not registered an

---

PRIVATE INTERNATIONAL LAW, Declarations,
http://www.hcch.net/index_en.php?act=status.comment&csid=436&disp=resdn; <u>see</u> <u>EOI Corp.</u>
<u>v. Medical Marketing Ltd.</u>, 172 F.R.D. 133, 136-37 (D.N.J. 1997) (finding that "[p]rovided the
State of destination does not object, the present Convention shall not interfere with – (a) the
freedom to send judicial documents, by postal channels, directly to persons abroad").

objection to subsection 10(a).  Ackermann v. Levine, 788 F.2d at 838-39 (noting that "[t]he reference to the freedom to send judicial documents by postal channels . . . would be superfluous unless it was related to the sending of such documents for the purpose of service") (internal citations and quotations omitted); see also EOI Corp. v. Medical Mktg. Ltd., 172 F.R.D. at 137 (determining that "service by mail is consistent with the overriding purpose of the Convention to develop a comprehensive system to effectuate proper service of process in other countries") (citing R. Griggs Grp. Ltd. v. Filanto Spa, 920 F. Supp. 1100, 1104 (D. Nev. 1996)).

Beyond this general grant of authority, however, the Hague Convention is silent as to where documents must be mailed, and who may validly accept them.  Accordingly, the Second Circuit has advised that "as to this issue on which the Convention is silent, Federal Rule 4 [governs]." Ackermann v. Levine, 788 F.2d at 841.  Thus, when service under the Hague Convention is attempted on individuals residing outside of the United States, Rule 4(f) still applies to any aspects of service on which Article 10(a) is silent. See, e.g., Papir v. Wurms, No. 02 CV 3273, 2005 WL 372061, at *3 (S.D.N.Y. Feb. 15, 2005) (applying Rule 4(h), which incorporates Rule 4(f), to service of a bank located in Israel).  Rule 4(f)(2) specifies that service may be effected

> if there is no internationally agreed means [of service], or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
>> (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
>>
>> (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
>>
>> (C) unless prohibited by the foreign country's law,

21

by:

> (i) delivering a copy of the summons
> and of the complaint to the individual
> personally; or
>
> (ii) using any form of mail that the
> clerk addresses and sends to the
> individual and that requires a signed
> receipt; . . .

FED R. CIV. P. 4(f)(2). Rule 4(f)(2)(C)(ii) is silent as to where service must be mailed, but, as this Court noted in the August 2014 Report, the Federal Rules of Civil Procedure generally do not allow an individual to be served through service on an organization with which he or she is affiliated; courts generally require service to be mailed to a defendant's residence. See, e.g., Ackermann v. Levine, 788 F.2d at 840-41; Wilson v. Austin, No. 11 CV 4594, 2012 WL 3764512, at *5 (E.D.N.Y. June 25, 2012); Silver Top Ltd. v. Monterey Indus., Ltd., No. 94 CV 5731, 1995 WL 70599, at *3 (S.D.N.Y. Feb. 21, 1995). Courts will, however, allow mailings to other addresses where a defendant has "actual notice" of the documents mailed. See, e.g., Burda Media, Inc. v. Blumenberg, No. 97 CV 7167, 2004 WL 1110419, at *6-*7 (S.D.N.Y. May 18, 2004).

### 2. Alternative Service

The inherent difficulties involved in international service have led numerous courts to recognize that alternative service pursuant to Rule 4(e)(1)[14] is appropriate when foreign entities are

---

[14] Rule 4(e)(1) authorizes alternative service by "following state law . . . [of] the state where the district court is located . . . ." Thus, in this case, alternative service under Rule 4 would require plaintiffs to follow New York law. The New York Civil Practice Law and Rules ("CPLR") permits service "in such manner as the court, upon motion without notice, directs, if

parties to a domestic lawsuit. See, e.g., Jian Zhang v. Baidu.com Inc., 293 F.R.D. 508, 514-515 (S.D.N.Y. 2013) (recognizing that courts have discretion to authorize alternative service even where a nation has declined to effect service under the Hague Convention); Stream SICAV v. Wang, 989 F. Supp. 2d 264, 278 (S.D.N.Y. 2013) (authorizing alternative service upon a foreign defendant even where service pursuant to the other provisions of Rule 4(f) had not even been attempted). This is particularly the case where, in a suit involving both entity and individual defendants, "it is likely that the individual defendants have already received actual notice of this lawsuit as a result of service on the entity defendants." Government Emps. Ins. Co. v. New Way Medical Supply Corp., et al., No. 15 CV 2597 (E.D.N.Y. July 21, 2015) (order authorizing alternative service).

Given that the defendants in this case, by nature of their status as international terrorists, would likely evade any service efforts made by plaintiffs through traditional means, it appears that service pursuant to the enumerated methods of Rule 4(f) would likely be impracticable. However, as plaintiffs have not moved for leave to serve the defendants by alternative means, the Court only considers whether plaintiffs have satisfied the requirements of Rule 4(f).

### 3. Analysis

Plaintiffs have struggled to properly serve defendants, given the difficulty of obtaining accurate addresses for all defendants. Plaintiffs initially attempted to serve all relevant court documents and filings on the defendants through Pakistan's Central Authority, which does not

---

service is impracticable . . . ." N.Y. C.P.L.R. § 308 (5). "The meaning of 'impracticable' will depend upon the facts and circumstances of the particular case." Safadjou v. Mohammadi, 105 A.D.3d 1423, 1424, 964 N.Y.S.2d 801, 802 (4th Dep't 2013).

appear to have served the documents. In addition, service was attempted by mail[15] to "4 Lake Road, Chauburji, Lahore, Pakistan," which plaintiffs refer to as "Jamat ud Dawa's address."[16] (See Fawcett Aff.[17] ¶ 12; see also Service Aff.[18] ¶ 7). The initial mailings were all accepted at this address by an individual identified only as "ISHFAQ." (See Service Aff. Ex. 5). In the August 2014 Report, the Court indicated that these mailings alone were insufficient under Rule 4(f) and the Hague Convention because the address of the organization would not ordinarily suffice as the service address for all of the individually named defendants. (Aug. 2014 Rep. at 22-23). Further, because JuD denied any connection to LeT, the Court found that LeT had not been properly served by mailing the Initial Complaints to JuD.[19] However, because the mailings sent to defendants Cheema and Sayeed were never returned, and Sayeed actually responded to the Initial Complaints,

---

[15]A more thorough discussion of the carriers and tracking mechanisms used to mail the Initial Complaints and other documents associated with plaintiffs' first motion for default judgment is contained in the August 2014 Report.

[16]JuD submitted a written response to some of the Initial Complaints, representing that it has "nothing to do with [LeT]," and that it is "a peaceful and charitable organization . . . [that] is not involved in any terrorist activities." (See Written response dated June 1, 2011, sent by Sayeed and Jamat ud Dawa to plaintiffs' counsel regarding: 10 CV 5381, 10 CV 5382, and 10 CV 5448, and filed on May 4, 2011 as Exhibit 12 to plaintiffs' Affidavit of Service 1 (Aff. of Service 1, Ex 12) ¶ 6). That response, however, was never filed with the Court. Since JuD has not filed an answer or formally appeared in the action, the Court does not consider this denial and assumes that the plaintiffs' allegations of a connection are true, as the Court must on a motion for default.

[17]Citations to "Fawcett Aff." refer to the Affidavit of John Fawcett, filed as Docket Entry No. 87 on July 23, 2015.

[18]Citations to "Service Aff." refer to the Affidavit of Service filed by plaintiffs on December 17, 2014.

[19]Plaintiffs' Amended Complaint, however, sets forth additional information in support of their allegation that LeT is also known as, inter alia, JuD. (Am. Compl. ¶¶ 31-40; see also discussion infra, Section II(D)).

24

the Court found that Cheema and Sayeed had actual notice of the Initial Complaints, excusing plaintiffs' deficient service as to those individuals. (Id. at 23-24). Thus, this Court found that it lacked personal jurisdiction over LeT, Ali, Iqbal, Majid, and Lakhvi. (Id. at 23).

Since the August 2014 Report, plaintiffs have provided further evidence to establish that JuD is a front for LeT, including memoranda from various Executive Departments of the United States government. (See Default Mot.[20] Exs. A-C; Am. Compl. ¶¶ 31-40). Specifically, plaintiffs allege that after Pakistan outlawed the LeT, its name was changed to JuD, the name of Sayeed's original organization, and JuD continued to operate in the same location, with the same phone numbers and website that LeT had used. (Am. Compl. ¶¶ 32-34, 38-40). Plaintiffs have also included further support for their contention that JuD is located at 4 Lake Road. (Fawcett Aff. Ex. 1). Thus, taking the facts alleged in plaintiffs' Amended Complaint as true, the Court finds that plaintiffs have established that JuD/LeT may properly be served at the 4 Lake Road address. Plaintiffs have failed, however, to address why any of the individual defendants may be served at this address.

At the inquest hearing on June 18, 2015, the Court specifically asked plaintiffs to explain "the basis for serving individuals at [4 Lake Road]," and asked for an explanation as to the identity of "ISHFAQ," including why plaintiffs believed that "ISHFAQ" was authorized to accept service on behalf of any of the defendants. (Tr.[21] at 12:19-25; 14:2-6).

Since then, plaintiffs have provided no further authority for their attempts to serve the

---

[20]Citations to "Default Mot." refer to the Motion for Default Judgment, filed by plaintiffs on February 24, 2015.

[21]Citations to "Tr." refer to the transcript of the inquest hearing which took place on June 5, 2015, filed on the docket on June 18, 2015 as Docket No. 83.

individual defendants at 4 Lake Road, nor have they sought authorization to serve by some

alternative means.  In explaining why "ISHFAQ" was authorized to accept service, plaintiffs have

simply stated that:

> FedEx delivered the packages to the receptionist/front desk or the
> mailroom of Jamat ud Dawa's offices . . . to an adult who
> represented that they worked there and were authorized to receive
> papers on behalf of the organization and its employees and agents. .
> . . I have no additional information, aside from the name, on the
> identity of the person who signed for the packages.

(Fawcett Aff. ¶ 14).

Even if this bare description were sufficient to establish ISHFAQ's ability to accept service

of the initial Complaint on behalf of any of the defendants, plaintiffs must still demonstrate proper

service of the Amended Complaint and of the default papers.  Plaintiffs' supplemental briefing,

submitted in July 2015, after the filing of the Amended Complaint, included a new set of service

receipts, some of which contained the names of other individuals who accepted packages at 4 Lake

Road:  "A. QADIR," "ABOBAKR," "MAHMOOD," "ABU SHAHID," and "HADER."  (See

generally Kreindler Suppl. Aff.[22] Ex. 5).  Plaintiffs have failed to explain what positions these

individuals, who are marked as having signed for many of the packages on behalf of the

defendants, hold in the organization or why the Court should find that these individuals were

authorized to accept service on behalf of LeT/JuD or any of the individually named defendants.

Copies of some of the receipts are so grainy that the names of those who signed for the packages

are illegible.  (See id.)  Indeed, it is unclear if some of these documents were signed for by anyone.

---

[22]Citations to "Kreindler Suppl. Aff." refer to the Supplemental Affirmation of James P.
Kreindler, filed on July 23, 2015.

Moreover, upon reviewing plaintiffs' briefing, it is unclear which documents were contained in which mailings, and thus, it cannot be determined which documents were actually mailed and received by the defendants. For example, plaintiffs have filed copies of mailing labels for packages which allegedly contained the Amended Complaint, but have not provided receipts indicating that these packages were actually delivered. Even less documentation has been provided with respect to the motion papers themselves; there appear to be no mailing labels or receipts documenting service or mailing of plaintiffs' default motion papers, which were filed with the Court on February 24, 2015. The only receipt dated after the motion papers were filed is dated as having been mailed on May 7, 2015, which more likely reflects the mailing of this Court's inquest scheduling order, which the Court issued on May 5, 2015.[23] (See Docket Nos. 79-80).

At this point, all that can be said with any certainty, based on the evidence before the Court, is that some unspecified documents have been mailed to an address which may be proper for one of the six defendants. Of those unspecified mailings, only some appear to have been signed for by anyone. Of those that have been signed for, only six mailings were received by an individual with respect to whom plaintiffs have alleged any authority to accept mailings. Finally, there is no evidence that the default motion papers themselves were actually mailed at all. Based on the numerous deficiencies in service addressed above, the Court has serious concerns about whether it has the authority to exercise personal jurisdiction over the defendants at this time.

Given that it is unclear from a review of the affidavits of service and mailing receipts

---

[23]Indeed, plaintiffs explicitly state that Docket No. 80 — the only receipt filed after the Amended Complaint — is an "Affidavit of Service for Court Order of May 5, 2015." (Docket No. 80) (emphasis added). There is no mention of plaintiffs' motion papers being included in that same mailing.

provided by plaintiffs which documents were actually mailed to 4 Lake Road, or whether "ISHFAQ," "A. QADIR," "ABOBAKR," "MAHMOOD," "ABU SHAHID," or "HADER" could validly accept service on behalf of any of the defendants, the Court finds that plaintiffs have not satisfied the requirements for service set out in the Hague Convention nor have they complied with the standards of Rule 4 with respect to service of the Amended Complaint or the motion papers on any of the defendants. Indeed, the Court's concern with the adequacy of service is compounded by plaintiffs' failure to provide any legal authority for their assertion that 4 Lake Road is an appropriate address to serve any of the individual defendants. Given the absence of evidence to show service of the Amended Complaint and the motion for default judgment on any of the defendants, the Court is reluctant to recommend entry of a judgment of default.

Accordingly, the Court respectfully recommends that plaintiffs' motion for default judgment be denied at this time, without prejudice to re-file with proper proof of service as to all necessary documents and further explanations as to: (1) the authority of these individuals to accept mail and service at 4 Lake Road; and (2) the basis for serving the individual defendants at this address.[24]

---

[24]In the August 2014 Report, this Court found that defendants Cheema and Sayeed had actual notice of the Initial Complaints based on service at the 4 Lake Road address. Thus, should plaintiffs seek Court approval for alternative service under Rule 4(e), the Court would recommend that alternative service by mail upon Sayeed and Cheema at the 4 Lake Road address be authorized given the insurmountable problems plaintiffs have faced in serving a terrorist organization and terrorist participants, who by their very nature, seek to hide from the authorities and the rule of law. No such alternative service order would be required to serve LeT/JuD at 4 Lake Road, as plaintiffs have introduced sufficient evidence demonstrating the propriety of service upon the organization at this address. However, before the Court would recommend that the default judgment enter, even as against these defendants, the plaintiffs must establish that they mailed the Amended Complaint and the default motion papers to the defendants so that they have an opportunity to respond, should they choose to do so.

B. Subject Matter Jurisdiction Over ATA and ATS Claims

Assuming that plaintiffs can establish personal jurisdiction over one or more of the defendants, the Court must also determine whether there is subject matter jurisdiction, which would allow the court to hear the claims brought by the plaintiffs. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93-102 (1998) (noting that courts may not reach the merits of a claim before establishing subject matter jurisdiction). Where subject matter jurisdiction has been conferred by an act of Congress, a party's failure to establish that its case falls within the class of cases covered by the statute renders a court without power to hear the matter. See Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG, 335 F.3d 52, 57 (2d Cir. 2003) (dismissing action where "it [was] clear that appellant's complaint d[id] not trigger that grant [of statutory authority]").

Here, plaintiffs' Amended Complaint does not specify the statutory basis for each cause of action with respect to each plaintiff. Rather, the Amended Complaint simply states that "[t]his Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1350 (Alien Tort Statute) and 18 U.S.C. § 2333 (Antiterrorism Act)." (Am. Compl. ¶ 17; see also ¶ 149 (stating that "[t]his Court has the authority and jurisdiction to hear plaintiffs' claims and award plaintiffs damages pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity jurisdiction), 1350 (Alien Tort Claims Act), and18 U.S.C. § 2333 (Antiterrorism Act)")).

1. Subject Matter Jurisdiction Over the ATA Claims

As noted in the August 2014 Report, plaintiffs have stated claims under the Antiterrorism Act, 18 U.S.C. § 2333, which provides:

29

> Any national of the United States injured in his or her person,
> property, or business by reason of an act of international terrorism,
> or his or her estate, survivors, or heirs, may sue therefor in an
> appropriate district court of the United States and shall recover
> threefold the damages he or she sustains and the cost of the suit,
> including attorney's fees.

18 U.S.C. § 2333(a). Plaintiffs have alleged claims by various United States nationals and/or

their estates, alleging that they were injured by an act of international terrorism. Clearly, the

Mumbai attacks constitute "acts of international terrorism," which are defined as activities that:

> (A) involve violent acts or acts dangerous to human life that are a
> violation of the criminal laws of the United States or any State; (B)
> appear to be intended – (i) to intimidate or coerce a civilian
> population; (ii) to influence the policy of a government by
> intimidation or coercion; or (iii) to affect the conduct of a
> government by mass destruction, assassination, or kidnapping.

18 U.S.C. § 2331(1)(A), (B). The statute further provides that the acts must "occur primarily

outside the territorial jurisdiction of the United States," which is the case here, since the attacks

which killed or injured the plaintiffs all took place in India. See 18 U.S.C. § 2331(1)(c).

Accordingly, plaintiffs have established that the Court has subject matter jurisdiction over

any claims brought under the ATA. These are the claims of Holtzberg, Jeswani, Scherr, Chroman,

Varagona, Ragsdale, Gilles, and Rosenberg, insofar as Rosenberg seeks to bring suit on behalf of

the minor M.T.H. or the estate of Gavriel Noach Holtzberg. The other claims, brought on behalf

of noncitizens, cannot proceed under the ATA. Thus, because Rivka Holtzberg and Norma

Shvarzblat-Rabinovich are not United States nationals, no jurisdiction exists under the ATA for

their claims. (See discussion infra, Section II(C)(2)). These decedents' failure to state claims as a

matter of law strip their United States national survivors of standing to sue under the ATA. (See

id.)

2.  Subject Matter Jurisdiction Over the ATS Claims

In the August 2014 Report, the Court raised concerns about the ability of plaintiffs to pursue claims under the ATS.  The ATS limits standing to bring claims under the ATS to "aliens" or non-citizens of the United States.  (Aug. 2014 Rep. at 29-30 (citing 28 U.S.C. § 1350 (granting district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States") (emphasis added)).  Thus, under the ATS, only those plaintiffs who are not United States nationals, or who bring claims on behalf of decedents who were not United States nationals, have standing to pursue claims.

Apart from the question of who has standing to sue under the ATS, the August 2014 Report noted that there was a fundamental question as to whether the ATS provided jurisdiction over the Mumbai attacks.  As noted, the Supreme Court has clarified that the ATS is limited in scope by a strong presumption against extraterritoriality.  Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1668-69 (2013) (holding that "[n]othing . . . suggests that Congress also intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign").  This presumption is strong "where a foreign national is being hailed into an unfamiliar court to defend himself." Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 322 (D. Mass. 2013).  The Supreme Court left open the possibility of extraterritorial application of the ATS where claims "touch and concern the United States . . . with sufficient force to displace the presumption . . . ." Kiobel v. Royal Dutch Petroleum, 133 S. Ct. at 1669.  Thus, courts must "determine whether the 'relevant' conduct — conduct which constitutes a violation of the law of nations or aiding and abetting such a violation — sufficiently "touches and concerns" the territory of the United States." Mastafa v. Chevron Corp., 770 F.3d 170, 186 (2d

31

Cir. 2014).  Where "relevant conduct" occurs both domestically and abroad, courts are only to

consider those aspects of the conduct which are the "focus" of congressional concern in passing

the ATS; the domestic conduct "must indicate a U.S. focus to the claims."  Doe v. Exxon Mobil

Corp., No. 01 CV 1357, 2015 WL 5042118, at *6 (D.D.C. July 6, 2015).

A limited number of courts have applied these guiding principles to allow plaintiffs to

bring suit under the ATS for injuries sustained wholly abroad.  See, e.g., Al Shimari v. CACI

Premier Tech., Inc., 758 F.3d 516, 530-31 (4th Cir. 2014) (holding that plaintiffs could sue their

American torturers under the ATS for alleged torture at Abu Ghraib); Mwani v. Laden, 947 F.

Supp. 2d 1, 5 (D.D.C. 2013) (concluding that a terrorist attack plotted in part in the United States

and "directed at a United States Embassy and its employees" fell within the "narrow category of

cases for which the presumption against extraterritorial application of the ATS is displaced");

Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 322-23 (D. Mass. 2013) (allowing

claims to be brought under the ATS against an American defendant for conduct within the United

States that led to harm in Uganda).

In the August 2014 Report, the Court recommended that plaintiffs be given an opportunity

to provide the Court with additional authority as to the impact of Kiobel on the case at hand.  In

now arguing that the Court has subject matter jurisdiction over these three claims under the ATS,

plaintiffs contend that defendants' conduct "touches and concerns the United States" with

sufficient force because:  (1) LeT has a "long-standing and well-documented hatred of the United

States (Pls. Mem.[25] at 6); (2) "[a] significant portion of the planning of the 2008 Mumbai terrorist

---

[25]Citations to "Pls. Mem." refer to the Brief in Support of Plaintiffs' Motion for Default
Judgment, attached as Exhibit 2 to the Motion for Default Judgment, filed by plaintiffs on
February 24, 2015.

attacks was carried out in the United States by David Coleman Headley, . . . a U.S. citizen" (Am. Compl. ¶ 59); (3) the attack was coordinated using a series of "virtual numbers"[26] purchased from an American company (Pls. Mem. at 6; Am. Compl. ¶ 100); (4) the attack "specifically targeted Americans" (Pls. Mem. at 6); and (5) the attack "resulted in American deaths." (Id.)

The first factor — LeT's general "hatred of the United States" — is irrelevant to the circumstances governing the specific attack in Mumbai. Further, the Court is not convinced by plaintiffs' allegation that the attacks "specifically targeted Americans," particularly in light of plaintiffs' own admission that the attacks were conducted in Mumbai, at locations plaintiffs describe variously as "Mumbai institution[s]" and "Mumbai icon[s]." (Am. Compl. ¶¶ 105-06). Moreover, the Chabad House was known to be a Jewish organization, and most importantly, when one considers the total number of people killed in the coordinated attacks — 164 individuals — only six Americans were killed,[27] belying the notion that Americans were specifically targeted. (Id. ¶ 123). Cf. Mastafa v. Chevron Corp., 770 F.3d at 186 (holding that "the pleaded conduct must be 'plausibl[e]'" to be considered in displacing the presumption).

Thus, the Court has considered the three remaining factors: (1) the potential involvement of an American citizen in planning the acts; (2) the use of virtual numbers purchased from an American company; and (3) the fact that six Americans died as a result of the attack. On balance,

---

[26]Plaintiffs do not seem to allege that the cell phones themselves were bought from an American company, instead stating that "LeT arranged virtual numbers using Voice over Internet Protocol" and that "LeT purchased this virtual account number from . . . a U.S.-based company." (Am. Compl. ¶ 100).

[27]In addition to the five decedents on behalf of whom plaintiffs have commenced the instant action, the original Complaints referenced a sixth American, Leibish Teitlebaum, who was killed in the 2008 Mumbai attacks. (See, e.g., Init. Compl. ¶ 48). The claims of decedent Teitlebaum, however, are not part of this action.

the Court finds that these allegations alone are not enough to displace the presumption against extraterritoriality.

Instructive to the Court's analysis is <u>Giraldo v. Drummond Co., Inc.</u>, one of the relatively few analogous cases decided after <u>Kiobel</u>. No. 09 CV 1041, 2013 WL 3873960 (D. Ala. July 15, 2013). There, plaintiffs brought suit in federal district court under the ATS for mass killings committed in Colombia, arguing that the ATS applied to their case because: (1) one defendant, an American corporation, had provided material support to the mass killings; (2) the mass killing scheme was "directed or furthered in the United States;" and (3) the conduct in the United States was "central to implementing the illegal scheme to fund [the mass killing]." <u>Id.</u> at *5. Despite these allegations, the court found that it lacked jurisdiction under the ATS, noting that "the ATS focuses on the torts of extrajudicial killings and war crimes," and thus, the mere fact that the attack was partially planned in the United States, even when coupled with the potential secondary liability of an American corporation, could not displace the presumption because "the tort at issue occurred abroad, in Colombia, and <u>not</u> in the United States." <u>Id.</u> at *8 (emphasis in original).

In this case, the Court also finds the plaintiffs' allegations to be insufficient. Unlike the cases cited in plaintiffs' Memorandum, this case involves plaintiffs bringing suit against noncitizen defendants for tortious conduct that occurred almost entirely in a foreign country. The mere fact that <u>some</u> domestic activity was involved in planning the attacks cannot overcome <u>Kiobel</u>'s strong presumption against extraterritoriality, as "the presumption . . . would be a craven watchdog indeed if it retreated to its kennel whenever <u>some</u> domestic activity is involved in the case." <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247, 266 (2010) (emphasis in original). Accordingly, the Court respectfully recommends that all of plaintiffs' claims under the ATS be

34

dismissed with prejudice for lack of subject matter jurisdiction.

C. Justiciability

Questions about the justiciability of claims brought before a court are also considered "threshold questions" to be addressed before the merits of those claims. See Can v. United States, 14 F.3d 160, 162 n.1 (2d Cir. 1994) (noting that justiciability is a threshold question that may be addressed before jurisdictional issues). Accordingly, where a plaintiff lacks standing to bring a particular claim, a court may not reach the merits of that claim. See, e.g., In re Facebook, Inc., IPO Securities and Derivative Litig., 922 F. Supp. 2d at 463-64 (dismissing action without reaching the merits in part because plaintiffs lacked standing to bring claims). This requirement applies with equal force in the context of a default judgment. See Bricklayers Ins. Welfare Fund v. Manley Constr. Corp., 2014 WL 4722754, at *3 (dismissing claims for which plaintiffs lacked standing upon plaintiffs' motion for default judgment). Thus, the Court must consider, as another threshold question, which plaintiffs have standing to bring claims under the ATA.

Where, as here, the cause of action is created expressly by an act of Congress, standing has two different dimensions: (1) "constitutional standing, a mandate of the 'case or controversy' requirement in Article III;" and (2) "prudential . . . standing, which involve[s] 'judicially self-imposed limits on the exercise of federal jurisdiction . . . .'" Lerner v. Fleet Bank, N.A., 318 F.3d 113, 126 (2d Cir. 2003) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). Thus, the Court first considers plaintiffs' Article III standing, then analyzes plaintiffs' prudential standing. Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates, Inc., 436 F.3d 82, 87 (2d Cir. 2006) (holding that Article III standing must be considered before prudential standing).

35

1. Article III Standing

Article III of the United States Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. CONST. art. III § 1. A plaintiff seeking to bring suit in federal court must establish "the irreducible constitutional minimum of standing" by demonstrating that: (1) he or she has suffered an "injury in fact;" (2) the injury suffered was "fairly traceable" to the actions of the defendant; and (3) it is "likely" that the injury will be redressed by a favorable judicial determination. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The Constitution requires that a plaintiff seeking to establish standing must have suffered "an invasion of a legally protected interest which is concrete and particularized, as well as an injury that is 'actual or imminent' rather than 'conjectural or hypothetical.'" Maxineau v. City of New York, No. 11 CV 2657, 2013 WL 3093912, at *3 (E.D.N.Y. June 18, 2013) (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560)). Further, a plaintiff must demonstrate that the asserted injury "'affect[s] plaintiff in a personal and individual way' . . . to avoid having the federal courts serve as 'merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding.'" New York Communities for Change v. New York City Dep't of Educ., No. 11 CV 3494, 2012 WL 7807995, at *17 (E.D.N.Y. Aug. 29, 2012), report and recommendation adopted, 2013 WL 1232244 (E.D.N.Y. Mar. 26, 2013).

a. Standing of Plaintiffs and Decedents

Under the ATA, plaintiffs must show that they were injured by reason of an act of international terrorism. While the Initial Complaints filed in each action contained more detailed allegations as to where each plaintiff or decedent was at the time of the attacks and the injuries or

36

consequences each one suffered, these allegations as to certain of the victims were inexplicably taken out or not included in the Amended Complaint. Now, plaintiffs' Amended Complaint only alleges actual injury with respect to Alan Scherr, N.S., Andreina Varagona, and Linda Ragsdale. (See Am. Compl. ¶ 111). Indeed, none of the other plaintiffs are even mentioned in the fact sections of the Amended Complaint that describe either the execution of the attacks or discuss the infliction of injuries upon the plaintiffs. While the Amended Complaint contains general allegations that "defendants have caused plaintiffs, plaintiffs' decedents and the decedents' family members to suffer severe and permanent injuries, damages and losses" (Am. Compl. ¶ 132), and that by reason of the direct acts of the defendants, "decedents suffered conscious pain and suffering and fear of impending death" (id. ¶¶ 137-39), the Amended Complaint fails to allege any specifics with respect to the individual plaintiffs or their decedents. Without a single allegation describing how the other plaintiffs or their estates were injured in any way during the attacks, the Court finds that plaintiffs Shimon Rosenberg, Nachman Holtzberg, Moses Shvarzblat, Maribeth Jeswani, Emunah Chroman, and Autumn Gilles have not alleged that they suffered any "concrete and particularized" injury that would give rise to Article III jurisdiction over their claims. Similarly, to the extent that Kia Scherr seeks to bring claims on her own behalf, the Court finds no specific factual allegations in the Amended Complaint that describe the injuries she is alleged to have suffered.

Although the allegations in the Amended Complaint are not as specific and as detailed as those contained in the initial Complaint, the Amended Complaint does adequately allege that the remaining plaintiffs or their decedents — Alan Scherr, N.S., Andreina Varagona, and Linda Ragsdale — suffered concrete injuries caused during the attacks. The Amended Complaint

37

alleges:

> The LeT team first attacked the lobby of the [Oberoi] hotel and then
> moved into the adjoining restaurant.  The six guests dived [sic]
> under the table.  Two were shot and wounded including Andreina
> Varagona and Linda Ragsdale.  Ms. Varagona had her hand on Alan
> Scherr encouraging him to be quiet when a bullet entered the back
> of his head, eventually causing his death.  His daughter, N.S. [sic]
> was shot at the same time and also died.

(Id.)  Given these allegations, the Court finds that the Amended Complaint adequately establishes

that Alan Scherr, N.S., Varagona, and Ragsdale all suffered injuries caused by the terrorist actions

of defendants, and that these injuries are adequately redressable through an award of damages, as

is typical in similar personal injury cases.


           b.  Standing of Estates

        Even if the other plaintiffs' injuries and/or deaths had been properly alleged in the

Amended Complaint, some of the plaintiffs who have sued on behalf of the estates of their family

members would still suffer from a fatal standing bar:  under the New York EPTL, "[a] personal

representative is a person who has received letters to administer the estate of a decedent."  EST.

POWERS & TRUSTS § 1-2.13.  Thus, in order to represent an estate, one must obtain specific letters

testamentary and provide them to the court.  Estate of Vaiselberg ex rel v. Snow, No. 02 CV 6235,

2003 WL 1878248, at *1 (S.D.N.Y. April 14, 2003) (finding that since Howard Vaiselberg,

attempting to sue on behalf of the estate of his mother, was not a "personal representative" with

letters to administer his mother's estate, he therefore lacked capacity to bring the suit); Graham v.

Henderson, 224 F.R.D. at 64 (finding that "[t]he law of the forum state determines the capacity of

the parties to sue and be sued" and determining that "under the applicable New York law, a

representative is a person who has received letters to administer the estate of a decedent") (citing Collins v. American Automobile Ins. Co., 230 F.2d 416, 422 (2d Cir. 1956); EST. POWERS & TRUSTS § 1–2.13)).

As noted in the August 2014 Report, some of the plaintiffs who are bringing claims on behalf of loved ones who perished in the Mumbai attacks face additional barriers to standing in that they have failed to adequately allege that they are the duly appointed executors or administrators of the estates of the decedents whom they seek to represent. In the August 2014 Report, this Court recommended that these plaintiffs be given an opportunity to provide the Court with additional legal or factual authority that would allow them to proceed on these claims, or provide letters testamentary establishing their power to represent their decedents' estates.[28]

Although the Court raised this issue in the August 2014 Report and in the inquest hearing held on June 5, 2015, urging plaintiffs to obtain proper letters testamentary, plaintiffs have only filed letters testamentary for plaintiff Kia Scherr. Accordingly, the Court finds that plaintiffs Rosenberg, Holtzberg, Shvarzblat, Jeswani, and Chroman do not have standing to bring suit on behalf of their decedents' estates.[29]

---

[28]The Court notes, however, that the ATA affords causes of action to the "estates, survivors, or heirs" of United States nationals injured by acts of international terrorism. 18 U.S.C. § 2333(a) (emphasis added). Thus, it is unclear whether a plaintiff needs to be formally appointed administrator or executor of the estate before they may bring suit under the ATA on behalf of their decedents. However, because plaintiffs in this action have explicitly alleged that they seek damages as "the personal representatives or special administrators" of the decedents' estates (Am. Compl. ¶ 138), and they do not sue as "heirs" of the decedents, the Court need not address whether they could pursue claims as "heirs" without formal documentation.

[29]The Court notes that, to the extent that plaintiff Rosenberg seeks to bring claims as the guardian of surviving minor M.T.H., he does not need letters testamentary to establish his standing. However, given that the Amended Complaint does not contain any allegations with respect to M.T.H., the Court still recommends that the Amended Complaint be dismissed with

## 2. Prudential Standing

Having found that the Amended Complaint fails to allege actual injury with respect to the decedents Rivka Holtzberg, Gavriel Noach Holtzberg, M.T.H., Norma Shvarzblat-Rabinovich, Sandeep Jeswani, and Ben Zion Chroman (see discussion supra at II(C)(1)), the Court must determine if their survivors — Shimon Rosenberg, Nachman Holtzberg, Moses Shvarzblat, Maribeth Jeswani, and Emunah Chroman — may nonetheless proceed with independent personal causes of action.

Where a cause of action is created expressly by an act of Congress, courts may only hear claims by plaintiffs who "fall within the zone of interests protected by the law invoked." Lexmark Intern., Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1388 (2014) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). Courts have applied this "zone of interests" framework to limit the class of plaintiffs who may properly sue under a given statute, although the range of interests protected — and, therefore, the breadth of potential plaintiffs considered — depends on the particular statute at issue. Id. In determining the exact zone of interests protected by a particular statute, courts are instructed to apply "traditional principles of statutory interpretation" to determine what class of individuals are afforded causes of action to protect their rights. Id.

As with any statutory analysis, the Court begins with the text of the ATA in determining which class of plaintiffs were envisioned by the drafters of the statute. In relevant part, the ATA provides that "any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor . . . ." 18 U.S.C. § 2333(a) (emphasis added). Accordingly, the statute is clear that only

---

respect to M.T.H. at this time.

claims brought on behalf of individuals who are United States nationals may proceed under the ATA.

While the text allows claims by an "estate, survivors, or heirs," the statute appears to limit the type of claims these individuals may bring. The main thrust of the statute appears to concern "national[s] of the United States injured in [their] person, property or business;" the ability of "estate[s], survivors, or heirs" to bring suit is expressly limited to suits "therefor." Id. The most logical antecedent of "therefor" in the statute would thus be the injury to the person, property, or business of the decedent, suggesting that the family members may not bring independent claims where their decedents have failed to state claims under the ATA.

This interpretation is bolstered by the legislative history of the ATA. Statements by Alan Kreczko, then Deputy Legal Adviser to the Department of State, and Lloyd Green, counselor to the Assistant Attorney General, indicate that the phrase "or his or her estate, survivors, or heirs" was included in a revision to the statute to "make certain the ability of family members to file a lawsuit on behalf of a slain or injured relative." Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary, 101st Cong., 2d Sess. (1990), at 46 (emphasis added). Despite its explicit contemplation of the nature of the rights of survivors of individuals killed in terrorist attacks, the Judiciary Committee made no mention of any intent to afford such survivors independent causes of action under the ATA. Accordingly, the Court finds that any damages awarded to surviving relatives of those killed the by terrorist attacks in this case may only be awarded if there is a valid claim filed by the estate.[30]

---

[30]As discussed supra, note 28, the statute also authorizes suits by "survivors or heirs." Here, however, the plaintiffs only allege that they are suing as "the personal representatives or special administrators" of the various decedents; this becomes important only because some of

Thus, in light of the text of the statute and the legislative history considered above, the Court finds that, insofar as the Amended Complaint has failed to allege anything with respect to the injuries suffered by decedents Rivka Holtzberg, Gavriel Noach Holtzberg, M.T.H., Norma Shvarzblat-Rabinovich, Sandeep Jeswani, and Ben Zion Chroman, and therefore has failed to state valid claims under the ATA, plaintiffs Shimon Rosenberg, Nachman Holtzberg, Maribeth Jeswani, and Emunah Chroman have also failed to state cognizable claims under the ATA. Thus, the Court respectfully recommends that the individual claims of Shimon Rosenberg, Nachman Holtzberg, Moses Shvarzblat, Kia Scherr, Maribeth Jeswani, and Emunah Chroman be dismissed.[31]

### D. Liability of LeT/JuD, Majid, Lakhvi, Sayeed and Cheema Under the ATA

As discussed above, the Amended Complaint sufficiently states a cause of action under the ATA for the claims of: plaintiff Scherr on behalf of the estate of Alan Scherr, and the estate of N.S.; Andreina Varagona, on behalf of herself; and Linda Ragsdale on her own behalf. To establish the liability of the defendants, however, the Amended Complaint must also plead the requisite mental state and causation with respect to each defendant. Gill v. Arab Bank, PLC, 893 F. Supp. 2d 474, 502 (E.D.N.Y. 2012); see also Ahmad v. Christian Friends of Israeli Communities, No. 13 CV 3376, 2014 WL 1796322, *2 (S.D.N.Y. May 5, 2014). This requires an

---

the plaintiffs have failed to demonstrate that they are legally authorized to act on behalf of the estates of their decedent relatives. (See discussion supra, Section II(C)(1)(b)).

[31]As discussed further infra Section III(A)(1), the dismissal of surviving relatives' independent causes of actions does not necessarily preclude the estates' recovery of solatium damages on behalf of the surviving relatives.

allegation that defendants' actions were "'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" Ahmad v. Christian Friends of Israeli Communities, 2014 WL 1796322, at *3 (quoting Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 426 (E.D.N.Y. 2013)). There must also be an allegation that "the defendant must have known or intended that the support would be used in preparation for, or in carrying out, violations of certain federal criminal statutes." Id.

In analyzing the allegations in the Initial Complaints, this Court found that the allegations in the Complaint were insufficient to allege plausible claims against certain of the defendants under the ATA — specifically, defendants Cheema and Sayeed. (Aug. 2014 Rep. at 40). Accordingly, the Court recommended denying the entry of a default judgment against these defendants without prejudice to amend to add more specific allegations. Following the district court's Order denying the motion for default judgment and dismissing the Initial Complaints, the plaintiffs filed the Amended Complaint, alleging additional facts against all of the defendants.

As noted above, the Amended Complaint and plaintiffs' subsequent filings adequately establish that JuD and LeT are the same organization. (Am. Compl. ¶¶ 31-40; Default Mot., Exs. A-C). The Amended Complaint alleges that LeT "organize[d] and carr[ied] out the Mumbai attacks of November 26-28, 2008." (Am. Compl. ¶ 24). The Amended Complaint also alleges that Sayeed and Cheema are both "leader[s], officer[s], and/or director[s] of LeT." (Am. Compl. ¶¶ 11, 13). According to the Amended Complaint, the ten attackers who carried out the shooting were "train[ed] at three LeT camps" by Majid, also an alleged leader of LeT. (Id. ¶¶ 86-87). The Amended Complaint alleges that, at these camps, "Sayeed . . . acted in leadership positions" (id. ¶ 89), and Cheema, for his part, "trained the LeT group of ten attackers in surveillance, bomb

43

making, and infiltration skills."[32]  (Id. ¶ 92).  During the training, "Sayeed . . . and Cheema supervised and closely monitored the group of ten."  (Id. ¶ 99).

According to the Amended Complaint, after the ten attackers completed their training, "Sayeed . . . told them that their mission was ready and that the target was Mumbai."  (Id. ¶ 94). Sayeed also allegedly "fixed the attack time," and set the targets for the attacks.  (Id. ¶¶ 95-96).  It is alleged that during the attack on the Taj Hotel, the LeT attackers "were in telephone contact with, and took instructions from, their handlers, including . . . Cheema."  (Id. ¶ 108).  Cheema is also alleged to have been "in the control room during the four days of the attack."  (Id. ¶ 117).

Having reviewed these allegations, the Court is satisfied that the Amended Complaint now alleges facts sufficient to state claims of liability under the ATA against defendants LeT/JuD, Majid, Lakhvi, Sayeed and Cheema.

Although the allegations in the Amended Complaint suggest that Cheema's role in the attacks was focused on training and monitoring the attack at the Taj Hotel, it is clearly alleged that he was instrumental in training the terrorists, and that he "supervised and closely monitored" the trainees during the training.  (Id. ¶ 92).  Moreover, the Amended Complaint alleges that he was actually in the control room during all four days of the attacks, giving instructions to the terrorists while the attacks were ongoing.  Even though he may have only been responsible for instructing the attackers at the Taj Hotel, the Amended Complaint alleges sufficient facts to demonstrate that Cheema was instrumental in providing support and assistance to the terrorists and that his role in

---

[32]The Amended Complaint notes that the trainees were not solely trained for the attacks in Mumbai, and thus some of the skills learned were not used during the Mumbai attacks, such as the suicide bombing and arms manufacturing training.  (Id. ¶¶ 87, 89).  This does not alter the Court's analysis.

44

training and supervising them is sufficient to establish scienter under the ATA.

### E. Immunity of Iqbal/Ali

Although the Court has determined that neither Iqbal nor Ali were properly served, and there is no evidence that either one had actual knowledge of the instant action or the default motion, the Court analyzes the claims against these defendants separately to address a concern it has with respect to plaintiffs' Amended Complaint.

Plaintiffs' Initial Complaints alleged that defendants Iqbal and Ali were officers, employees, and/or agents of ISI, a Pakistani organization engaged in intelligence gathering and operations on behalf of the military of the Islamic Republic of Pakistan. (See, e.g., Init. Compl. ¶¶ 11, 14, 15). Although defendants Iqbal and Ali have not appeared to assert immunity under the FSIA, the Second Circuit has recognized that the FSIA strips courts of jurisdiction over agents of foreign states. See Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., 476 F.3d 140, 143 (2d Cir. 2007). Thus, the Court may not exercise jurisdiction over Iqbal and Ali if they are foreign officials covered by the FSIA.

Noting this, the Court's August 2014 Report raised concerns that, to the extent that Pasha and Taj, two former defendants, were dismissed from the action as foreign officials immune from suit under the FSIA, Iqbal and Ali may also be subject to dismissal from the action as immune under the FSIA. The Court granted plaintiffs leave to explain, however, why Iqbal and Ali should be treated differently from the two previously dismissed defendants.

It appears that, rather than actually addressing this question, plaintiffs have attempted to circumvent the jurisdictional bar imposed by the FSIA by simply removing the allegations linking

45

Iqbal and Ali to ISI. While it is possible that the initial allegations linking Iqbal and Ali to ISI in the Initial Complaints were errors, plaintiffs do not even acknowledge this change in their pleadings or in their motion papers.[33] Although the Court in the August 2014 Report recommended that plaintiffs be given an opportunity to explain why these defendants were not immune, plaintiffs have not taken advantage of that opportunity and instead have simply amended the Complaint to eliminate any mention of these defendants' relationship with the ISI. The fact that the Amended Complaint no longer contains these allegations does not, without more, address this Court's concerns as to jurisdiction over these individuals, who may in fact be foreign officials.

Accordingly, it appears that plaintiffs' claims against defendants Iqbal and Ali are subject to dismissal under the FSIA, unless plaintiffs more adequately distinguish Iqbal and Ali from Pasha and Taj. However, in light of this Court's findings with respect to service, it need not address this question now.

F. Summary as to Liability

In summary, therefore, the Court respectfully recommends that the motion for default judgment and damages be denied in its entirety at this time due to plaintiffs' apparent failure to properly serve the majority of defendants with the Amended Complaint and due to plaintiffs' failure to properly serve any of the defendants with the default motion papers and accompanying

---

[33]In the Amended Complaint, plaintiffs acknowledge that Iqbal and Ali are not members of LeT, stating that the attack was "planned, trained for and carried out by the named defendants who are members of defendant LeT, as well as by Major Iqbal and Major Sameer Ali." (Am. Compl. ¶ 22) (emphasis added). This separation of Iqbal and Ali from the "named defendants who are members of defendant LeT" suggests to the Court that Iqbal and Ali are affiliated with ISI, the only other organization alleged to have been involved with the attacks.

documents. Further, the Court respectfully recommends that any of plaintiffs' claims brought pursuant to the ATS be dismissed with prejudice for failure to establish subject matter jurisdiction, that the claims brought under the ATA on behalf of decedents who are not United States nationals be dismissed for lack of standing, and that all claims against defendants Iqbal and Ali be dismissed for lack of subject matter jurisdiction in light of the Foreign Sovereign Immunities Act.

Finally, insofar as the Amended Complaint fails to establish a factual basis for any injuries suffered by Rivka Holtzberg, Gavriel Noach Holtzberg, M.T.H., Norma Shvarzblat-Rabinovich, Sandeep Jeswani, Ben Zion Chroman, or Autumn Gilles, the Court respectfully recommends that the claims brought by them or on their behalf by plaintiffs Shimon Rosenberg, Moses Shvarzblat, Maribeth Jeswani, and Emunah Chroman be dismissed without prejudice to refile a Second Amended Complaint which properly alleges not only the injuries suffered by these individuals, but also the causal connection between the injuries and the terrorist acts committed by the defendants.[34] Further, to the extent that plaintiffs Rosenberg, Shvarzblat, Jeswani, and Chroman have not provided letters testamentary establishing their right to sue on behalf of their decedents, the Court respectfully recommends that they be found to lack standing to bring claims on behalf of decedents Rivka Holtzberg, Gavriel Noach Holtzberg, Norma Shvarzblat-Rabinovich, Sandeep Jeswani, and Ben Zion Chroman. In light of this Court's findings that the ATA does not afford the survivors independent causes of action where their decedents have not stated valid claims, the Court also recommends that the individual claims of Shimon Rosenberg, Moses Shvarzblat, Maribeth Jeswani, and Emunah Chroman be dismissed without prejudice.

_____

[34]As noted supra, note 9, much of this information was alleged in the Initial Complaints.

47

III. Damages

Assuming plaintiffs can establish that the defendants have been properly served, the Court turns to the issue of damages.  Having determined that the Amended Complaint establishes the liability of LeT/JuD, Majid, Lakhvi, Sayeed and Cheema under the ATA for the injuries suffered by Alan Scherr, N.S., Andreina Varagona, and Linda Ragsdale, the Court must determine whether these four plaintiffs have met their burden of "prov[ing] damages to the Court to a 'reasonable certainty.'" Alexandru v. Brown, No. 11 CV 2157, 2012 WL 2319246, at *3 (E.D.N.Y. Feb. 16, 2012) (quoting Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)), report and recommendation adopted, 2012 WL 2320792 (E.D.N.Y. June 19, 2012).  Plaintiffs seek three broad classes of damages:  (1) economic losses suffered by plaintiffs for their own lost earning potential, or that of their deceased family members; (2) pain and suffering damages to compensate plaintiffs for their experiences during the attacks; and (3) solatium damages for the emotional suffering of family members of those who were killed during the attacks.  (See generally Pl. Damages Mem.[35] at 4-6).


A. Classes of Damages

Economic losses, as used in this motion, refer to the "present value of past and future lost earnings that the Decedents[36] might reasonably have been expected to earn but for the wrongful

---

[35]Citations to "Pl. Damages Mem." refer to the Plaintiffs' Damages Inquest Memorandum, filed in conjunction with the plaintiffs' Motion for Damages on February 24, 2015.

[36]Although plaintiffs' Damages Inquest Memorandum refers only to the lost earnings of "Decedents," it appears that plaintiffs also seek damages for the economic losses incurred by the surviving victims as well.

48

death or injury, as well as the cost of household services and advice, counsel, guidance, instruction and training services." (Id. at 4).  Pain and suffering damages, on the other hand, are meant to compensate individuals for the conscious pain they endured as a result of a tortious injury.  See Jupiter v. United States, No. 05 CV 4449, 2012 WL 6641649, at *13 (E.D.N.Y. Dec. 20, 2012).  Plaintiffs bear the burden of proving such conscious pain and suffering.  Garcia v. O'Keefe, 5 Misc. 3d 1006(a), 2004 WL 2375284, at *9 (N.Y. Sup. Ct. Sept. 9, 2004).  Solatium damages are meant to encompass a variety of common law damages suffered by those close to a decedent, including loss of consortium, loss of companionship, society and guidance, and mental anguish.  Knox v. Palestine Liberation Org., 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006).

### 1. Availability of Solatium Damages

Courts have disagreed as to whether solatium damages are available in cases brought under the ATA.  Compare Goldberg v. UBS AG, 690 F. Supp. 2d 92, 97 n.10 (E.D.N.Y. 2010) (noting that "[w]hether such emotional damages are recoverable under the ATA thus depends on what substantive law will govern," and stating that "New York law does not permit such damages in wrongful death cases"), with Knox v. Palestine Liberation Org., 442 F. Supp. 2d at 77-78 (allowing claims for solatium damages to proceed because "the full range of damages should be available to persons entitled to bring actions under the ATA").

Having reviewed the legislative history of the ATA, the Court is inclined to allow awards of solatium damages in light of the deterrent purposes expressed in Senate hearings about the ATA.  The statements of Joseph Morris, President and General Counsel of the Lincoln Legal Foundation, make clear that the purpose of the civil remedy afforded by the ATA is to "interrupt,

49

or at least imperil, the flow of terrorism's lifeblood: money." Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary, 101st Cong., 2d Sess. (1990), at 85. Further, the treble damages provision included in the ATA was explicitly meant to encompass "all the additional deterrent power that such sanctions may have." Id. at 46. Thus, the Court agrees with the modern trend of allowing solatium damages in suits brought under the ATA regardless of the availability of such damages under the general tort law of the state in which the district court sits. See, e.g., In re Terrorist Attacks on September 11, 2001, 2012 WL 3090979, at *5; Lelchook v. Commerzbank AG, 2011 WL 4087448, at *2; Knox v. Palestine Liberation Org., 442 F. Supp. 2d at 77-78.

As discussed supra, Section II(C)(2), surviving relatives of decedents killed in terrorist attacks may not bring claims under the ATA independent of those brought by the decedents' estates. However, where an estate validly brings claims under the ATA, courts have routinely awarded solatium damages as an element of the estate's claims. See, e.g., In re Terrorist Attacks on September 11, 2001, 2012 WL 3090979, at *5; Estate of Heiser v. Islamic Republic of Iran, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) (treating solatium as a form of damages rather than as a separate claim for surviving relatives). Having found that decedents Alan Scherr and N.S. have stated cognizable claims under the ATA, the Court finds that plaintiff Kia Scherr is entitled to recover solatium damages.

B.  Individualized Damages Assessment

In support of their requests for economic losses, plaintiffs Varagona, Ragsdale, and

Scherr[37] have provided a detailed report from Dr. Patricia Pacey (the "Pacey Report"[38]), an

economist whose "regular activities [include] providing evaluations in personal injury/wrongful

death and commercial damages matters for both plaintiffs and defendants." (Pacey Aff.[39] ¶ 1).  In

assessing the lost economic contributions of each plaintiff, Dr. Pacey has provided a detailed

breakdown of the relevant factors considered, which include, among others:  (1) the wages earned

by each victim prior to the incident; (2) the benefits received by each victim through their

employment; (3) the value of the "home services" provided by each victim to the other members

of their families; (4) the reduced earnings of each victim after the incident; and (5) the prospective

future duration of such earnings for each victim.  (See generally Pacey Rep.).  Dr. Pacey's

estimates for each victim's lost economic contributions seem to have been calculated by adding

together the wages each victim would have earned over the remainder of their respective

employment, and any other economic benefits each victim would have generated; that amount is

then offset by the wages each victim could earn after the attacks and the personal consumption of

each victim.  (Id.; see also Pacey Aff. ¶¶ 11-12, 13).[40]

---

[37]Although the report addresses the damages sustained by each of the victims of the 2008 Mumbai attacks, the Amended Complaint only alleges injury in fact with respect to these three plaintiffs.  (See discussion supra, Section II(C)(1)(a)).  Accordingly, the Court has only considered the report insofar as it assesses the injuries sustained by Varagona, Ragsdale, and Scherr.

[38]Citations to "Pacey Rep." refer to the Economic Appraisal Report of Dr. Patricia Pacey, dated October 24, 2014, and attached as Exhibit 1 to plaintiffs' Motion for Damages filed on February 24, 2015.

[39]Citations to "Pacey Aff." refer to the Affidavit of Patricia L. Pacey, Ph.D., filed on July 23, 2015.

[40]The Court has reviewed Dr. Pacey's determinations as to plaintiffs Scherr, Varagona, and Ragsdale, individually.

In support of their requests for pain and suffering and solatium damages, plaintiffs have provided affidavits explaining their experiences during and after the 2008 Mumbai attacks, explaining any injuries they sustained and the subsequent trauma they have been forced to live with.

With respect to each plaintiff, the Court addresses each class of damages separately.

### 1. Andreina Varagona

Plaintiff Varagona seeks an award of either $665,200.00 or $1,469,200.00 in economic losses, plus $5 million in pain and suffering damages. Both requests are analyzed below.

### a. Economic Losses

Plaintiff Varagona worked in the film industry between 1998 and 2004, earning between $75,000 and $90,000 per year. (Varagona Aff.[41] ¶ 1). Thereafter, in 2004, Ms. Varagona quit the film industry to begin working as a holistic healthcare provider. (Pacey Rep. at 3). The Pacey Report indicates that, following the 2008 Mumbai attack, Ms. Varagona's annual earnings have dropped to $17,000.00 per year. (Id. at 5).

The Pacey Report has calculated the projected earnings of plaintiff Varagona using two separate scenarios: (1) her projected earnings had she remained in the holistic healthcare field

---

[41]Citations to "Varagona Aff." refer to the Affidavit of Andreina Varagona in Support of Plaintiffs' Motion for Default Judgment and Damages Inquest, attached to plaintiffs' Motion for Damages filed on February 24, 2015.

("Scenario I");[42] and (2) her projected earnings had she returned to her position in the film industry ("Scenario II"). (Id.) Both scenarios assume that Ms. Varagona would have worked until the age of 65, and lived until the age of 77.3. (Id. at 4).

Having reviewed the Pacey Report, the Amended Complaint, and the affidavit provided by Ms. Varagona in support of the motion for default judgment, the Court notes that Ms. Varagona has never seemed to indicate any desire or intent to return to the film industry, and thus the Court finds no basis for proceeding with the projected earnings analysis conducted upon that premise, and therefore denies plaintiffs' request for damages under Scenario II. Accordingly, the Court respectfully recommends that Scenario I be used as the basis for estimating Ms. Varagona's lost earnings.

In Scenario I, Dr. Pacey estimates that Ms. Varagona would have earned $39,400.00 per year as a holistic healthcare provider, but for her injury. (Id. at 5). As a result of the injury, however, Ms. Varagona is only able to earn $17,000.00 per year.[43] Thus, over the 19.8 years over which Ms. Varagona could have worked before turning 65, Ms. Varagona's lost earnings total $443,520.00.[44] Inexplicably, however, Dr. Pacey's calculations for lost wages seem to total

_____

[42]As Dr. Pacey has explained, "there is not sufficient information to predicate Ms. Varagona's pre-incident earnings on the potential success of [the clinic she founded]," and the earnings projections for Varagona were generated by looking at prevailing rates for holistic healthcare providers in the Nashville metropolitan area, where Ms. Varagona lives. (Pacey Rep. at 4).

[43]Dr. Pacey indicates that this one-year offset is meant to account for the time Ms. Varagona would have taken to establish herself in the field of holistic health care, whether through further training or through overhead costs of establishing her own business. (See Pacey Rep. at 3-4).

[44]This figure was calculated by subtracting Ms. Varagona's post-injury annual wage of $17,000.00 from the annual wage she would have received but for the 2008 Mumbai attacks,

$446,800.00. (Id. at 9).  While this discrepancy may have a reasonable explanation, plaintiffs

have not provided one.  Accordingly, the Court respectfully recommends that Ms. Varagona be

awarded $443,520.00 in lost wages as part of her economic losses.

Dr. Pacey also calculates, as part of Ms. Varagona's lost earnings, a loss of employer-

provided benefits resulting from Ms. Varagona's inability to hold a full-time job.  (Id. at 6).  These

benefits "incorporate[] the array of benefits typically provided by employers including mandatory

benefits, medical coverage, and a pension/retirement plan."  (Id.)  Dr. Pacey has valued Ms.

Varagona's benefits at 20% of the wages she would have earned but for the incident.[45]  Thus, for

each of the 19.8 years Ms. Varagona could have earned $39,400.00 in annual wages, Dr. Pacey

opines that Ms. Varagona could also have earned $7,880.00 in benefits.[46]  Over the duration of her

employment, this would have totaled $156,024.00 in benefits.[47]  Discounting this amount to a net

present value, Dr. Pacey thus estimates that Ms. Varagona is entitled to $135,200.00 in lost

benefits.  The Court finds no ambiguities with respect to these calculations, and thus respectfully

recommends that Ms. Varagona be awarded $135,200.00 in lost benefits as part of her economic

losses.

In addition to projecting Ms. Varagona's lost earnings, the Pacey Report provides an

---

$39,400.00, for an annual lost income of $22,400.00.  This amount was then multiplied by the 19.8 years for which Ms. Varagona is projected to lose this income.

[45]Dr. Pacey notes that this 20% valuation is "consistent with survey data" collected by the Bureau of Labor Statistics, and the Court sees no error in this determination.

[46]This figure was calculated by taking 20% of Ms. Varagona's annual wages of $39,400.00.

[47]This figure was calculated by multiplying Ms. Varagona's annual benefits of $7,880.00 by 19.8 years of work.

estimate of the value of home services provided by Ms. Varagona. According to the Pacey Report, "essential/home services" represent "paid or unpaid productive labor around the home." (Id. at 7). Dr. Pacey has valued such services from $9.00 to $15.00 per hour, and has estimated a weekly contribution of 2 to 6 hours. (Id.) Using the midpoints of these figures, as Dr. Pacey did (id. at 8), the Court finds that these benefits total $48.00 per week.[48] Since Dr. Pacey has estimated that these services would continue for the remainder of Ms. Varagona's life, the Court determines that Ms. Varagona would have been entitled to $48.00 per week for the remaining 32.1 years of her estimated lifespan. Thus, the Court has calculated that Ms. Varagona is entitled to $80,121.60 in lost "essential/home services" as a result of her injuries.[49] Once again, however, Dr. Pacey appears to have estimated these losses to total $83,200.00. (Id. at 9). No explanation has been provided for this apparent discrepancy.

Accordingly, the Court respectfully recommends that plaintiff Varagona has established her entitlement to $443,520.00 in lost wages, $135,200.00 in lost benefits, and $80,121.60 in lost "essential/home services." This brings the total to $658,841.60 in economic damages. The Court further notes that this proposed economic loss is reasonable in light of comparable awards in other similar cases. See, e.g., Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261, 310-24 (D.D.C. 2005) (awarding economic losses between $50,000.00 and $3 million in wrongful death actions under the ATA); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1249 (S.D. Fla. 1997) (awarding economic losses of $1,532,913 to a victim of terrorism); Ferrarelli v. United States, No.

---

[48]This figure was calculated by multiplying $12.00 per hour, the midpoint between $9.00 and $15.00, by 4 hours per week, the midpoint between 2 and 6 hours per week.

[49]This figure was calculated by multiplying the $48.00 owed per week by the 52 weeks in one year, then by the 32.1 years Ms. Varagona is expected to live.

90 CV 4478, 1992 WL 893461, at *19 (E.D.N.Y. Sept. 24, 1992) (awarding $1,020,571.92 in lost wages).

Accordingly, should the district court decide to award certain plaintiffs damages despite the procedural defects outlined above, the Court respectfully recommends that Varagona be awarded $658,841.60 in economic losses.

### b. Pain and Suffering

In addition to economic losses, plaintiff Varagona seeks an award of $5,000,000.00 for pain and suffering for the conditions she experienced during the shooting and the trauma she has continued to suffer since. Ms. Varagona alleges that during the attacks, she was shot in the leg, suffering a shattered right femur and displaced knee cap as a result. (Id. ¶¶ 10, 11, 13). She was also shot in the right tricep, and felt another bullet graze her neck. (Id. ¶ 13). As a result of these injuries, Ms. Varagona "los[t] sensation to [sic] [her] right quadriceps . . . and lost control and sensation in the fingers on [her] right hand." (Id.) After spending two weeks at Bombay Hospital, Ms. Varagona was deemed stable enough to return to the United States, where she spent 25 months at an outpatient facility. (Id. ¶¶ 13-14). As part of this process, she underwent a second surgery, spending several months in a wheelchair before graduating to use of a walker. (Id. ¶ 14). Ms. Varagona also began to suffer from nightmares that affected her ability to sleep. (Id.)

However, despite acknowledging that "courts generally rely on prior similar cases to determine the appropriate amount [of pain and suffering damages]" (Pl. Damages Mem. at 5), plaintiffs have failed to cite any authority in support of the reasonableness of the proposed $5,000,000.00 award. The Court is also unable to determine how much of the $5 million is meant

56

to compensate Ms. Varagona for past pain and suffering, and how much is meant as compensation for future pain and suffering. Indeed, plaintiffs' briefing makes just one mention of the survivors' claims for pain and suffering damages. (See id. at 6 (stating that "$5 million for their pain and suffering is reasonable")). Further, though part of the $5 million sought appears to be based on the continuing treatments Ms. Varagona claims to require for lasting injuries and trauma (see Varagona Aff. ¶¶ 16-17), and this Court previously requested plaintiffs to provide at least some documentation as to these costs, plaintiffs have again failed to provide any medical records, bills, or other evidence that would support their calculation of $5 million as a reasonable award for pain and suffering.

Without a sufficient factual or legal basis for assessing the reasonableness of proposed damages for pain and suffering with respect to plaintiff Varagona, the Court has reviewed her Affidavit, the sole evidence provided, and reviewed applicable case law to determine an appropriate measure of damages. Having surveyed awards for pain and suffering in personal injury actions involving gunshot wounds, the Court finds that plaintiff's requested pain and suffering damages are significantly higher than those generally awarded in New York. The Supreme Court, Ulster County, recently awarded $825,000.00 in pain and suffering damages, excluding medical expenses, to a woman who was shot in the eye such that the bullet became lodged in her right orbit. (See Verdict Summary, Kennedy v. Riordan, 2014 WL 3735392 (N.Y. Sup. Ct. Mar. 19, 2014)). Similarly, an individual who was shot multiple times in the arm with a hollow-point bullet[50] and sustained permanent damage to his ulnar nerve, resulting in a loss of

---

[50]Hollow-point bullets expand upon their entry into a victim, disrupting more flesh and causing more severe tissue damage.

sensation and functionality in the entire arm, recovered $1.1 million in pain and suffering damages. (See Verdict Summary, Plaintiff v. Defendant, 1995 WL 339918 (N.Y. Sup. Ct. Jan. 1, 1995)).

The only cases which seem to award the sorts of damages plaintiffs request were shootings which left the victims paraplegic, comatose, or otherwise permanently disabled, and which were supported by extensive documentation. (See, e.g., Verdict Sheet, Waldron v. City of New York, 2004 WL 6221327 (N.Y. Sup. Ct. Apr. 6, 2004) (awarding $8 million in pain and suffering and medical expenses where a police officer punched the plaintiff to the ground, then shot the plaintiff in the back; the expert physician testified that plaintiff's vertebra were fractured and he was rendered a paraplegic); Verdict Sheet, Campos v. City of New York, 2003 WL 26455066 (N.Y. Sup. Ct. Oct. 1, 2003) (awarding $8 million in pain and suffering after plaintiff's expert pathologist testified that the officer shot plaintiff at close range in the side, shattering his vertebrae and rendering plaintiff a paraplegic, exacerbating plaintiff's preexisting health conditions)).

In light of the precedents discussed above, the nature of Ms. Varagona's injuries, the length of time required for her convalescence, and the relatively sparse evidence provided in support of Ms. Varagona' request for damages, and cognizant of the uniquely horrifying experience of living through a terrorist attack such as the 2008 Mumbai attacks, the Court respectfully recommends that Ms. Varagona be awarded $2 million in pain and suffering damages. This figure is in line with awards in other cases brought under the ATA. See, e.g., In re Terrorist Attacks on Sept. 11, 2001, No. 03 CV 9848, 2012 WL 3090979, at *4 (S.D.N.Y. July 30, 2012), report and recommendation adopted, 2012 WL 4711407 (S.D.N.Y. Oct. 3, 2012) (hereinafter, "Havlish") (awarding $2 million in pain and suffering to victims of the terror attacks on

58

September 11, 2001); <u>Knox v. Palestine Liberation Org.</u>, 442 F. Supp. 2d at 79 (awarding $1 million in pain and suffering damages to victims of a terrorist shooting in Israel).

In total, therefore, the Court respectfully recommends that plaintiff Varagona be awarded $658,841.60 in economic losses and $2 million in pain and suffering damages, for a total award of $2,658,841.60.

### 2. Ragsdale

Plaintiff Ragsdale has requested $140,000.00 in economic losses, and $5 million in pain and suffering. Each request is addressed below.

#### a. Economic Losses

Ms. Ragsdale has provided less information about her past earnings than Ms. Varagona; her affidavit only indicates that she "earned a six-figure salary" before 2004, when she quit her job to "take up [her] true passion, creative writing for children." (Ragsdale Aff.[51] ¶ 1). Between 2004 and the attacks, Ms. Ragsdale has indicated that she "earned over $8,700 per year." (<u>Id.</u>) Ragsdale states, however, that "[she] expected to make considerably more, perhaps $50-100,000 per year . . . ." (<u>Id.</u>) Despite the lack of reliable data upon which to base a determination of lost wages, Dr. Pacey has stated that "it is reasonable to recognize Ms. Ragsdale has some impairment of her earnings capacity." (Pacey Rep. at 11). To calculate this lost earning capacity, Dr. Pacey determined the average annual earnings for someone of Ms. Ragsdale's age and education level,

---

[51]Citations to "Ragsdale Aff." refer to the Affidavit of Linda Ragsdale in Support of Plaintiffs' Motion for Default Judgment and Damages Inquest, attached to plaintiffs' Motion for Damages filed on February 24, 2015.

then assessed a lost earnings figure "due to reduced productivity and efficiencies" in whatever competitive field she might enter. (Id.) Dr. Pacey values this lost earning capacity at $8,700.00 per year. (Id. at 12). Dr. Pacey further estimates that Ms. Ragsdale has lost benefits totaling 10% of her lost earning capacity each year, totaling $870.00 per year. (Id. at 13).

Although plaintiffs have provided no support for accepting this novel method of determining economic damages based on the averages for similar demographics as an accurate determination of Ragsdale's economic losses,[52] the Court is cognizant of the inherently speculative nature of calculating future earnings. Given that all calculations of future lost wages are "matters of estimate and prediction," courts are to use "practical wisdom" rather than requiring exact proof of future earnings. Fanetti v. Hellenic Lines Ltd., 678 F.2d 424, 432 n.7 (2d Cir. 1982).

In light of the horrific injuries sustained by Ms. Ragsdale in the course of the attacks, and the continuing impact it has on her life (see generally Ragsdale Aff.), the Court finds that an annual loss of $8,700.00 is a reasonable estimate of Ms. Ragsdale's economic damages. However, having independently reviewed the figures in the Pacey Report, the Court is unable to find a sufficient basis for an award of $140,000.00. Multiplying Ms. Ragsdale's annual lost earning capacity of $8,700.00 by 9.8 years of projected employment results in a total lost wages calculation of $85,260.00. Multiplying the lost benefits of $870.00 per year by 9.8 years of employment leads to a total lost benefits award of $8,526.00. Adding these two figures together results in a total economic loss of $93,786.00.

---

[52]Nowhere does Ms. Ragsdale indicate that she intended to pursue any other field of employment; indeed, Dr. Pacey herself indicates that "given [her] understanding of Ms. Ragsdale's choices and opportunities, it is not likely she would have chosen to seek such employment." (Pacey Rep. at 12).

Finally, Dr. Pacey explains that "the time and value [of Ms. Ragsdale's essential/home services] must be included in the total economic loss." (Id. at 14). Unlike Ms. Varagona or Alan Scherr, however, Dr. Pacey does not appear to have quantified Ms. Ragsdale's essential or home services in any way. Nor has she provided the Court with any independent basis for calculating such losses. In total, Dr. Pacey estimates the value of Ms. Ragsdale's economic loss, extended over the 9.8 years for which Ms. Ragsdale is projected to have worked, to be $140,000.00. (Id. at 15). While it may be that the difference between the $93,786.00 calculated by the Court and the $140,000.00 estimated by Dr. Pacey represents the value of Ms. Ragsdale's essential/home services, nowhere in plaintiffs' papers do they explain this.

Accordingly, the Court respectfully recommends that Ms. Ragsdale be awarded $93,786.00 in economic losses.

b. Pain and Suffering

Ms. Ragsdale's claims for pain and suffering damages suffer from the same issues as discussed above with respect to Ms. Varagona: namely, both plaintiffs have failed to adduce any legal support for the reasonableness of the proposed $5 million award, or make any factual distinctions between past and future pain and suffering supported by factual evidence. Further, Ms. Ragsdale also indicates that she requires medical treatment for lasting injuries and trauma (see Ragsdale Aff. ¶¶ 4-5), but has failed to provide any bills, documents, or other evidence as to the cost of such treatment, despite this Court's clear directive to do so in the August 2014 Report. (See Aug. 2014 Rep. at 56-57).

Accordingly, as with Ms. Varagona, the Court has independently surveyed awards in

similar personal injury gunshot cases and the allegations in Ms. Ragsdale's Affidavit. Ms. Ragsdale alleges that she was hit in the torso by a bullet which subsequently nicked her stomach and exited her body at the top of her thigh. (Ragsdale Aff. ¶ 4). After spending several weeks at a hospital in Bombay, Ms. Ragsdale returned to the United States, although she still experiences chronic pain due to lymphatic complications that have caused fluid buildup.[53] (Id. ¶¶ 3, 4, 5). As a result, Ms. Ragsdale alleges that she cannot stand, sit, or walk for long periods of time. (Id. ¶ 3). She remains unable to wear any clothing without a soft waistband due to the swelling and scarring she has suffered. (Id. ¶ 5).

In light of these allegations and the unique circumstances inherent to surviving a terrorist attack, but cognizant of the relative lack of evidence provided in support of plaintiff Ragsdale's requested damages, the Court respectfully recommends that Ms. Ragsdale be awarded $2 million in pain and suffering.

In total, therefore, the Court respectfully recommends that plaintiff Ragsdale be awarded $93,786.00 in economic damages, and $2 million in pain and suffering damages, for a total award of $2,093,786.00.

### 3. Scherr

Plaintiff Kia Scherr seeks economic damages and pain and suffering damages on behalf on both Alan Scherr and N.S., both of whom were killed during the 2008 Mumbai attacks. In addition, she seeks solatium damages for herself. Each request is addressed in turn.

---

[53]Ms. Ragsdale does not explain where she suffers this fluid buildup.

a. Economic Damages

Prior to the 2008 Mumbai attacks, Alan Scherr served as the Vice President of the Synchronicity Foundation, a meditation organization located in rural Virginia. (Pacey Rep. at 49). Kia Scherr has submitted an affidavit (the "Scherr Affidavit") in which she explains that, in connection with his employment with the Synchronicity Foundation, Alan Scherr received a monthly stipend of $300.00. (Scherr Aff.[54] at 1). Beyond this, Dr. Pacey has estimated Alan Scherr's lost wages starting from $1,500.00 per year and increasing thereafter to $5,100.00 per year. (Pacey Rep. at 50-51). Using both Alan Scherr's wages and the monthly stipend Alan Scherr received, Dr. Pacey has calculated the amortized total value of lost income to be $79,700.00. (Id. at 54). Dr. Pacey has also estimated an annual loss of $16,500.00 in "[a]ccomodations" and $2,400.00 in "[f]ood," which she states "reflect[s] the value of their two bedroom home in the Blue Ridge mountains of Virgina . . . based on an average monthly rent of $1,000 to $1,500 with an additional ten percent for the costs of home operations . . . ." (Id. at 51). In total, Dr. Pacey calculates this to be worth an amortized $375,500.00.[55] (Id. at 54). Finally, Dr. Pacey has estimated the lost value of Alan Scherr's "essential/home services" to total $188,000.00, representing services of between 12-16 hours per week at the rate of $10.00 to $16.00 per hour. (Id.)

The basis for these figures is unclear at best. With respect to the lost income amount,

---

[54]Citations to "Scherr Aff." refer to the Affidavit of Kia Scherr in Support of Plaintiffs' Motion for Default Judgment and Damages Inquest, attached to the Motion for Damages filed on February 24, 2015. As the paragraphs in the Scherr Affidavit are not individually numbered, the Court has referred only to the page numbers on which certain allegations are contained.

[55]This represents the sum of the proposed $113,400.00 in "past losses" and the $262,000.00 in "future losses" listed in the Pacey Report.

plaintiffs have not demonstrated that Alan Scherr received any wages beyond the monthly stipend of $300.00. The source of the additional $1,500.00-$5,600.00 annual wage is not apparent. While Dr. Pacey suggests that at least part of this figure may represent "outside consulting fees," nowhere in plaintiffs' papers is anything alleged with respect to Alan Scherr's other employment or his receipt of consulting fees. Thus, the Court finds no basis for awarding damages to a reasonable certainty. Similarly, the damages requested for "Accommodations and Food" have no readily apparent basis. Kia Scherr has not alleged — either in the Amended Complaint or in the Scherr Affidavit — that she suffered any loss of accommodations in any way.[56]

The lost value of Alan Scherr's home services is, however, properly compensable under New York common law, and has a clear basis in the Pacey Report. It is unclear to the Court, however, why his domestic work is compensated at a rate between $10.00 and $16.00 per hour, a higher rate than that of plaintiff Andreina Varagona, whose services are valued between $9.00 and $15.00 per hour. Accordingly, the Court has calculated the value of Alan Scherr's home services using the same rate as employed for Ms. Varagona: an average rate of $12.00 per hour. Similarly, plaintiffs have not provided any explanation for why Dr. Pacey has estimated that Alan Scherr contributed an average of 14 hours of household work per week (id. at 53), compared with the 4

---

[56]A generous set of interpretive leaps gives rise to the possibility that this award seeks to represent the value of the home Alan Scherr and Kia Scherr lived in, provided for entirely free of charge by a third-party foundation for which Alan Scherr worked. The damages, therefore, would represent the money that Kia Scherr must now pay to afford a comparable residence in a comparable location. However, this is not set forth in any of plaintiffs' papers, and the Court has no factual basis for making this determination. Nowhere in the Amended Complaint nor in the Scherr Affidavit do plaintiffs explain how they arrived at this figure, nor do they allege that Kia Scherr is now required to pay rent. Indeed, the Pacey Report itself states that "Ms. Scherr has been traveling and living in donated housing and assistance [sic] since the incident." (Pacey Rep. at 51). Accordingly, it is unclear whether Kia Scherr is entitled to any damages for "Accommodations and Food."

hours credited to Ms. Varagona. Without a factual basis for such a distinction, the Court calculates the value of Alan Scherr's lost services using the lower numbers listed for Ms. Varagona. Multiplying an hourly rate of $12.00 by a weekly contribution of 4 hours, the Court calculates a weekly loss of $48.00 in essential/home services. Thus, over the remaining 16.4 years of his life, the Court calculates the total value of Alan Scherr's lost services at $40,934.40.[57]

With respect to N.S., plaintiffs seek damages totaling $66,600.00 for the "value of elderly care from N.S. to Kia Scherr." (Pacey Rep. at 55). This figure has been calculated at a rate of $10.00-$16.00 per hour, for 4-8 hours per week, beginning from the date on which Kia Scherr will turn 65 and running for the remainder of Kia Scherr's life. (Id.) New York courts do allow parents of decedent children to recover economic damages for the support they reasonably expected to receive absent the child's death. See, e.g., In re Air Crash Near Nantucket Island, Massachusetts, on October 31, 1999, 462 F. Supp. 2d 360, 367 (E.D.N.Y. 2006) (awarding parents economic damages where decedent made monthly $2,000.00 support payments to assist parents). However, where there is insufficient evidence or factual basis for "estimat[ing] future support without engaging in conjecture," courts will only award nominal damages. See id. (quoting Hollie v. Korean Air Lines Co., Ltd., 60 F.3d 90, 93 (2d Cir. 1995) (awarding only nominal damages to other survivors of decedent where no specific allegations existed as to support received); cf. Gillen v. Maternity Ctr. Ass'n, No. 1230 TSN 96, 1997 WL 697051 (N.Y. Civ. Ct. 1997) (allowing parents' claims for pecuniary losses to go forward because there were sufficient allegations as to "medical and funeral expenses incurred by the distributees"). This is particularly

---

[57]This figure was calculated by multiplying the $48.00 weekly loss in essential/home services by the 52 weeks in a year. The resulting figure was then multiplied by the 16.4 years Alan Scherr would have lived but for the 2008 Mumbai attacks.

the case where the decedent child is a minor; the Court can find no authority for assuming, without

any factual basis, that any degree of support would have been provided once N.S. reached the age

of majority.  Without any allegations as to what sort of support Kia Scherr would have needed,

what support N.S., a minor child at the time of the attacks, would have provided, and what the

value of those services would be, the Court cannot assess the reasonableness of this demand

"without engaging in conjecture."  In re Air Crash Near Nantucket Island, Massachusetts, on

October 31, 1999, 462 F. Supp. 2d at 367.  Accordingly, the Court awards only nominal damages

of $100.00 for the lost support of N.S.

      Accordingly, the Court respectfully recommends that plaintiff Scherr be awarded

$41,034.40 in economic damages, representing $40,934.40 for the loss of Alan Scherr's domestic

services and $100.00 in nominal damages for the loss of N.S.'s future support.


### b.  Pain and Suffering

      Plaintiff Scherr also seeks an award of $2 million in pain and suffering for each decedent

she represents, on the grounds that both "experienced fear of impending death, witnessed others

being shot, were then shot themselves and bled to death." (Pl. Damages Mem. at 6).  When

analyzing the pain and suffering experienced by deceased individuals, courts focus on the periods

immediately before and after the injury; "[w]hen the interval between injury and death is short, the

victim's degree of consciousness, the severity and duration of pain and the apprehension of

impending death are factors to be considered . . . ." Garcia v. O'Keefe, 2004 WL 2375284, at *9.

As a prerequisite to any recovery however, a "claimant must demonstrate a level of awareness for

a period of time following the injury in establishing conscious pain and suffering." Public

Administrator of Queens Cnty. ex rel Estate and Beneficiaries of Guzman v. City of New York,

No. 06 CV 7099, 2009 WL 498976, at *13 (S.D.N.Y. Feb. 24, 2009) (quoting Cummins v. Cnty.

of Onondaga, 84 N.Y.2d 322, 325-26, 618 N.Y.S.2d 615, 616-17, 642 N.E.2d 1071, 1072-73

(N.Y. 1994).

Plaintiffs have only provided sparse evidence as to their actual experiences during the 2008

Mumbai attacks, and what plaintiffs have provided suggests that Kia Scherr may be unable to

meet this threshold burden as to Alan Scherr. Plaintiffs' various submissions consistently describe

Alan Scherr as being shot in the head. (See Am. Compl. ¶ 111 (stating that a bullet "entered the

back of [Alan Scherr's] head"); see also Varagona Aff. ¶ 10 (stating that "a bullet hit Alan's

head"); Scherr Aff. at 3 (noting that "the death report stated that Alan was shot at the back of the

head")). Although the Amended Complaint suggests that some period of time may have passed

between Alan Scherr's injury and his death (Am. Compl. ¶ 111 (alleging that the bullet

"eventually" led to his death), plaintiffs' submissions elsewhere describe Alan Scherr's death as

"[i]mmediate[]." (Varagona Aff. ¶ 10). Such injuries have been presumed to be instantly fatal by

courts assessing pain and suffering. Cf. Public Administrator of Queens Cnty. ex rel Estate and

Beneficiaries of Guzman v. City of New York, 2009 WL 498976, at *13 (declining to award any

pain and suffering damages where decedent was shot in the back of the head and died instantly);

Ferguson v. City of New York, 73 A.D.3d 649, 650, 901 N.Y.S.2d 609, 611 (1st Dep't 2010)

(declining to award any pain and suffering damages where "plaintiff failed to present any evidence

that the decedent was conscious or had any cognitive awareness after he was shot in the head,

which caused his nearly instantaneous death"). Thus, it appears that Alan Scherr may not be able

to recover any damages for pain and suffering as a matter of law. However, in light of the

allegation in the Amended Complaint, the Court would respectfully recommend that Kia Scherr be awarded nominal damages of $100.00 for the pain and suffering of Alan Scherr.[58]

To the extent that plaintiffs' filings simply contain fewer allegations with respect to N.S.'s injuries and death, the Court has similar concerns about N.S.'s ability to recover pain and suffering damages. However, there is at least one indication in the Scherr Affidavit that N.S. "was shot multiple times and died from internal hemorrhage." (Scherr Aff. at 3). This is confirmed by the Varagona Affidavit, which states that the terrorists "c[a]me back and fire[d] more shots at us until N.S. died." (Varagona Aff. ¶ 11). Thus, it appears that N.S. did not die instantly upon being injured, and did experience conscious pain and suffering prior to death. Considering "the causal agent itself and the circumstances surrounding the injury," Geressy v. Digital Equipment Corp., 980 F.Supp. 640, 657 (E.D.N.Y. 1997), and in light of similar awards in past ATA cases, see Havlish, 2012 WL 3090979, at *2, the Court finds that $2 million is an adequate award for the conscious pain and suffering experienced by N.S. between her injury and her death. Cf. Lewis v. City of New York, 689 F. Supp. 2d 417, 433 (E.D.N.Y. 2010) (noting that "[m]easuring pain and suffering is heavily subjective and fact specific").

Accordingly, without a sufficient basis for determining the reasonableness of the experiences of Alan Scherr during the 2008 Mumbai attacks, the Court respectfully recommends that the motion for damages be denied as to plaintiff Scherr insofar as it seeks damages for the

---

[58]The Court notes, however, that Alan Scherr could likely recover damages for emotional distress, a different class of damages, for his experience before he was shot. Cf. Kalish v. Trans World Airlines, 89 Misc. 2d 153, 390 N.Y.S. 2d 1007, 1011 (N.Y. Civ. Ct. 1977) (awarding emotional distress damages for the pre-injury anticipation of harm experienced by plaintiff). However, because plaintiffs have not requested emotional distress damages, the Court cannot award them. See Fed. R. Civ. P. 54(c) (stating "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings").

pain and suffering of Alan Scherr. With respect to N.S., however, the Court respectfully recommends that plaintiff Scherr be awarded $2 million in pain and suffering damages on behalf of N.S., and $100.00 in nominal damages for the pain and suffering of Alan Scherr.

### c. Solatium

Finally, plaintiff Kia Scherr seeks solatium damages for the emotional harm she herself suffered due to the deaths of her spouse, Alan Scherr, and her child, N.S.

In analyzing the quantum of solatium damages to be awarded, courts consider factors including:

> (1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e. closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death.

Knox v. Palestine Liberation Org., 442 F. Supp. 2d at 78 (citing Smith ex rel Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 234 (S.D.N.Y. 2003)). Kia Scherr seeks an award of $12.5 million for the loss of her spouse, and $8.5 million for the loss of her child.

In the Scherr Affidavit, Kia Scherr explains the effects of the deaths of her spouse and child on her life. When she first heard the news about her family, Kia Scherr states that "[her] heart broke into a million pieces," explaining that "[her] life had just ended in the snap of a bullet that ruptured the very core of [her] existence." (Scherr Aff. at 3). Even years after the attacks, she "still suffer[s] from depression at times, panic attacks, and emotional trauma is [sic] still present and is triggered regularly," and states that she "cannot hold a 'normal' job, but can do

volunteer work for world peace." (Scherr Aff. at 3).

Affixing a monetary value to the sort of trauma Kia Scherr experienced and continues to experience is necessarily an imperfect solution for her loss. However, plaintiffs have based their requests on the awards in Havlish, which in turn were "upward departures" from the standard solatium damages framework set forth in Estate of Heiser v. Islamic Republic of Iran, under which the appropriate ranges for solatium damages are as follows: (1) between $8 million and $12 million for loss of a spouse; (2) $5 million for loss of a child; and (3) $2.5 million for loss of a sibling. 466 F. Supp. 2d at 269. Having reviewed the Scherr Affidavit, the Court respectfully recommends that Kia Scherr be awarded $12 million for the loss of her husband Alan Scherr and $8 million for the loss of her child N.S., for a total award of solatium damages of $20 million.

In total, therefore, the Court respectfully recommends that plaintiff Scherr be awarded $41,034.40 in economic losses representing the lost domestic services of Alan Scherr, $2 million in damages for the pain and suffering experienced by N.S. between her injury and her death, $100.00 in nominal damages for the pain and suffering experienced by Alan Scherr, and $20 million in solatium damages for her own emotional suffering.

C. Treble Damages

Under the ATA, "[a]ny national of the United States injured . . . by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue . . . in any appropriate district court . . . and shall recover threefold the damages he or she sustains . . . ." 18 U.S.C. § 2333(a). Thus, based on the information provided by plaintiffs, a treble damage award appears entirely appropriate in this case.

70

Having determined above that plaintiff Varagona is entitled to $2,658,841.60 in damages, plaintiff Ragsdale is entitled to $2,093,786.00 in damages, and plaintiff Scherr is entitled to $22,041,134.40 in damages, the Court respectfully recommends that these awards be tripled. Accordingly, the Court respectfully recommends that plaintiff Varagona be awarded $7,976,524.80 in treble damages; plaintiff Ragsdale be awarded $6,281,358.00 in treble damages; and plaintiff Scherr be awarded $66,123,403.20 in treble damages.

### D. Attorneys' Fees and Costs

Finally, plaintiffs' counsel seeks to recover costs of $123,472.00 associated with this action, explaining that attorneys' fees will be paid for separately, pursuant to the retainer agreements signed with each client. The ATA explicitly authorizes prevailing plaintiffs to recover "the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a). In the August 2014 Report, the Court denied counsel's request in its entirety due to insufficient documentation, directing counsel to provide the Court with a breakdown of each aspect of the costs sought and supporting documentation as to each request. In his renewed application for costs, plaintiffs' counsel has broken down the $123,472.00 as follows: (1) $1,947.00 for "Court Transcripts"; (2) $1,960.00 in "Filing fees and other Court Costs"; (3) $25,000.00 for "Pacey Economics, Inc. (Expert)"; (4) $50,250.00 for "John Fawcett (Expert)"; (5) $24,170.80 in "Lexis & Westlaw Research"; (6) $9,175.44 in "Appeal printing"; (7) $1,395.91 in "Postage & Messengers"; (8) $3,080.40 in "Office Printing, photocopying"; (9) $276.29 in "Conference Calls"; and $6,215.90 in "Travel and meals." (Pl. Damages Mem. at 9). In support of these requests, counsel has filed two supplemental documents: an affidavit from John Fawcett explaining the basis for his expert fees,

71

and a document entitled "Transactions Listing," which purports to explain the research costs incurred from Westlaw and Lexis.

Insofar as no documentation has been provided in support of counsel's request for "Court Transcripts," "Filing Fees and other Court Costs," "Pacey Economics, Inc. (Expert)," "Appeal printing," "Postage & Messengers," "Office Printing, photocopying," "Conference Calls," and "Travel and meals," the Court respectfully recommends that, once again, these requests be denied. Cf. Gunawan v. Sake Sushi Restaurant, 897 F. Supp. 2d 76, 96 (E.D.N.Y. 2012) (declining to award costs where plaintiff had not provided any documentation in support thereof). However, the Court takes judicial notice of the filing fee in this district, and respectfully recommends that plaintiffs be awarded $400.00. See Joe Hand Promotions, Inc. v. Elmore, No. 11 CV 3761, 2013 WL 2352855 at *12 (E.D.N.Y. May 29, 2013) (taking judicial notice of the $400.00 filing fee in this district and awarding it as part of costs).

With respect to the fees sought for the work of John Fawcett,[59] the Court notes several problems. As a threshold issue, the Court notes that "absent specific statutory or contractual authorization for the taxation of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 [in awarding expert witness fees]." Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987). Section 1821 only authorizes recovery of costs for: (1) attendance at trial; (2) travel expenses for trial; and (3) subsistence for overnight stays in connection with trial. 28 U.S.C. § 1821. Thus, courts have held that, absent specific statutory

---

[59]John Fawcett served as an expert on terrorist organizations and assisted plaintiffs by identifying 4 Lake Road as an appropriate address for service on JuD/LeT, documenting the relationship between JuD and LeT, and providing other factual details about the 2008 Mumbai attacks. (See generally Fawcett Aff.).

authorization, expert fees incurred in connection with the preparation of reports or affidavits are not recoverable under 28 U.S.C. § 1821. Barrera v. Brooklyn Music, Ltd., 346 F. Supp. 2d 400, 406 (S.D.N.Y. 2004) (citing United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp., 95 F.3d 153, 173 (2d Cir. 1996)). Applying this principle, the Havlish court declined to award prevailing plaintiffs costs under the ATA due to the statute's failure to explicitly provide for such recovery. Havlish, 2012 WL 3090979, at *6. Plaintiffs have not briefed the question of whether the ATA authorizes recovery of expert fees beyond the limits of Section 1821. Accordingly, it is unclear whether plaintiffs are entitled to any expert fees associated with this action.

Further, however, the only evidence submitted in support of plaintiffs' request for expert fees is the Affidavit of John Fawcett. Fawcett explains that the $50,250.00 figure was calculated at an hourly rate of $125.00 for a total of 402 hours spent on the case — 87 hours spent in assisting with the drafting of the initial Complaint, 250 hours spent between the filing of the initial Complaint and the first motion for default judgment, and 65 hours spent since the denial of the first motion for default judgment. (Fawcett Aff. ¶¶ 16-19). In awarding expert fees, however, courts generally require some contemporaneous time records demonstrating the accuracy of the hours worked. See Feliciano v. Cnty. of Suffolk, 246 F.R.D. 134, 135-36 (E.D.N.Y. 2007) (denying a request for expert fees where no billing records were provided).

Counsel has failed to provide any such contemporaneous records of the time spent by Mr. Fawcett on this matter, giving the Court no basis for reviewing the amount of time allegedly spent

on the case.[60]  While Mr. Fawcett, in his affidavit, does indicate the amount of time spent on

various aspects of the case, such recollections created after the fact have regularly been found

unsatisfactory by courts in this district.  See, e.g., Cement and Concrete Workers Dist. Council

Welfare Fund v. Metro Found. Contractors, Inc., No. 08 CV 4563, 2011 WL 703888, at *2

(E.D.N.Y. Feb. 27, 2011) (denying a request for fees where the only evidence submitted was an

affidavit prepared in conjunction with an application for default judgment).  Counsel has also

failed to provide any authority establishing the reasonableness of a $125.00 hourly rate for

Fawcett's work.  Accordingly, the Court finds that it has no basis to evaluate the reasonableness of

either Fawcett's proposed hourly rate or the proposed hours spent on the case, and recommends

that plaintiffs' requests for these costs be denied.

    The Court is similarly unable to form any basis of judgment with respect to counsel's

proposed research fees using the document submitted in support thereof.  The submitted

"Transaction Listing" contains six columns, labeled "Date," "Prof," "Narrative," "Component

Task Code," "Units," "Price," and "Value."  (See generally Trans. Listing[61]).  Plaintiff has not

provided any explanation as to what these columns mean, leaving the Court to guess as to how the

research costs were calculated.  In reviewing this submission, the Court notes several issues.

    First, it is unclear what each "Narrative" refers to; while these entries seem to refer to the

---

[60]The Court is particularly troubled by the lack of contemporaneous records in this case,
as Fawcett's proposed hours appear significantly higher than would be expected: for example,
he has allegedly billed 62 hours for "providing factual information for the Complaint," and 69
hours for "factual back-up for various Court filed briefs."  (Fawcett Aff. ¶¶ 17-18).  Given that
these figures seem unreasonably high, the Court is reticent to award any fees without proof that
these hours were actually spent on the case.

[61]Citations to "Trans. Listing" refer to the Transactions Listing attached as Exhibit 1 to
the Supplemental Affirmation of James P. Kreindler, filed on July 23, 2015.

actual activities conducted through the respective services of Westlaw and Lexis, the Court cannot understand what is encompassed by "WESTLAW Communication" as opposed to "WESTLAW Connect" or "WESTLAW Database - Time." (Id.) Second, the Court is unable to determine what the "Units" column is meant to measure, although the values contained therein vary between 0.0842 and 5,879.0000. (Compare id. at 2, with id. at 4). Finally, the Court does not understand why entries flagged with the same "Narrative" marker appear to have vastly different prices, despite the fact that the "Units" entries are comparable. For example, it appears that on October 8, 2010, an activity flagged as "WESTLAW Database - Time" was marked for 0.9567 "Units," and lists a "Price" of $149.37. (Id. at 1) On October 14, 2010, however, another entry flagged "WESTLAW Database - Time" was marked for 1.1128 "Units," but lists a "Price" of $294.46. (Id.)

Counsel's submitted document is rife with such ambiguities and inconsistencies and thus, the Court is not in a position to evaluate the reasonableness of the proposed research costs beyond mere conjecture. Accordingly, the Court respectfully recommends that counsel's requests for these costs be denied.

In total, therefore, the Court respectfully recommends that plaintiff's counsel's requests for costs associated with this litigation be denied in its entirety, save the $400.00 filing fee, for counsel's failure to provide sufficient legal authority for such an award under the ATA, and for counsel's failure to provide intelligible records demonstrating entitlement to the requested amounts.

75

CONCLUSION

In light of the foregoing, the Court respectfully recommends that plaintiffs' third motion for default judgment be denied at this time in the absence of evidence that the Amended Complaint or the motion papers themselves were properly served. The Court further recommends that the claims of plaintiffs Shimon Rosenberg, Nachman Holtzberg, Moses Shvarzblat, Maribeth Jeswani, Emunah Chroman, and Autumn Gilles be dismissed in their entirety due to counsel's failure to properly plead their claims in the Amended Complaint or file letters testamentary where necessary, and that any of plaintiffs' claims which arise under the Alien Tort Statute be dismissed for a lack of subject matter jurisdiction in the wake of the Supreme Court's decision in Kiobel v. Royal Dutch Petroleum Co. Finally, the Court recommends that the Amended Complaint be dismissed with respect to defendants Iqbal and Ali in light of plaintiffs' failure to respond to this Court's concerns about qualified immunity.

However, the Court recommends that plaintiffs be given another chance to file a Second Amended Complaint, this time properly alleging harm with respect to each plaintiff/decedent. Plaintiffs should also be directed to properly serve the Second Amended Complaint and the corresponding motion for default judgment and damages, providing receipts for all service. Finally, plaintiffs should be directed to file all necessary letters testamentary establishing the named plaintiffs' standing to sue on behalf of decedent estates.

Should the district court choose to overlook the numerous procedural defects addressed herein, however, the Court would respectfully recommend that plaintiffs' motion for default judgment be granted only as to plaintiffs Varagona, Ragsdale, and Scherr. The Court would respectfully recommend that plaintiff Varagona be awarded $7,976,524.80, plaintiff Ragsdale be

76

awarded $6,281,358.00, and plaintiff Scherr be awarded $66,123,403.20, pursuant to the treble damages provisions of the ATA, and that all other requests for damages be denied. Finally, the Court would recommend that plaintiffs' counsel's request for costs associated with this action be denied in its entirety save an award of $400.00 representing the filing fee in this district, due to counsel's failure to comply with this Court's previous directives to properly document the claimed expenses.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(d), 72; Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail. Plaintiffs are directed to mail a copy of this Report and Recommendation promptly by certified mail, return receipt requested, to 4 Lake Road, Chauburji, Lahore, Pakistan, and to provide the Court with copies of the return receipts.

**SO ORDERED**.

Dated: Brooklyn, New York
      July 5, 2016

/s/ Cheryl L. Pollak

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

77